**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| LEX CLAIMS, LLC, | |
| JACANA HOLDINGS I LLC, | |
| JACANA HOLDINGS II LLC, | |
| JACANA HOLDINGS III LLC, | Case No. 1:16-cv-____ (___) |
| JACANA HOLDINGS IV LLC, | |
| JACANA HOLDINGS V LLC, | |
| MPR INVESTORS LLC, | |
| ROLSG, LLC, | |
| RRW I LLC, | |
| -and- | |
| SL PUERTO RICO FUND II L.P., | |
| Plaintiffs, | |
| v. | |
| ALEJANDRO GARCÍA PADILLA, in his official capacity as Governor of the Commonwealth of Puerto Rico, | **COMPLAINT** |
| JUAN ZARAGOZA GOMEZ, in his official capacity as Secretary of the Treasury of the Commonwealth of Puerto Rico, | |
| -and- | |
| LUIS CRUZ BATISTA, in his official capacity as Director of the Office of Management and Budget of the Commonwealth of Puerto Rico, | |
| Defendants. | |

Plaintiffs Lex Claims, LLC, Jacana Holdings I LLC, Jacana Holdings II LLC, Jacana

Holdings III LLC, Jacana Holdings IV LLC, Jacana Holdings V LLC, MPR Investors LLC,

ROLSG, LLC, RRW I LLC, and SL Puerto Rico Fund II, L.P. for their Complaint against

Defendants Alejandro García Padilla, in his official capacity as Governor of the Commonwealth of Puerto Rico; Juan Zaragoza Gomez, in his official capacity as Secretary of the Treasury of the Commonwealth of Puerto Rico; and Luis Cruz Batista, in his official capacity as Director of the Office of Management and Budget of the Commonwealth of Puerto Rico, allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This is an action for declaratory and injunctive relief under Section 204(c)(3) of the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. 114-187 ("PROMESA" or the "Act").  PROMESA authorizes the establishment of a Financial Oversight and Management Board (the "Oversight Board" or the "Board") to address Puerto Rico's fiscal condition and related issues (PROMESA § 101) and simultaneously imposes a stay on certain litigation by Puerto Rico's creditors (PROMESA § 405).  Recognizing that appointment of the Board according to the statutorily prescribed process cannot be accomplished instantaneously, the Act prohibits Puerto Rico from taking certain action after enactment but before the Board is appointed and operating.

2.      More particularly, Section 204(c)(3), titled "PROHIBITION ON ACTION UNTIL OVERSIGHT BOARD IS APPOINTED," provides that, "[d]uring the period after a territory becomes a covered territory and prior to the appointment of all members and the Chair of the Oversight Board," Puerto Rico "shall not enact new laws that either permit the transfer of any funds or assets outside the ordinary course of business or that are inconsistent with the constitution or laws of the territory as of the date of enactment of this Act."  A manifest purpose of this provision is to prohibit Puerto Rico from capitalizing on the stay on certain bondholder litigation by enacting laws that siphon money away from creditors—especially those that are protected under the Puerto Rico Constitution—before the Board is operational.

2

3.      Plaintiffs are beneficial owners of substantial amounts of the bonds that are explicitly protected by Puerto Rico's Constitution, and are therefore protected by PROMESA Section 204(c)(3).  Those constitutionally protected bonds fall into two categories: (i) the Commonwealth's general obligation bonds ("GO Bonds"), which were issued by the Commonwealth and are protected and secured by a first lien on all available resources of the Commonwealth and backed by a pledge of the Commonwealth's good faith, credit, and taxing power; and (ii) bonds issued by certain of the Commonwealth's public corporations and guaranteed by the same first lien and pledge by the Commonwealth ("GO-Guaranteed Bonds"). Together, these bonds are known as the "Constitutional Debt" because they are—alone among Puerto Rico's obligations—expressly protected under Article VI of the Puerto Rico Constitution.

4.      The Puerto Rico Constitution is explicit in this regard.  Section 8 of Article VI of the Puerto Rico Constitution provides that if Puerto Rico's "available resources" are insufficient to meet all of its desired spending, "***interest on the public debt and amortization thereof shall first be paid***, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. Const. Art. VI, Sec. 8 (emphasis added).  This promise of first priority (the "Constitutional Debt Priority Guarantee") unambiguously requires Puerto Rico to pay Constitutional Debt ahead of any other expenditure.   Indeed, when Puerto Rico approached the capital markets in late 2013 to issue additional GO Bonds, Governor García Padilla acknowledged that "[o]ur Constitution gives first priority over all revenues to payments on our general obligation debt," and pledged that Puerto Rico's government would "do everything necessary for Puerto Rico to honor all of its commitments."  *See* Ex. A.  As recently as June 29, 2016, Governor García Padilla again acknowledged that "general obligation bonds" are "the island's senior credits protected by a constitutional lien on revenues."  *See* Ex. B ¶ 9.

3

5.     Despite this crystal-clear constitutional guarantee and PROMESA's equally explicit prohibition on new measures that violate Puerto Rico's laws or constitution or permit transfers "outside the ordinary course of business," PROMESA § 204(c)(3), Puerto Rico has undertaken extraordinary measures in flagrant disregard of the Constitutional Debt Priority Guarantee.  Indeed, within hours of PROMESA's enactment, Puerto Rico commenced a series of actions doing exactly what Section 204(c)(3) of PROMESA was designed to prevent.

6.     First, Governor García Padilla issued Executive Order 2016-30, which relied on a Puerto Rico statute that was *preempted* by PROMESA (*see* PROMESA § 303).  That order violated the Constitution by declaring a moratorium on the Commonwealth's obligation to repay its Constitutional Debt, despite (by the Commonwealth's own admission) having hundreds of millions of dollars in cash on hand and "available to pay GO and Commonwealth-guaranteed indebtedness" (*see* Ex. C ¶ 3), and despite having "clawed back" almost $300 million of cash that had been earmarked for the payment of debt service by other entities *for the express purpose of paying Constitutional Debt.*

7.     Second, the Commonwealth enacted a budget for Fiscal Year 2017 that does not purport to pay Constitutional Debt, yet makes huge transfers outside the ordinary course of business and diverts vast resources to purposes that apparently enjoy political favor but are indisputably junior to Constitutional Debt.  This includes outsized contributions to Puerto Rico's public employee pension systems of approximately $800 million—which is roughly $150 million more than the Commonwealth appropriated last year—and legislation currently on the Governor's desk would increase that amount by at least $170 million.  The Fiscal Year 2017 budget also diverts approximately $250 million from the general fund to prop up the insolvent

Government Development Bank ("GDB") or to replace certain GDB functions—and, again, pending legislation would increase that amount by $115 million.

8.      These and other actions plainly are transfers "outside the ordinary course of business" and are "inconsistent with the constitution or laws" of Puerto Rico.  PROMESA § 204(c)(3).      Accordingly, Plaintiffs seek declaratory relief under Section 204(c)(3) of PROMESA invalidating the Commonwealth's efforts to violate its constitutional and legal obligations to Constitutional Debt.  Plaintiffs also seek limited injunctive relief to reverse the effects of the most egregious measures and transfers described in this Complaint.  To be clear, this lawsuit does not seek to compel payment on Plaintiffs' bonds; rather, it seeks to prevent the Commonwealth from unlawfully dissipating these assets before the Oversight Board is fully operational.

## PARTIES

9.      Plaintiffs Lex Claims, LLC, Jacana Holdings I LLC, Jacana Holdings II LLC, Jacana Holdings III LLC, Jacana Holdings IV LLC, Jacana Holdings V LLC, MPR Investors LLC, ROLSG, LLC, RRW I LLC, and SL Puerto Rico Fund II L.P. are the beneficial owners of a substantial amount of Constitutional Debt, including both GO Bonds and GO-Guaranteed Bonds.

10.      Defendant Alejandro García Padilla is Governor of the Commonwealth of Puerto Rico and is being sued in his official capacity.

11.      Defendant Juan Zaragoza Gomez is Secretary of the Treasury of the Commonwealth of Puerto Rico and is being sued in his official capacity.

12.      Defendant Luis Cruz Batista is Director of the Office of Management and Budget of the Commonwealth of Puerto Rico and is being sued in his official capacity.  Pursuant to 23

L.P.R.A. § 104(c), Defendant Governor García Padilla may delegate certain authority for implementing payment priorities to Defendant Cruz.

13.     Defendants are responsible for implementing the unlawful measures identified in this Complaint and for ensuring that the Commonwealth complies with its legal and constitutional obligations when setting and following fiscal priorities.

## JURISDICTION AND VENUE

14.     This action arises under Section 204(c)(3) of PROMESA, which was signed into law on June 30, 2016; 42 U.S.C. § 1983; and 28 U.S.C. §§ 2201, 2202.  If the Court were to determine that PROMESA's stay provisions applied to this action (contra ¶ 64, *infra*), this action would also arise under Section 405(e) of PROMESA, which grants the district court jurisdiction to consider requests to lift the stay for cause.  This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3).

15.     Venue is proper in this district pursuant to Section 106(a) of PROMESA, which provides that "any action . . . arising out of this Act, in whole or in part, shall be brought in a United States district court for the covered territory."

## FACTUAL ALLEGATIONS

I.     **Puerto Rico's Strategy Of Default And Federal Intervention**

    A.     **Puerto Rico's First Choice: "Super" Chapter 9**

16.     On June 29, 2015, Defendant Governor García Padilla delivered a television address in which he declared that Puerto Rico's debt is "unpayable" and that "Puerto Rico does not today have the capacity to continue paying under the actual terms" of its debt.  He went on to assert that bondholders must accept a "sacrifice" and that Puerto Rico should not be "force[d] to choose" between paying bondholders and competing financial priorities.

17.     Those threats were a prelude to Puerto Rico's primary strategy.  Over the next twelve months, Puerto Rico spent many tens of millions of dollars on advisors and lobbyists who urged the Commonwealth not to honor its Constitutional Debt (or most of its other debt), but instead to seek shelter in federal legislation.

18.     Notably, Puerto Rico *resisted* federal legislation that would have made Puerto Rico eligible to invoke the traditional federal restructuring regime for municipal debt set forth in Chapter 9 of the federal Bankruptcy Code.  Instead, Puerto Rico sought unprecedented federal legislation colloquially referred to as "*Super* Chapter 9," which would have allowed Puerto Rico to retain control over its fiscal affairs and to put all of its debt—beyond what would be permitted for any of the 50 States eligible to authorize their municipalities to access Chapter 9—into a federal bankruptcy regime.  Congress proved unwilling to enact Super Chapter 9.

**B.      PROMESA**

19.     Instead, Congress passed PROMESA, and the President signed it into law on June 30, 2016.  PROMESA imposes a much more restrictive set of compromises and conditions than Puerto Rico had sought.  The law spans some 68 sections, many of which incorporate further statutory provisions (largely from the federal Bankruptcy Code).  It is not necessary to set forth all of those detailed provisions here; for present purposes, it suffices to describe three main features of the Act.

### *1.      The Oversight Board*

20.     First, the Act imposes the Oversight Board "to provide a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets."  PROMESA § 101(a).  To that end, the Act grants the Board significant powers over Puerto Rico's budgeting and expenditures,

seeking to reverse years of mismanagement, waste, and a lack of transparency in the Commonwealth's finances.  *Id.* § 104.

21.    The Act simultaneously blocks Puerto Rico from attempting to impose a restructuring regime, declare a moratorium on debt payments, or otherwise impair creditors' lawful priorities.  As relevant here, Section 303(1) of PROMESA provides that "a territory law prescribing a method of composition of indebtedness or a moratorium law . . . may not bind any creditor of a covered territory or any covered territorial instrumentality thereof that does not consent to the composition or moratorium."  Section 303(3) further provides that "unlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory, shall be preempted by this Act."

22.    The Oversight Board will "consist of seven members appointed by the President" of the United States according to a statutorily prescribed procedure.  *Id.* § 101(e)(1)(A).  That process includes provisions designed to promote the prompt appointment of Oversight Board members (*see, e.g.*, *id.* § 101(e)(2)(G)), but there is no set date by which the Oversight Board must be fully constituted.  At present, none of the Oversight Board's members has been appointed.

23.    The Act also contemplates the selection of an Executive Director and certain advisors and staff to the Oversight Board.  *Id.* § 103.  Given the significant duties of the Oversight Board—not to mention the disarray that pervades the Commonwealth's financial reporting—the Board and its staff will require some period of time after appointment to be fully functional.  At present, no Executive Director has been named, nor has any staff been hired.

### 2.    *A Stay On Certain Bondholder Litigation*

24.    Section 405 of PROMESA stays certain bondholder litigation and other actions relating to Puerto Rico's debt.  The purpose of the stay was, in essence, to preserve the status quo until the Oversight Board became fully operational.  The stay took effect immediately upon PROMESA's enactment.  As principally relevant here, the Act imposes a stay on

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the Government of Puerto Rico that was or could have been commenced before the enactment of this Act, or to recover a Liability Claim against the Government of Puerto Rico that arose before the enactment of the Act.

*Id.* § 405(b)(1).

25.    The Act defines a "Liability" to include

> a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness for borrowed money, including rights, entitlements, obligations whether such rights, entitlements, or obligations arise from contract, statute, or any other source of law related to such a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness . . . of which—
>
>> (A) the issuer, obligor, or guarantor is the Government of Puerto Rico; and
>>
>> (B) the date of issuance or incurrence precedes the date of enactment of this Act.

*Id.* § 405(a)(1).

26.    The Act defines a "Liability Claim" to mean

> as it relates to a Liability—
>
>> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>>
>> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

*Id.* § 405(a)(2).

27.    The Act provides that relief from the stay may be granted under certain circumstances.  *See, e.g., Id.* § 405(e)(2) ("cause"); *id.* § 405(g) ("irreparable damage").

28.    Accordingly, by preventing bondholders from suing to "recover a Liability Claim against the Government of Puerto Rico," *id.* § 405(b)(1), the stay provision quoted above operates to prevent bondholders from suing for payment.  The potential for mischief is palpable: With bondholders unable to sue for payment, the Commonwealth could attempt to divert resources toward more politically popular interests, even if doing so violates existing legal requirements.  That would be the exact opposite of the preservation of the status quo that the stay was intended to protect.

29.    This lawsuit does not seek payment on Plaintiffs' bonds.  To be clear, however, Plaintiffs do not concede the validity of PROMESA's stay provisions, or any other provision that impairs in any way the rights of holders of Constitutional Debt, and Plaintiffs reserve the right to challenge any and all such provisions in due course.

> ***3.***    ***PROMESA Expressly Prohibits Puerto Rico From Exploiting The Stay On Litigation After Enactment Of PROMESA But Before The Oversight Board Is Appointed***

30.    Recognizing that there would be some period of time after the stay took effect but before appointment of the Oversight Board and its Chair, PROMESA severely restricts Puerto Rico's ability to take certain action that would impair its creditors (and, in particular, holders of Constitutional Debt).  To that end, Section 204(c)(3)(A) of the Act declares that Puerto Rico

> shall not enact new laws that either permit the transfer of any funds or assets outside the ordinary course of business or that are inconsistent with the constitution or laws of the territory as of the date of enactment of this Act, provided that any executive or legislative action authorizing the movement of funds or assets during this time period may be subject to review and rescission by the Oversight Board upon appointment of the Oversight Board's full membership.

10

31.     This section addresses Congress's concern that Puerto Rico might seek to exploit bondholders' inability to sue for payment before the Oversight Board is operational to siphon money away from (among others) bondholders protected by the Puerto Rico Constitution.  As noted above and described in further detail below, Constitutional Debt (including bonds held by Plaintiffs) is, alone among the various categories of debt, expressly granted top priority over all other expenditures by Article VI of the Puerto Rico Constitution.  Section 204(c)(3) thus preserves the Commonwealth's assets from efforts by Puerto Rico to pursue its own political preferences, rather than the requirements established and respected by PROMESA for a budget and fiscal plan subject to approval by the Oversight Board.  *See id.* §§201-212.

32.     Section 204(c)(3)(A) accordingly serves to protect the interests of bondholders whose lawsuits to recover payment may be stayed by other provisions of PROMESA and who stand to be injured (directly or otherwise) by the Commonwealth's efforts to divert resources before the Oversight Board is fully operational.  Those protected creditors include holders of Constitutional Debt, including the Plaintiffs in this action.

33.     Section 204(c)(3)(B) of the Act further grants the Oversight Board power to "review, and in its sole discretion, rescind, any law that—(i) was enacted during the period between . . . May 4, 2016, and the date of appointment of all members and the Chair of the Oversight Board" and "(ii) alters pre-existing priorities of creditors in a manner outside the ordinary course of business or inconsistent with the territory's constitution or the laws of the territory as of . . . May 4, 2016."

## II.     Puerto Rico's Constitutional Debt

34.     Section 204(c)(3)'s prohibition on constitutional violations is aimed directly at protecting holders of the Constitutional Debt.  The Constitutional Debt is set apart from all other debt issued by the Commonwealth and related entities by a series of contractual, statutory, and constitutional promises that ensure that the payments on Constitutional Debt are made promptly when due and, critically, *before* Puerto Rico's expenditures for all other purposes.

35.     The Commonwealth currently has approximately $12.5 billion in principal amount of GO Bonds outstanding.  The Commonwealth has pledged its good faith, credit, and taxing power for the timely payment of principal and interest on these GO Bonds, a pledge that represents an absolute and enforceable obligation to pay the GO Bonds when due, including by raising taxes if necessary to do so.

36.     In addition, Puerto Rico has pledged its good faith, credit, and taxing power to guarantee timely payment on approximately $5.8 billion in additional GO-Guaranteed Bonds.  In the event that the issuing entities fail to make payments on the GO-Guaranteed Bonds, the Commonwealth's guarantee represents an absolute and enforceable obligation to make those payments, including by raising taxes if necessary to do so.

37.     The total amount of Constitutional Debt protected and secured by the Constitutional Debt Priority Guarantee is less than $18.3 billion (although that amount is increasing because of the July 1, 2016, non-payment)—as noted above, this amounts to only a portion of the $70 billion figure that Puerto Rico has repeatedly asserted as its total debt load (which figure includes debts not only of the Commonwealth but also of its public corporations, instrumentalities, and municipalities).

38.     The Commonwealth's Constitutional Debt is "public debt" within the meaning of the Puerto Rico Constitution, and is therefore entitled—in addition to the good faith, credit, and taxing power pledge—to the highest priority among all of Puerto Rico's expenditures.  Section 8 of Article VI provides that if Puerto Rico's "available resources" are insufficient to fund all of its desired spending, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. Const. art. VI, § 8.  (The English version of Puerto Rico's Constitution refers to "available revenues," but, as the Commonwealth itself has acknowledged, the word used in the corresponding Spanish text—"recursos"—is more aptly translated as "resources." *See, e.g.*, Official Statement for Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A, at p. 28.  That phrasing underscores Puerto Rico's commitment to tap all of its financial resources—whether or not they may be described as revenues—to make the required payments on its Constitutional Debt.)  Accordingly, Constitutional Debt has a first claim and lien on all available resources of the Commonwealth.

39.     For decades, the absolute priority of Constitutional Debt has been further recognized in the Puerto Rico statute that defines the remaining "order of priorities" mentioned in Article VI, Section 8 of the Puerto Rico Constitution.  That statute, 23 L.P.R.A. § 104(c), recognizes that Constitutional Debt must be paid first above all other expenditures, even (and especially) when resources are scarce.  "In keeping with Section 8, Article VI," the statute provides a hierarchy of priorities governing the "disbursement of public funds . . . when resources available for a fiscal year are insufficient to cover the appropriations made for that year."  One—and only one—category is given the highest priority:  "[T]he payment of interest and amortizations corresponding to the public debt."  (Puerto Rico attempted to modify Section

104(c) earlier this year, but that act and any executive order seeking to implement it are preempted by Section 303 of PROMESA. *See* ¶ 21, *supra*.)

40.     In addition to the guarantee of first priority for Constitutional Debt set forth in Article VI, Section 8, the Puerto Rico Constitution provides further safeguards that function to ensure full and timely payment of Constitutional Debt in times of financial hardship.

41.     For example, Article VI, Section 6 of the Puerto Rico Constitution, states:

> If at the end of any fiscal year the appropriations necessary for the ordinary operating expenses of the government *and for the payment of interest on and amortization of the public debt* shall not have been made, the several sums appropriated in the last appropriation acts for the objects and purposes therein specified, so far as the same may be applicable, shall continue in effect item by item, and *the Governor shall authorize the payments necessary* for such purposes until corresponding appropriations are made.

(Emphasis added).  This provision thus ensures that if the government does not appropriate funds for the payment of interest and principal on the public debt when due, such payments will nonetheless be automatically appropriated.  That protection is reinforced by the Puerto Rico statutes authorizing issuance of Constitutional Debt, which have provided continuous appropriations to fund debt service on the issued bonds.  *See, e.g.*, 13 L.P.R.A. §§ 37, 38.

42.     Article VI, Section 2 of the Puerto Rico Constitution provides an additional protection for holders of Puerto Rico's public debt by limiting the Commonwealth's capacity to incur debt with this first-priority status, thus ensuring that the Commonwealth will retain the capacity to honor its Constitutional Debt Priority Guarantee.

43.     There is, in short, no serious dispute that the Puerto Rico Constitution and laws such as 23 L.P.R.A. § 104(c) grant Constitutional Debt absolute and highest priority among all of Puerto Rico's expenses.  Accordingly, PROMESA's prohibition on new measures that violate Puerto Rico's Constitution and laws are aimed squarely at Constitutional Debt.  The Act

therefore prohibits Puerto Rico from taking action after PROMESA's enactment that would divert resources away from Constitutional Debt.

### III. Immediately Upon PROMESA's Enactment, Puerto Rico Violated Section 204(c)(3)

44.     Within hours of PROMESA's enactment, Puerto Rico violated Section 204(c)(3). As explained below, Puerto Rico immediately embarked on a systematic plan to default on and impair Constitutional Debt while paying certain other, lower-priority obligations, and to divert resources to politically preferred purposes.  These actions were "outside the ordinary course of business" and in direct violation of Puerto Rico's laws and Constitution—exactly what PROMESA Section 204(c)(3) was designed to prevent.

### A.     Puerto Rico Deliberately And Needlessly Defaulted On Constitutional Debt Despite Holding Hundreds Of Millions Of Dollars In Cash That Was Expressly Earmarked For Payment Of Constitutional Debt

45.     The first such action was Executive Order 2016-30 ("EO 2016-30"), which Governor García Padilla issued on June 30, 2016, almost immediately after the President signed PROMESA into law.  *See* Ex. D.  EO 2016-30 directly violates the Puerto Rico Constitution by announcing a moratorium on the Commonwealth's obligation to repay its Constitutional Debt, even while the Commonwealth continued to spend funds for other purposes and had hundreds of millions in cash on hand that were required by law to be devoted to payment of the Constitutional Debt.

46.     EO 2016-30 relied on "Act 21-2016, as amended, known as the 'Puerto Rico Emergency Moratorium and Rehabilitation Act.'"  That legislation purported to give Governor García Padilla authority to declare a payment moratorium on certain debt payments by declaring a "state of emergency" via executive order.  Act 21-2016 § 102.  That legislation and EO 2016-30 are plainly foreclosed and preempted by Section 303 of PROMESA.  *See* ¶ 21, *supra*. Despite its clear legal duty to pay Constitutional Debt in full, on July 1, 2016, Puerto Rico

defaulted on approximately $817 million due on its Constitutional Debt—almost the entirety of what it owed.

47.    Puerto Rico's decision to choose near-total default on these bonds was not only clearly illegal under both the Constitution and PROMESA, it was also unnecessary.  As Puerto Rico's GDB has acknowledged, the Commonwealth had $200 million in its operating account when the July 1 payment came due—funds that even the Commonwealth must concede constitute "available resources" that could, and should, have been used to pay Constitutional Debt.  Indeed, in the press release announcing the default, the GDB openly admitted that there were hundreds of millions of dollars in cash on hand "available to pay GO and Commonwealth-guaranteed indebtedness expected to be payable on July 1."  Ex. C ¶ 3.  The Commonwealth simply chose not to follow its legal duty to pay Constitutional Debt, apparently preferring to divert that cash to other purposes.

48.    What is more, the Commonwealth decided not to devote even a single cent (outside of two issue-specific reserve accounts) to GO Bonds even though the Commonwealth had clawed back hundreds of millions of dollars in revenue conditionally earmarked for the payment of other debt, *for the express purpose of paying Constitutional Debt*.   The Commonwealth's recent (and long overdue) financial disclosures state that the Commonwealth clawed back $289 million during the second half of Fiscal Year 2016.  Roughly half of these funds have purportedly been deposited with the insolvent GDB, where the Commonwealth has chosen to restrict withdrawals.  Approximately $150 million more was, by the GDB's admission, being held at a commercial bank and was indisputably available for the July 1 payment.  *See* Ex. C ¶ 3.  As the Commonwealth previously recognized in executive orders initiating the clawback of the earmarked revenue, these funds *must* be devoted to the payment of the public

debt.  *See, e.g.,* Ex. E, point "Third" (providing that clawed back funds "shall be kept in a separate account and shall be used only to make public debt payments as they become due").

49.     At the same time as the Commonwealth chose near-total default on its Constitutional Debt, hundreds of millions of dollars were paid to other, lower-priority obligations.  Those include (to name but a few examples) payments on bonds issued by the Puerto Rico Highways and Transportation Authority, the Puerto Rico Convention Center District Authority, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and $200 million on June 30, 2016, in payment of certain tax and revenue anticipation notes.   Those payments were in addition to billions of dollars that the Commonwealth spent on other purposes that are junior to Constitutional Debt over the months leading up to its July 1 default on its Constitutional Debt.  Choosing to default on Constitutional Debt, having made these other, lower-priority payments, plainly violated the express terms of the Puerto Rico Constitution and 23 L.P.R.A. § 104(c)—and thereby violates Section 204(c)(3)(A) of PROMESA as well.

50.     To be clear, there was no basis for even a partial default on Constitutional Debt. The Commonwealth's Fiscal Year 2016 budget included a full appropriation for the July 1 payments; if the Commonwealth lacked the funds necessary to make this payment, that is due to Puerto Rico's failure to manage expenditures as necessary to respect Constitutional Debt's absolute priority.   *See also* 23 L.P.R.A. § 104(d)(1) (requiring mid-year adjustment of appropriations if necessary so that priorities set forth in 23 L.P.R.A. § 104(c) can be respected).

**B.     Puerto Rico Enacted A Fiscal Year 2017 Budget That Fails To Pay Constitutional Debt In Full, Despite Clawing Back Revenue Expressly Designated For That Purpose, And Diverts Massive Resources To Politically Preferred Uses**

51.     Puerto Rico's first violation of Section 204(c)(3) was compounded by a second series of violations resulting from the Commonwealth's recently passed general fund budget for Fiscal Year 2017.  That budget devotes zero dollars to Constitutional Debt.  Related legislation (H.B. 2959), which the Governor has yet to sign, would devote at most $451 million to payment of Constitutional Debt—just 31 percent of what is required to fund the payments due over the course of the year (to say nothing of the payments missed on July 1, 2016).  And H.B. 2959 would simultaneously make still further extraordinary diversions of resources to expenses that are indisputably junior to Constitutional Debt.  All of this is well outside the "ordinary course of business" and flouts the Puerto Rico Constitution, which expressly requires appropriations for full payment of Constitutional Debt.

52.     However, Puerto Rico's violations of its Constitution (and hence PROMESA) go far beyond not appropriating for and paying the Constitutional Debt in full.  For starters, approximately $412 million in funds to be clawed back in Fiscal Year 2017 from other entities for the express purpose of funding payments on Constitutional Debt will be diverted to other purposes.  (This spending spree may be expanded to include $289 million of the funds clawed back during Fiscal Year 2016 for purposes of paying the Constitutional Debt—money that appears to be unaccounted for.)

53.     This double-speak—clawing back money for the purpose of paying Constitutional debt, but then refusing to pay the Constitutional Debt—is emblematic of the Commonwealth's refusal to use the tools at its disposal to respect the Constitution.  All told, there is approximately $863 million in annual revenue that is, by the express terms of the relevant documents, subject to

claw back if necessary to pay Constitutional Debt.  Interest expense on the Constitutional Debt is very near to that amount.  To respect the Constitution (at least in large part), Puerto Rico would simply need to exercise the claw back rights and then follow its legal duty to use those funds to pay the Constitutional Debt.  Instead, the Commonwealth has invoked claw back rights that can be used only to *protect* Constitutional Debt, yet simultaneously *refuses* to make full payment on that debt.  The Commonwealth's hypocrisy defies explanation and flouts the rule of law.  There is no lawful justification for diverting clawed back revenue to any purpose except payment of Constitutional Debt.

54.    Adding insult to constitutional injury, the budget contemplates an *increase* of more than $500 million in non-debt service spending.  In other words, even as the Commonwealth claims that it lacks sufficient funds to pay its Constitutional Debt, it plans additional spending for other purposes.

55.    Governor García Padilla has attempted to justify the decision to default by contending that essential services must be prioritized above payments to bondholders.  As a legal matter, that contention is demonstrably wrong.  As explained above, the Commonwealth's Constitution and laws prioritize payment of GO Bonds over even what the Commonwealth may characterize as essential services.

56.    Even if it were not patently unconstitutional and unlawful, Defendant Governor García Padilla's position cannot justify the Fiscal Year 2017 budget, which includes more than $1 billion in spending for purposes that cannot, by any stretch of the imagination, be described as "essential."  These include, to list but a few examples: approximately $250 million devoted to financing the insolvent GDB and assuming certain of its functions (plus another $115 million if the Governor signs a pending bill, P.S. 1575); approximately $800 million in pension funding

(which is $150 million *more* than the Commonwealth contributed last year, and which would jump by at least another $170 million under H.B. 2959); subsidies of more than $800 million to the University of Puerto Rico (to maintain artificially low tuition rates well below what comparable state universities in fiscally balanced States charge); and a number of other smaller appropriations—such as $2.5 million to fund the Office of the First Lady, and $1.2 million for "development of high performance Puerto Rican athletes." The spending decisions reflected in the budget are simply political calculations in clear violation of Puerto Rico's unambiguous legal duties under PROMESA, the Puerto Rico Constitution, and related laws.

*       *       *

57.    The actions detailed above are just some of the more obvious examples of the Commonwealth's effort to violate its Constitution in the wake of PROMESA. Given the Commonwealth's woefully inadequate financial reporting and the disturbing lack of transparency in the government's operations, further violations will no doubt come to light in the days and weeks ahead and may require further legal action.

**FIRST CAUSE OF ACTION**
**Declaratory and Injunctive Relief**
**PROMESA § 204(c)(3); 42 U.S.C. § 1983; 28 U.S.C. § 2201(a)**

58.    Plaintiffs re-allege and incorporate paragraphs 1–57 above.

59.    The Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, states that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Plaintiffs seek a declaration that the Commonwealth's conduct described above violates Section 204(c)(3) of PROMESA.

60.     Defendants have violated Section 204(c)(3) by implementing new laws and measures having the force of law that "permit the transfer of . . . funds or assets outside the ordinary course of business" and "that are inconsistent with the constitution or laws" of Puerto Rico as of PROMESA's enactment.  These actions have caused direct and substantial injury to Plaintiffs, and, if left unremedied, will continue to cause further direct and substantial injury to Plaintiffs.

61.     Section 204(c)(3)(A) grants Plaintiffs a right to enforce the requirements of that provision against Defendants.  Creditors protected by the laws and Constitution of Puerto Rico are directly injured by the dissipation of assets in violation of Section 204(c)(3).  That is particularly true for holders of Constitutional Debt, including Plaintiffs, who alone among creditors are protected by the clear rights established in Article VI of the Puerto Rico Constitution.

62.     Moreover, because the Oversight Board does not yet exist during this interim period, enforcement of this provision necessarily falls to Puerto Rico's creditors such as Plaintiffs.  While the Oversight Board maintains certain rights of rescission with respect to violations of 204(c)(3), until the Board is constituted and operational only private enforcement can prevent the Commonwealth or others from later arguing that the unlawful results of these measures cannot, as a legal or practical matter, be fully unwound.  Private enforcement is thus consistent with—indeed, it is absolutely necessary to—full and proper functioning of PROMESA's scheme of rights and remedies.

63.     The actions described above deprive Plaintiffs of rights, privileges, and immunities secured by the laws of the United States, including Section 204(c)(3) of PROMESA.

The actions do so under color of law of the territory of Puerto Rico.  Accordingly, Defendants' conduct adopting, applying, or enforcing these measures violates 42 U.S.C. § 1983.

64.     This lawsuit is not stayed by PROMESA.  As described above, the relevant stay provisions under Section 405 of PROMESA apply to claims seeking to enforce certain creditors' "right to payment" (PROMESA § 405(a)(2)(A)) or "an equitable remedy for breach of performance if such breach gives rise to a right to payment" (*id.* § 405(a)(2)(B)).  Although Plaintiffs fully reserve all legal and equitable rights—including the right to challenge the validity of PROMESA, including (but not limited to) its stay provisions—this lawsuit does not seek relief that would violate the stay.  This lawsuit does not seek to compel payment of Constitutional Debt; rather, it seeks a declaration that Puerto Rico has violated PROMESA's prohibition on new measures authorizing transfers "outside the ordinary course of business" and violating Puerto Rico's Constitution and laws.

65.     Plaintiffs also seek a narrowly tailored injunction segregating and preserving assets affected by several of the most egregious violations of PROMESA Section 204(c)(3). Plaintiffs do not concede that such relief reflects the full scope of their legal rights (or even reflects all of the unlawful measures identified above), because Constitutional Debt is senior to *all* expenditures of the Commonwealth's available resources.  The requested injunctive relief, however, would afford at least partial protection from the Commonwealth's most flagrant dissipation of assets.  Accordingly, the requested injunction seeks to preserve the funds transferred (or to be transferred) by these extraordinary, unconstitutional, and unlawful measures until the Oversight Board is appointed, fully operational, and has made a determination as to the propriety of these measures.  More particularly, Plaintiffs seek an injunction:

a.      requiring the Defendants, in their official capacities as Commonwealth officers, to segregate and preserve all funds clawed back, to be clawed back, or available to be clawed back under contractual and legal provisions expressly acknowledging that those funds are subject to turnover for purposes of paying of Constitutional Debt;

b.      prohibiting the Defendants, in their official capacities as Commonwealth officers from implementing the outsized transfers to the public employee pension funds contemplated in the Fiscal Year 2017 budget and limiting the Commonwealth to the contribution it made in Fiscal Year 2016; and

c.      prohibiting the Defendants, in their official capacities as Commonwealth officers, from implementing the diversion to the insolvent GDB the approximately $250 million contemplated by the Fiscal Year 2017 budget, or such other amounts (such as those allocated in pending legislation).

66.     The requested injunctive relief would not require payment to be made to Plaintiffs, but would forbid Defendants from transferring funds or assets pursuant to those laws found to violate PROMESA Section 204(c)(3) and to preserve those assets until such time as the Oversight Board is fully operational.  Plaintiffs currently lack an adequate remedy at law; the Commonwealth will otherwise dissipate these and other assets and then claim that it lacks funds sufficient to pay Constitutional Debt as required.  The requested injunctive relief is therefore necessary and appropriate.

## SECOND CAUSE OF ACTION
### Relief from Stay
### PROMESA § 405(e)

67.     Plaintiffs re-allege and incorporate paragraphs 1–66 above.

68.     If this lawsuit is deemed to fall within PROMESA's stay provisions, Plaintiffs respectfully request relief from the stay under Section 405(e) of PROMESA.

69.     Section 405(e)(1) of PROMESA, titled "JURISDICTION, RELIEF FROM STAY" states that "[t]he United States District Court for the District of Puerto Rico shall have original and exclusive jurisdiction of any civil actions arising under or related to this section."

70.     Section 405(e)(2) of PROMESA states that "[o]n motion of or action by a party in interest and after notice and a hearing, the United States Court for the District of Puerto Rico, for cause shown, shall grant relief from the stay provided under subsection (b) of this section."

71.     Plaintiffs are a party in interest within the meaning of Section 405(e)(2).  They have a direct and substantial interest in the protections afforded to Constitutional Debt by Section 204(c)(3) of PROMESA and, in turn, by the Puerto Rico Constitution and related laws.

72.     Plaintiffs have shown cause for relief from the stay.  As noted above, Plaintiffs seek relief that will prevent Puerto Rico from siphoning assets away from Constitutional Debt. The Commonwealth has no legitimate interest in unlawfully preferring certain creditors or expenditures over payment of Constitutional Debt.  Plaintiffs will suffer significant harm if the Commonwealth's unlawful actions are not stopped.  The Commonwealth has repeatedly asserted that it lacks resources sufficient to pay Constitutional Debt despite its clear legal duty to do so, and in fact has defaulted on that debt.  Accordingly, preventing further unlawful dissipation of assets will prevent the Commonwealth from arguing that further non-payment is required.

24

73.     The possibility of retrospective action by the Oversight Board is not sufficient to protect Plaintiffs' rights and interests under Section 204(c)(3) of PROMESA.   The Commonwealth may well argue that certain transfers cannot be undone, and as a practical matter, funds transferred or disbursed under these unlawful measures may prove difficult to retrieve from third parties or subsequent transferees.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the entry of judgment as follows:

A.     Declaring that the Commonwealth's post-PROMESA measures permitting transfers outside the ordinary course of business or in violation of Puerto Rico's Constitution and laws to the detriment of holders of Puerto Rico's Constitutional Debt are invalid under Section 204(c)(3) of PROMESA.

B.     Enjoining enforcement or implementation of certain of those measures until the Oversight Board has made a determination as to their propriety, with such injunction:

(1)     requiring the Defendants, in their official capacities as Commonwealth officers, to segregate and preserve all funds clawed back, to be clawed back, or available to be clawed back under contractual and legal provisions expressly acknowledging that those funds are subject to turnover for purposes of paying of Constitutional Debt;

(2)     prohibiting the Defendants, in their officials capacities as Commonwealth officers, from implementing the outsized transfers to the public employee pension funds contemplated in the Fiscal Year 2017 budget and limiting the Commonwealth to the contribution it made in Fiscal Year 2016; and

(3)     prohibiting the Defendants, in their official capacities as Commonwealth officers, from implementing the diversion to the insolvent GDB the approximately $250

million contemplated by the Fiscal Year 2017 budget, or such other amounts (such as those allocated in pending legislation).

C.      If such relief is deemed necessary, an order granting relief under Section 405(e) from PROMESA's stay on certain creditor litigation, insofar as is necessary to prevent harm to the interests of holders of Constitutional Debt.

D.      An order awarding Plaintiffs costs and attorneys' fees, as authorized under 42 U.S.C. § 1983.

E.      Granting such other and further relief as the Court deems just and proper.

In San Juan, Puerto Rico this 20th day of July 2016.

Respectfully submitted,

s/ *Raúl M. Arias-Marxuach*
Raúl M. Arias-Marxuach
USDC-PR Bar No. 209706
McConnell Valdés LLC
270 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918
Telephone: (787) 759-9292
Facsimile: (787) 759-8282
rma@mcvpr.com

Mark T. Stancil (*pro hac vice* forthcoming)
Gary A. Orseck (*pro hac vice* forthcoming)
Ariel N. Lavinbuk (*pro hac vice* forthcoming)
Donald Burke (*pro hac vice* forthcoming)
Robbins, Russell, Englert, Orseck
    Untereiner & Sauber LLP
1801 K Street, NW
Washington, D.C. 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
mstancil@robbinsrussell.com
gorseck@robbinsrussell.com
alavinbuk@robbinsrussell.com
dburke@robbinsrussell.com

*Counsel for Plaintiffs*