**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| LEX CLAIMS, LLC, | |
| JACANA HOLDINGS I LLC, | |
| JACANA HOLDINGS II LLC, | |
| JACANA HOLDINGS III LLC, | |
| JACANA HOLDINGS IV LLC, | |
| JACANA HOLDINGS V LLC, | |
| MPR INVESTORS LLC, | |
| ROLSG, LLC, | |
| RRW I LLC, | |
| -and- | Case No. 3:16-cv-02374 (FAB) |
| SL PUERTO RICO FUND II, L.P., | **SECOND AMENDED COMPLAINT** |
| Plaintiffs, | |
| v. | |
| THE COMMONWEALTH OF PUERTO RICO, | |
| ALEJANDRO GARCÍA PADILLA, in his official capacity as Governor of the Commonwealth of Puerto Rico, | |
| JUAN ZARAGOZA GÓMEZ, in his official capacity as Secretary of the Treasury of the Commonwealth of Puerto Rico, | |
| LUIS CRUZ BATISTA, in his official capacity as Director of the Office of Management and Budget of the Commonwealth of Puerto Rico, | |
| THE PUERTO RICO SALES TAX FINANCING CORPORATION (also known as COFINA), | |
| JUAN VAQUER, | |
| in his official capacity as Executive Director of the Puerto Rico Sales Tax Financing Corporation (also known as COFINA), | |
| -and- | |
| BANK OF NEW YORK MELLON CORP., | |
| Defendants. | |

Plaintiffs Lex Claims, LLC, Jacana Holdings I LLC, Jacana Holdings II LLC, Jacana Holdings III LLC, Jacana Holdings IV LLC, Jacana Holdings V LLC, MPR Investors LLC, ROLSG, LLC, RRW I LLC, and SL Puerto Rico Fund II, L.P. for their Complaint against Defendants the Commonwealth of Puerto Rico (the "Commonwealth"); Alejandro García Padilla, in his official capacity as Governor of the Commonwealth of Puerto Rico; Juan Zaragoza Gómez, in his official capacity as Secretary of the Treasury of the Commonwealth of Puerto Rico; Luis Cruz Batista, in his official capacity as Director of the Office of Management and Budget of the Commonwealth of Puerto Rico; the Puerto Rico Sales Tax Financing Corporation (also known by its acronym in Spanish, "COFINA"); Juan Vaquer, in his official capacity as the Executive Director of COFINA; and Bank of New York Mellon Corp. ("BNYM"), as trustee for certain bonds issued by COFINA, allege as follows:

## NATURE OF THE ACTION

1.      This action seeks declaratory and injunctive relief under Sections 204(c)(3), 207, 303(1), and 303(3) of the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016) (codified at 48 U.S.C. §§ 2101–2241) ("PROMESA" or the "Act") and certain other relief.  PROMESA establishes a Financial Oversight and Management Board (the "Oversight Board" or the "Board") to address Puerto Rico's fiscal condition and related issues, PROMESA § 101 (codified at 48 U.S.C. § 2121), and simultaneously imposes a stay on certain litigation by Puerto Rico's financial creditors, PROMESA § 405 (codified at 48 U.S.C. § 2194).

2.      As explained below, Defendants have flouted PROMESA's provisions, running the financial affairs of the Commonwealth as if PROMESA imposed no meaningful constraints on their actions.  The thrust of this strategy has been to place political advantage squarely ahead

2

of clear legal requirements.  The Commonwealth has authorized massive financial transfers that are plainly unlawful.  It also continues to favor certain bondholders, namely the COFINA bondholders, by siphoning off hundreds of millions of dollars in tax revenues each year in order to pay them—in flagrant disregard of the Puerto Rico Constitution.  PROMESA expressly prohibits these actions.  The most central PROMESA violations are described immediately below; other violations and additional reasons why the Commonwealth's pattern of conduct is unlawful are set forth in the remainder of this complaint.

**I.      The Commonwealth Violates Sections 204(c)(3) And 207 Of PROMESA**

3.      Section 204(c)(3) of PROMESA (codified at 48 U.S.C. § 2144(c)(3)), titled "PROHIBITION ON ACTION UNTIL OVERSIGHT BOARD IS APPOINTED," provides that, "[d]uring the period after a territory becomes a covered territory and prior to the appointment of all members and the Chair of the Oversight Board," Puerto Rico "shall not enact new laws that either permit the transfer of any funds or assets outside the ordinary course of business or that are inconsistent with the constitution or laws of the territory as of the date of enactment of this Act."  A manifest purpose of this provision is to prohibit the Commonwealth from capitalizing on the stay on certain bondholder litigation by enacting laws that divert money away from creditors—especially those that are protected under the Puerto Rico Constitution—before the Board is operational.

4.      Section 207 of PROMESA (codified at 48 U.S.C. § 2147), titled "OVERSIGHT BOARD AUTHORITY RELATED TO DEBT ISSUANCE," provides that, "[f]or so long as the Oversight Board remains in operation, no territorial government may, without the prior approval of the Oversight Board, issue debt or guarantee, exchange, modify, repurchase, redeem, or enter into similar transactions with respect to its debt."  A manifest purpose of this provision is to prohibit Puerto Rico from using additional debt issuances, modifications, or guarantees to diminish the funds available for payment of existing debt.

5.     Plaintiffs are beneficial owners of substantial amounts of bonds that are explicitly protected by Puerto Rico's Constitution, and are therefore protected by PROMESA Sections 204(c)(3) and 207.   These constitutionally protected bonds fall into two categories: (i) the Commonwealth's general obligation bonds ("GO Bonds"), which were issued by the Commonwealth, are protected and secured by a first lien on all available resources of the Commonwealth, and are backed by a pledge of the Commonwealth's good faith, credit, and taxing power; and (ii) bonds issued by certain of the Commonwealth's public corporations, which are guaranteed by the same first lien and pledge by the Commonwealth ("GO-Guaranteed Bonds").   Together, these bonds are known as "Constitutional Debt" because they are—alone among Puerto Rico's obligations—expressly protected under Article VI of the Puerto Rico Constitution.

6.     The Puerto Rico Constitution is explicit in this regard.   Article VI, Section 8 of the Puerto Rico Constitution provides that, if Puerto Rico's "available resources" are insufficient to meet all of its desired spending, "***interest on the public debt and amortization thereof shall first be paid***, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."   P.R. Const. art. VI, § 8 (emphasis added).   This promise of first priority (the "Constitutional Debt Priority Guarantee") unambiguously requires Puerto Rico to pay Constitutional Debt ahead of any other expenditure.   As explained by the late José Trías Monge (a delegate to the Puerto Rico Constitutional Convention, former Chief Justice of the Puerto Rico Supreme Court, and one of Puerto Rico's leading legal scholars), Article VI, Section 8 "*placed in absolute first term, and beyond the scope of the power of the Governor, the payment of interests and the amortization*" of the Constitutional Debt.   Ex. A (emphasis added).

7.     Indeed, when Puerto Rico approached the capital markets in late 2013 to issue additional GO Bonds, Governor García Padilla acknowledged that "[o]ur Constitution gives first priority over all revenues to payments on our general obligation debt," and pledged that Puerto Rico's government would "do everything necessary for Puerto Rico to honor all its commitments."  *See* Ex. B.  As recently as June 29, 2016, Governor García Padilla again acknowledged that "general obligation bonds" are "the island's senior credits protected by a constitutional lien on revenues."  *See* Ex. C ¶ 9.

8.     Despite the crystal-clear Constitutional Debt Priority Guarantee and PROMESA's equally explicit prohibition on new measures that violate Puerto Rico's laws or constitution or that permit transfers "outside the ordinary course of business," PROMESA § 204(c)(3) (codified at 48 U.S.C. § 2144(c)(3)), Puerto Rico has undertaken extraordinary measures in flagrant disregard of the Constitutional Debt Priority Guarantee.  Indeed, within hours of PROMESA's enactment, Puerto Rico commenced a series of actions doing exactly what Section 204(c)(3) of PROMESA was designed to prevent.

9.     First, Governor García Padilla issued Executive Order 2016-30 (the "Executive Order").  The Executive Order declared "a moratorium on the Commonwealth's obligation to make payments on any bonds or notes issued or guaranteed by the Commonwealth," other than certain payments owed to the Government Development Bank for Puerto Rico ("GDB").  Ex. E ¶¶ 1, 8.  The Executive Order relied on a Puerto Rico statute that was *preempted* by PROMESA. *See* PROMESA § 303 (codified at 48 U.S.C. § 2163).   The Executive Order violated the Constitution by declaring a moratorium on the Commonwealth's obligation to repay its Constitutional Debt, despite (by the Commonwealth's own admission) having hundreds of millions of dollars in cash on hand and "available to pay GO and Commonwealth-guaranteed

indebtedness," Ex. D ¶ 3, and despite having "clawed back" at least $289 million of cash since January 1, 2016, that had been earmarked for the payment of debt service by other entities *for the express purpose of paying Constitutional Debt*.

10.     Second, the Commonwealth enacted a budget for Fiscal Year 2017 that does not purport to pay Constitutional Debt, yet makes huge transfers outside the ordinary course of business and diverts vast resources to purposes that apparently enjoy political favor but are indisputably junior to Constitutional Debt.  This includes outsized contributions to Puerto Rico's public employee pension systems of approximately $800 million—which is roughly $150 million more than the Commonwealth appropriated last year.  The Fiscal Year 2017 budget also diverts approximately $250 million from the general fund to prop up the insolvent GDB or to replace certain GDB functions.

11.     Third, the Commonwealth has enacted further legislation that diverts vast additional resources to the insolvent GDB.  Under that legislation, if given effect, the Commonwealth would take on responsibility for debts owed to the GDB by other, independent entities, and would then pay $375 million to the GDB in this fiscal year on that consolidated obligation (to be followed by more than $100 million each year for another thirty-four years). The Commonwealth took this action despite defaulting on the Commonwealth's obligation to repay the Constitutional Debt, its most senior obligation.

12.     These and other actions are plainly transfers "outside the ordinary course of business" and are "inconsistent with the constitution or laws" of Puerto Rico.  PROMESA § 204(c)(3) (codified at 48 U.S.C. § 2144(c)(3)).  The Commonwealth's attempt to take responsibility for debts owed to the GDB by other entities constitutes the modification, issuance, or guarantee of debt.  PROMESA § 207 (codified at 48 U.S.C. § 2147).

6

II.    **Section 303(3) Of PROMESA Preempts The Executive Order, Which Unlawfully Stops Payments To Constitutional Debt But Allows The Continued Diversion Of Available Resources To COFINA Creditors**

13.    Plaintiffs also seek declaratory relief that the Executive Order is preempted by Section 303(3) of PROMESA, because the Executive Order unlawfully alters, amends, or modifies the rights of holders of Constitutional Debt.

14.    Section 303(3) of PROMESA states that "unlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality . . . shall be preempted by this Act."   PROMESA § 303(3) (codified at 48 U.S.C. § 2163(3)). PROMESA defines the term "territory" to include Puerto Rico.  *Id.* § 5(20) (codified at 48 U.S.C. § 2104(20)).  The term "territorial instrumentality," as defined in PROMESA, includes COFINA, which is a public corporation and instrumentality of the Commonwealth of Puerto Rico.  *Id.* § 5(19) (codified at 48 U.S.C. § 2104(19)).

15.    As discussed above, the Commonwealth of Puerto Rico has pledged its good faith, credit, and taxing power to the repayment of the Commonwealth's Constitutional Debt and has granted special protections to that debt under the Puerto Rico Constitution, including a first claim on all "available resources" of the Commonwealth.  In contrast, bonds issued by COFINA are *not* covered by any pledge of the Commonwealth's good faith, credit, or taxing power and are *not* public debt for purposes of the Puerto Rico Constitution (and thus do not have a lawful first claim on available resources of the Commonwealth).  COFINA was created and has issued bonds in an attempt to evade provisions in the Puerto Rico Constitution applicable to the Commonwealth's public debt, including the Constitutional Debt's first claim on available resources and related constitutional limitations on the quantity of public debt that the Commonwealth is permitted to issue.

16.     Bonds issued by COFINA purport to be backed by a legislative assignment to COFINA of a portion of the revenues received from collection of the Commonwealth's general sales and use tax ("SUT").   As explained in more detail below, however, that purported legislative assignment cannot trump the public debt's *constitutionally* guaranteed first claim on *all* available resources.   Simply put, legislation saying that core tax revenues are not constitutionally pledged "available resources" does not make it so.

17.     Immediately after PROMESA was signed into law, Governor García Padilla issued the Executive Order, which, as described above, declared a moratorium on payments to holders of Constitutional Debt.  Ex. E ¶¶ 1, 8.  The Executive Order, however, did not halt the diversion to COFINA of revenues received from collection of the Commonwealth's SUT, and therefore breached the Constitutional Debt Priority Guarantee.   By prioritizing payments on COFINA bonds, among others, over payments on Constitutional Debt issued or guaranteed by the Commonwealth, the Executive Order unlawfully altered, amended, and modified the rights of holders of Constitutional Debt issued or guaranteed by the Commonwealth.

18.     The Executive Order caused the Commonwealth, in breach of the Constitutional Debt Priority Guarantee, to default on the Commonwealth's Constitutional Debt at the same time that a portion of the revenues received from collection of the Commonwealth's SUT continued to be paid to COFINA.

19.     The details of the COFINA scheme confirm that it is an unlawful attempt to avoid the Puerto Rico Constitution and its protections for Constitutional Debt.  Under a Puerto Rico statute known as Act No. 56-2007, COFINA is funded primarily by revenues received from collection of the Commonwealth's SUT.  *See* Act of July 5, 2007, No. 56-2007, 2007 P.R. Laws 173 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a–16).  A Puerto Rico statute known as

Act No. 291-2006 purports to make these revenues unavailable for repayment of the Constitutional Debt. *See* Act of Dec. 26, 2006, No. 291-2006, sec. 1, § 2, 2006 P.R. Laws 1110, 1112 (codified as amended at P.R. Laws Ann. tit. 13, § 12). Sales and use taxes imposed by the Commonwealth, however, are a quintessential example of "available resources" for purposes of the Constitutional Debt Priority Guarantee. For that reason, Act Nos. 56-2007 and 291-2006 violate the Constitutional Debt Priority Guarantee. These laws are consequently unenforceable to the extent that they purport to remove any revenues received from collection of the Commonwealth's SUT from the "available resources" that are subject to the constitutional first lien and first priority rights conferred by the Constitutional Debt Priority Guarantee on holders of the Commonwealth's Constitutional Debt.

20.     By allowing SUT revenues to flow to COFINA and consequently allowing COFINA to continue paying its bondholders, the Executive Order permits the application of "available resources" to bonds issued by COFINA instead of the Commonwealth's Constitutional Debt. Section 303(3) of PROMESA preempts the Executive Order because the Executive Order unlawfully deprives holders of the Commonwealth's Constitutional Debt of their right under the Constitutional Debt Priority Guarantee to be paid before the Commonwealth makes any other disbursements, including any disbursements to COFINA or to holders of bonds issued by COFINA.

## III.     Section 303(1) Of PROMESA Prohibits The Commonwealth From Using A Moratorium Law To Bind Non-Consenting Creditors

21.     Section 303(1) of PROMESA provides that "a territory law prescribing a method of composition of indebtedness or a moratorium law, but solely to the extent that it prohibits the payment of principal or interest . . . may not bind any creditor of a covered territory or any covered territorial instrumentality thereof that does not consent to the composition or

moratorium." PROMESA § 303(1) (codified at 48 U.S.C. §2163(1)). Under this provision, the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, No. 21-2016 (enacted Apr. 6, 2016, and amended May 5, 2016, and July 12, 2016) (the "Moratorium Act"), is preempted insofar as it purports to bind holders of Constitutional Debt.

* * *

22.     To be clear, this lawsuit does not seek to compel payment on Plaintiffs' bonds at this time. Rather, Plaintiffs seek limited declaratory and injunctive relief to prevent the Commonwealth from unlawfully dissipating assets before the Oversight Board is fully operational, and diverting available resources to lower priority obligations, including purported obligations to COFINA or to COFINA bondholders.

## PARTIES

23.     Plaintiffs Lex Claims, LLC, Jacana Holdings I LLC, Jacana Holdings II LLC, Jacana Holdings III LLC, Jacana Holdings IV LLC, Jacana Holdings V LLC, MPR Investors LLC, ROLSG, LLC, RRW I LLC, and SL Puerto Rico Fund II, L.P. are the beneficial owners of a substantial amount of Constitutional Debt, including both GO Bonds and GO-Guaranteed Bonds.

24.     Defendant the Commonwealth of Puerto Rico is a territory of the United States.

25.     Defendant Alejandro García Padilla (the "Governor") is Governor of the Commonwealth of Puerto Rico and is being sued in his official capacity.[1]

26.     Defendant Juan Zaragoza Gómez (the "Secretary") is Secretary of the Treasury of the Commonwealth of Puerto Rico and is being sued in his official capacity.

---

[1]     Any successors to Defendants sued in their official capacities will be automatically substituted by operation of law. Fed. R. Civ. P. 25(d).

27.     Defendant Luis Cruz Batista is Director of the Office of Management and Budget of the Commonwealth of Puerto Rico and is being sued in his official capacity.  Pursuant to P.R. Laws Ann. tit. 23, § 104(c), Defendant Governor García Padilla may delegate certain authority for implementing payment priorities to Defendant Cruz.

28.     The defendants listed above in paragraphs 25–27 (collectively, the "Commonwealth Officer Defendants") are responsible for implementing the unlawful measures identified in this Complaint and for ensuring that the Commonwealth complies with its legal and constitutional obligations when setting and following fiscal priorities.

29.     Defendant COFINA is a public corporation and instrumentality of the Commonwealth.

30.     Defendant Juan Vaquer is Executive Director of COFINA and is being sued in his official capacity.

31.     Defendant BNYM is incorporated under the laws of Delaware and maintains its principal place of business in New York, New York.  BNYM is the trustee for COFINA bonds.

32.     The defendants listed above in paragraphs 29–31 (collectively, the "COFINA Defendants") are responsible for effectuating the diversion of revenues received from collection of the Commonwealth's SUT to COFINA and its bonds.

## JURISDICTION AND VENUE

33.     This action arises under Sections 204(c)(3), 207, 303(1), and 303(3) of PROMESA (codified at 48 U.S.C. §§ 2144(c)(3), 2147, 2163(1), and 2163(3)), which was signed into law on June 30, 2016; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202; the Constitution of the United States; and the Puerto Rico Constitution.  This action also arises under Section 405(e) of PROMESA (codified at 48 U.S.C. § 2194(e)), which grants the district court jurisdiction to

11

consider requests to lift the stay for cause.  This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3); Section 405(e)(1) of PROMESA; and 28 U.S.C. § 1367(a).

34.     Venue is proper in this district pursuant to Section 106(a) of PROMESA (codified at 48 U.S.C. § 2126(a)), which provides that "any action . . . arising out of this Act, in whole or in part, shall be brought in a United States district court for the covered territory."

## FACTUAL ALLEGATIONS

### I.     Puerto Rico's Strategy Of Default And Federal Intervention

#### A.     Puerto Rico's First Choice: "Super" Chapter 9

35.     On June 29, 2015, Defendant Governor García Padilla delivered a television address in which he declared that Puerto Rico's debt is "unpayable" and that "Puerto Rico does not today have the capacity to continue paying under the actual terms" of its debt.  He went on to assert that bondholders must accept a "sacrifice" and that Puerto Rico should not be "force[d] to choose" between paying bondholders and competing financial priorities.

36.     Those threats were a prelude to Puerto Rico's primary strategy.  Over the next twelve months, Puerto Rico spent many tens of millions of dollars on advisors and lobbyists who urged the Commonwealth not to honor its Constitutional Debt (or most of its other debt), but instead to seek shelter in federal legislation.

37.     Notably, Puerto Rico *resisted* federal legislation that would have made Puerto Rico eligible to invoke the traditional federal restructuring regime for municipal debt set forth in Chapter 9 of the federal Bankruptcy Code.  Instead, Puerto Rico sought unprecedented federal legislation colloquially referred to as "*Super* Chapter 9," which would have allowed Puerto Rico to retain control over its fiscal affairs and to put all of its debt—beyond what would be permitted

for any of the fifty States eligible to authorize their municipalities to access Chapter 9—into a federal bankruptcy regime.  Congress proved unwilling to enact Super Chapter 9.

### B.    PROMESA

38.    Instead, Congress passed PROMESA, and the President signed it into law on June 30, 2016.  PROMESA imposes a much more restrictive set of compromises and conditions than Puerto Rico had sought.  The law spans some sixty-eight sections, many of which incorporate further statutory provisions (largely from the federal Bankruptcy Code).  It is not necessary to set forth all of those detailed provisions here; for present purposes, it suffices to describe several main features of the Act.

#### 1.    *The Oversight Board*

39.    First, the Act imposes the Oversight Board "to provide a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets."  PROMESA § 101(a) (codified at 48 U.S.C. § 2121(a)).  To that end, the Act grants the Board significant powers over Puerto Rico's budgeting and expenditures, seeking to reverse years of mismanagement, waste, and a lack of transparency in the Commonwealth's finances.  *Id.* § 104 (codified at 48 U.S.C. § 2124). The Oversight Board is authorized to initiate a restructuring proceeding under Title III of PROMESA for the Commonwealth or a territorial instrumentality.  *See* PROMESA §§ 206, 304(a) (codified at 48 U.S.C. §§ 2146, 2164(a)).  Under Title VI of PROMESA, the Oversight Board is also authorized to certify that certain bond modifications have been duly approved by creditors and meet certain other requirements.  *See id.* § 601(g)(1)(C), (m)(1)(B) (codified at 48 U.S.C. § 2231(g)(1)(C), (m)(1)(B)).

40.    On August 31, 2016, President Obama announced the appointment of Andrew G. Biggs, José B. Carrión III, Carlos M. García, Arthur J. Gonzalez, José R. González, Ana J. Matosantos, and David A. Skeel Jr. to the Oversight Board.  On the same day, Governor García

Padilla announced that Richard Ravitch would serve on the Oversight Board as his administration's *ex officio* member, a position without voting rights.  On September 30, 2016, the Oversight Board elected Mr. Carrión as the Board's Chair.  The Act also contemplates the selection of an Executive Director and certain advisors and staff to the Oversight Board.  *Id.* § 103 (codified at 48 U.S.C. § 2123).  Given the significant duties of the Oversight Board—not to mention the disarray that pervades the Commonwealth's financial reporting—the Board and its staff will require some period of time to be fully functional.  At present, no Executive Director has been named, no staff has been hired, and no legal or financial advisors have been retained.

### 2.      *A Stay On Certain Bondholder Litigation*

41.     Section 405 of PROMESA stays certain bondholder litigation and other actions relating to Puerto Rico's debt.  The purpose of the stay is, in essence, to preserve the status quo until the Oversight Board becomes fully operational.  The stay took effect immediately upon PROMESA's enactment.  As principally relevant here, the Act imposes a stay on

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the Government of Puerto Rico that was or could have been commenced before the enactment of this Act, or to recover a Liability Claim against the Government of Puerto Rico that arose before the enactment of the Act.

*Id.* § 405(b)(1) (codified at 48 U.S.C. § 2194(b)(1)).

42.     The Act defines a "Liability" to include

> a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness for borrowed money, including rights, entitlements, or obligations whether such rights, entitlements, or obligations arise from contract, statute, or any other source of law related to such a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness . . . of which—
>
>> (A) the issuer, obligor, or guarantor is the Government of Puerto Rico; and

14

> (B) the date of issuance or incurrence precedes the date of enactment of this Act.

*Id.* § 405(a)(1) (codified at 48 U.S.C. § 2194(a)(1)).

43.     The Act defines a "Liability Claim" to mean

as it relates to a Liability—

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

*Id.* § 405(a)(2) (codified at 48 U.S.C. § 2194(a)(2)).

44.     The Act provides that relief from the stay may be granted under certain circumstances.  *See, e.g., id.* § 405(e)(2) (codified at 48 U.S.C. § 2194(e)(2) ("cause")); *id.* § 405(g) (codified at 48 U.S.C. § 2194(g) ("irreparable damage")).

45.     Accordingly, by preventing bondholders from suing to "recover a Liability Claim against the Government of Puerto Rico," *id.* § 405(b)(1), the stay provision quoted above operates to prevent bondholders from suing for payment.  The potential for mischief is palpable: With bondholders unable to sue for payment, the Commonwealth could attempt to divert resources toward more politically popular interests, even if doing so violates existing legal requirements.  That would be the exact opposite of the preservation of the status quo that the stay was intended to protect.

46.     The Act provides that the stay will remain in effect at least until February 15, 2017, with a possible extension of up to seventy-five days, unless a plan of adjustment under Title III of PROMESA is filed before that date.  *See id.* § 405(d) (codified at 48 U.S.C. §

2194(d)).  The PROMESA stay therefore could be in effect until May 1, 2017, or until a plan of adjustment is filed, whichever is earlier.  *Id.*

47.     Section 301(a) of PROMESA incorporates the Bankruptcy Code's automatic stay. *See* PROMESA § 301(a) (codified at 48 U.S.C. § 2161(a)) (incorporating 11 U.S.C. § 362 in all cases brought under Title III of PROMESA).  Consequently, if the Oversight Board commences a Title III proceeding, the automatic stay will again restrict bondholders' ability to protect certain of their rights.  These stays could limit the ability of holders of Constitutional Debt to protect certain of their rights indefinitely.

48.     This lawsuit does not seek payment on Plaintiffs' bonds at this time.  To be clear, however, Plaintiffs do not concede the validity of PROMESA's stay provisions, or any other provision that impairs in any way the rights of holders of Constitutional Debt, and Plaintiffs reserve the right to challenge any and all such provisions in due course.

### 3.     *PROMESA Expressly Prohibits Puerto Rico From Exploiting The Stay On Litigation After The Enactment Of PROMESA But Before The Oversight Board Was Appointed*

49.     Recognizing that there would be some period of time after the stay took effect but before appointment of the Oversight Board and its Chair, PROMESA severely restricts Puerto Rico's ability to take certain action that would impair its creditors (and, in particular, holders of Constitutional Debt).  To that end, Section 204(c)(3)(A) of the Act declares that Puerto Rico

> shall not enact new laws that either permit the transfer of any funds or assets outside the ordinary course of business or that are inconsistent with the constitution or laws of the territory as of the date of enactment of this Act, provided that any executive or legislative action authorizing the movement of funds or assets during this time period may be subject to review and rescission by the Oversight Board upon appointment of the Oversight Board's full membership.

50.     This section addresses Congress's concern that Puerto Rico might seek to exploit bondholders' inability to sue for payment before the Oversight Board is operational to siphon

money away from (among others) bondholders protected by the Puerto Rico Constitution.  As noted above and described in further detail below, Constitutional Debt (including bonds held by Plaintiffs) is, alone among the various categories of debt, expressly granted top priority over all other expenditures by Article VI of the Puerto Rico Constitution.  Section 204(c)(3) thus preserves the Commonwealth's assets from efforts by Puerto Rico to pursue its own political preferences, rather than the requirements established and respected by PROMESA for a budget and fiscal plan subject to approval by the Oversight Board.  *See id.* §§ 201–212 (codified at 48 U.S.C. §§ 2141–2152).

51.    Section 204(c)(3)(B) of the Act further grants the Oversight Board power to "review, and in its sole discretion, rescind, any law that—(i) was enacted during the period between . . . May 4, 2016 . . . and the date of appointment of all members and the Chair of the Oversight Board" and "(ii) alters pre-existing priorities of creditors in a manner outside the ordinary course of business or inconsistent with the territory's constitution or the laws of the territory as of . . . May 4, 2016."

52.    Section 207 of the Act protects the interests of bondholders by restricting the Commonwealth's ability to modify existing debts or take on new obligations.  In particular, Section 207 provides that Puerto Rico may not "issue debt or guarantee, exchange, modify, repurchase, redeem, or enter into similar transactions with respect to its debt," without first obtaining "the prior approval of the Oversight Board."

### 4.    *PROMESA Preempts Unlawful Executive Orders*

53.    PROMESA also preempts unlawful executive orders that violate the rights of the Commonwealth's senior creditors, including holders of its Constitutional Debt, by permitting the diversion of the Commonwealth's funds to junior creditors or to other uses.  *See* PROMESA § 303(3) (codified at 48 U.S.C. § 2163(3)).

17

54.     Section 303(3) of PROMESA declares that "unlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory . . . shall be preempted by this Act." Section 303(3) thus preempts unlawful executive orders that alter, amend, or modify rights of holders of the Commonwealth's Constitutional Debt, including the right of those holders to be paid from all available resources before those resources may be used for any other purpose, such as diversion of those resources to COFINA.

55.     Section 303(3) provides critical protections to holders of the Commonwealth's Constitutional Debt in light of other provisions of PROMESA. As explained above, PROMESA imposes a stay preventing holders of the Commonwealth's Constitutional Debt from bringing suit to enforce many of those bondholders' contractual rights for an extended period of time. Section 303(3) of PROMESA was intended, among other purposes, to prevent the Commonwealth from unfairly exploiting that stay by promulgating and enforcing unlawful executive orders that purport to alter, amend, or modify the rights of the Commonwealth's debtholders. By promulgating and enforcing the Executive Order, the Defendants have done precisely what Section 303(3) was intended to prevent.

### 5.     Under PROMESA, Commonwealth Laws Imposing a Moratorium Cannot Bind Non-Consenting Holders of the Commonwealth's Constitutional Debt

56.     Section 303(1) of PROMESA provides that "a territory law prescribing a method of composition of indebtedness or a moratorium law, but solely to the extent that it prohibits the payment of principal or interest . . . may not bind any creditor of a covered territory or any covered territorial instrumentality thereof that does not consent to the composition or moratorium." PROMESA § 303(1) (codified at 48 U.S.C. § 2163(1)). Section 303(1) thus prevents the Commonwealth from using a moratorium law to halt payments on debts of the Commonwealth without the affected creditors' consent.

### 6. Sections 204(c)(3), 207, and 303 of PROMESA Protect Bondholder Rights, Particularly Those Rights Protecting Constitutional Debt

57.     Section 204(c)(3)'s prohibition on constitutional violations and transfers outside of the ordinary course is aimed directly at protecting holders of Constitutional Debt, as is Section 207's prohibition on modifying, issuing, or guaranteeing debts without the prior approval of the Oversight Board.  Sections 303(1) and 303(3) similarly protect holders of Constitutional Debt against the Commonwealth's attempts to unlawfully subordinate their rights and declare a moratorium.  The PROMESA stay strips bondholders of their ability to enforce their right to payment in the absence of judicial relief from the stay.  In order to ameliorate that harsh consequence for bondholders, Sections 204(c)(3), 207, 303(1), and 303(3) of PROMESA create limited but critical protections for bondholders: Section 204(c)(3) prohibits the Commonwealth from violating its constitution and laws and making transfers outside of the ordinary course prior to the Board becoming fully operational, Section 207 prohibits the Commonwealth from modifying, issuing, or guaranteeing debts without the prior approval of the Control Board, Section 303(1) bars the Commonwealth from using a moratorium act to bind non-consenting creditors, and Section 303(3) preempts unlawful executive orders that violate the legal order of priorities.  These protections are broader than their Bankruptcy Code analogues found in 11 U.S.C. § 903, and invoke protections similar to Section 363(b) of the Bankruptcy Code.

58.     Sections 204(c)(3), 207, 303(1), and 303(3) of PROMESA accordingly serve to protect the interests of bondholders whose lawsuits to recover payment may be stayed under the Act and who might otherwise be injured (directly or otherwise) by the Commonwealth's efforts to divert available resources or to cease making payments while the stay is in effect.  Those protected creditors include holders of Constitutional Debt, such as the Plaintiffs in this action.

II.      **Puerto Rico's Constitutional Debt**

59.      The Constitutional Debt is set apart from all other debt issued by the Commonwealth and related entities by a series of contractual, statutory, and constitutional promises that ensure that payments on the Constitutional Debt are made promptly when due and, critically, *before* Puerto Rico's expenditures for all other purposes.

60.      The Commonwealth currently has approximately $12.5 billion in principal amount of GO Bonds outstanding and owes an additional amount on those bonds of approximately $600 million in overdue interest, interest on overdue interest and principal, and accrued interest as of the filing of this complaint.  Including these amounts, the Commonwealth has approximately $13.1 billion in GO Bond obligations outstanding, and this amount continues to grow as the Commonwealth remains in default.  The Commonwealth has pledged its good faith, credit, and taxing power for the timely payment of principal and interest on these GO Bonds, a pledge that represents an absolute and enforceable obligation to pay the GO Bonds when due, including by raising taxes if necessary to do so.

61.      In addition, Puerto Rico has pledged its good faith, credit, and taxing power to guarantee timely payment of principal and interest on approximately $5.7 billion in principal amount of additional outstanding GO-Guaranteed Bonds.  Additionally, there is over $60 million of GO-Guaranteed Bond obligations outstanding, consisting of overdue interest, interest on overdue interest and principal, and accrued interest as of the filing of this complaint.  This amount continues to grow as the Commonwealth remains in default.  In the event that the issuing entities fail to make payments on the GO-Guaranteed Bonds, the Commonwealth's guarantee represents an absolute and enforceable obligation to make those payments, including by raising taxes if necessary to do so.

62.     The total principal amount of Constitutional Debt outstanding, all of which is protected and secured by the Constitutional Debt Priority Guarantee, is approximately $18.2 billion.   Including interest, overdue interest, interest on overdue interest and principal, and accrued interest, there is approximately $18.9 billion of Constitutional Debt obligations outstanding.   The Commonwealth has repeatedly claimed that Puerto Rico's total debt load, including amounts owed by the Commonwealth and by its public corporations, instrumentalities, and municipalities, amounts to approximately $70 billion.   If that is so, the total principal amount of Constitutional Debt outstanding is less than 30% of Puerto Rico's total debt load.

63.     The Commonwealth's Constitutional Debt is "public debt" within the meaning of the Puerto Rico Constitution, and is therefore entitled—in addition to the good faith, credit, and taxing power pledge—to the highest priority among all of Puerto Rico's expenditures and a first claim on all of the Commonwealth's available resources.   Article VI, Section 8 provides that if Puerto Rico's "available resources" are insufficient to fund all of its desired spending, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."   P.R. Const. art. VI, § 8.   (The English version of Puerto Rico's Constitution refers to "available revenues," but, as the Commonwealth itself has acknowledged, the word used in the corresponding Spanish text—"recursos"—is more aptly translated as "resources."   *See, e.g.*, Official Statement for Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A 28 (2014).   That phrasing underscores Puerto Rico's commitment to tap all of its financial resources—whether or not they may be described as revenues—to make the required payments on its Constitutional Debt.)

64.     In 1950, Congress enacted the Act of July 3, 1950, Pub. L. No. 81-600, 64 Stat. 319 (codified as amended at 48 U.S.C. §§ 731b–e) ("Public Law 600"), which established the process for drafting the Puerto Rico Constitution.  Public Law 600 provided that it was "in the nature of a compact so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption." *Id.* § 1.  The constitution would become effective only if approved by Congress.  A proposed constitution was drafted over several months spanning 1951 to 1952, pursuant to the process established by Public Law 600.  The proposed constitution submitted to Congress included the Constitutional Debt Priority Guarantee. *See* Message from the President of the United States Transmitting the Constitution of the Commonwealth of Puerto Rico Adopted by the People of Puerto Rico on March 3, 1952, H.R. Doc. No. 82-435, at 14 (1952).  Although Congress insisted on several modifications to the draft constitution, it approved the constitution without modifying the terms of the Constitutional Debt Priority Guarantee. *See* Joint Resolution of July 3, 1952, Pub. L. No. 82-447, 66 Stat. 327 (1952).

65.     Article VI, Section 2 of the Puerto Rico Constitution allows holders of Constitutional Debt to compel the Secretary of the Treasury to "apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by" the Constitutional Debt Priority Guarantee "at the suit of any holder of bonds or notes issued in evidence thereof."  P.R. Const. art. VI, § 2.  This is an additional creditor protection added to the Puerto Rico Constitution in 1961, with the approval of Congress. Act of Aug. 3, 1961, Pub. L. No. 87-121, 75 Stat. 245 (1961).  In granting holders of Constitutional Debt the right to compel the use and disposition of this specified collateral, the Puerto Rico Constitution recognizes that they have a direct and judicially enforceable

constitutional first lien on, and a direct and judicially enforceable first priority claim to, all of the Commonwealth's available resources.

66.     For decades, the absolute priority of Constitutional Debt has been further recognized in the Puerto Rico statute that defines the remaining "order of priorities" mentioned in Article VI, Section 8 of the Puerto Rico Constitution.  That statute, P.R. Laws. Ann. tit. 23, § 104(c), recognizes that Constitutional Debt must be paid first above all other expenditures, even (and especially) when resources are scarce.  "In keeping with Section 8, Article VI," the statute provides a hierarchy of priorities governing the "disbursement of public funds . . . when resources available for a fiscal year are insufficient to cover the appropriations made for that year."  *Id.*  One—and only one—category is given the highest priority:  "[T]he payment of interest and amortizations corresponding to the public debt."  *Id.* § 104(c)(1).  (Puerto Rico attempted to modify Section 104(c) earlier this year, but, as discussed below, that act and any executive order seeking to implement it are preempted by Section 303 of PROMESA and violate the Puerto Rico Constitution.)

67.     Article VI, Section 6 of the Puerto Rico Constitution requires the Commonwealth to make payments on the Constitutional Debt, effectively overriding non-compliant budgets that do not contain appropriations for the payment of that debt.  This provision states:

> If at the end of any fiscal year the appropriations necessary for the ordinary operating expenses of the Government *and for the payment of interest on and amortization of the public debt* for the ensuing fiscal year shall not have been made, the several sums appropriated in the last appropriation acts for the objects and purposes therein specified, so far as the same may be applicable, shall continue in effect item by item, and *the Governor shall authorize the payments necessary* for such purposes until corresponding appropriations are made.

P.R. Const. art. VI, § 6 (emphasis added).  Under this provision, if the Legislative Assembly does not appropriate funds for the payment of interest and principal on the Constitutional Debt

when due, appropriations for the prior year for that purpose shall continue in effect.  This protection is reinforced by the Puerto Rico statutes authorizing issuance of public debt, which have provided at least since 1942 for continuous appropriations to fund payments owed to holders of that debt.  *See, e.g.*, Act of Dec. 7, 1942, No. 33-1942 (3d Spec. Sess.), §§ 3, 4, 1942 P.R. Laws 2d–3d Spec. Sess. 174, 182–84 (codified at P.R. Laws Ann. tit. 13, §§ 37, 38).

68.     When the Commonwealth decided in late 2013 to issue additional GO Bonds, the Governor accurately acknowledged that "[o]ur Constitution gives first priority over all revenues to payments on our general obligation debt," and pledged that Puerto Rico's government would "do everything necessary for Puerto Rico to honor all its commitments."  *See* Ex. B.  As recently as June 29, 2016, the Governor again acknowledged that "general obligation bonds" are "the island's senior credits protected by a constitutional lien on revenues."  *See* Ex. C ¶ 9. Accordingly, Constitutional Debt is protected and secured by a constitutional first lien on, and first priority claim to, all available resources of the Commonwealth.

69.     In addition to previously discussed protections, the Puerto Rico Constitution provides further safeguards that are intended to ensure full and timely payment of the Constitutional Debt in times of financial hardship.

70.     For example, Article VI, Section 2 of the Puerto Rico Constitution provides in pertinent part that:

> The power of the Commonwealth of Puerto Rico to impose and *collect* taxes . . . shall be exercised as determined by the Legislative Assembly and *shall never be surrendered or suspended*.

P.R. Const. art. VI, § 2 (emphasis added).  This provision protects holders of Constitutional Debt by prohibiting the Commonwealth from surrendering or suspending its power to collect taxes.  In other words, taxes must be collected *by the Commonwealth*, and revenues arising from those

24

taxes must be available to the Commonwealth in order to fund, if necessary, payments on the Constitutional Debt.

71.     Article VI, Section 2 of the Puerto Rico Constitution provides still further protections for holders of Puerto Rico's Constitutional Debt by limiting the quantity and duration of GO Bonds issued by the Commonwealth and the quantity of GO-Guaranteed Bonds on which the Commonwealth has been required to make payments.  This provision was intended to ensure that the Commonwealth retains the capacity to honor its Constitutional Debt Priority Guarantee without devoting excessive resources to service of public debt.

72.     Article VI, Section 7 of the Puerto Rico Constitution requires the Commonwealth to have a balanced budget and, if the budget is not balanced, to raise taxes sufficient to cover any excess appropriations.

73.     There is, in short, no serious dispute that the Puerto Rico Constitution and laws such as P.R. Laws Ann. tit. 23, § 104(c) grant Constitutional Debt the absolute and highest priority among all of Puerto Rico's expenses.  Accordingly, PROMESA's prohibitions on new measures that violate Puerto Rico's Constitution and laws are aimed squarely at protecting Constitutional Debt.   The Act therefore prohibits Puerto Rico from taking action after PROMESA's enactment that would divert resources away from Constitutional Debt.

## III.   Immediately Upon PROMESA's Enactment, Puerto Rico Violated PROMESA Section 204(c)(3)

74.     Within hours of PROMESA's enactment, Puerto Rico violated it.  As explained below, Puerto Rico immediately embarked on a systematic plan to default on and impair Constitutional Debt while paying certain other, lower-priority obligations, and to divert resources to politically preferred purposes.  In the months since PROMESA's enactment, moreover, Puerto Rico has continued to pursue this plan.  Puerto Rico's actions were "outside the ordinary course

of business" and in direct violation of Puerto Rico's laws and Constitution—exactly what PROMESA Section 204(c)(3) was designed to prevent.

A. **Puerto Rico Deliberately And Needlessly Defaulted On Constitutional Debt Despite Holding Hundreds Of Millions Of Dollars In Cash That Was Expressly Earmarked For Payment Of Constitutional Debt**

75.     The first such action was the Executive Order, which Governor García Padilla issued on June 30, 2016, almost immediately after the President signed PROMESA into law.  *See* Ex. E.  The Executive Order directly violates the Puerto Rico Constitution by announcing a moratorium on the Commonwealth's obligation to repay its Constitutional Debt, even while the Commonwealth continued to spend funds for other purposes and had hundreds of millions in cash on hand that were required by law to be devoted to payment of the Constitutional Debt.

76.     The Executive Order relied on the Moratorium Act.  That legislation purported to give Governor García Padilla the authority to declare a payment moratorium on certain debt payments by declaring a "state of emergency" via executive order.  Moratorium Act § 102.  The Moratorium Act thus purports to set aside the Commonwealth's constitutional and contractual obligations to ensure the timely payment of principal and interest on the Constitutional Debt.  *See* Moratorium Act § 103(hh), (ii); *id*. § 202(a)(i)(A), (C).  As explained below, the Moratorium Act and the Executive Order are plainly foreclosed and preempted by Section 303 of PROMESA.  Despite its clear legal duty to pay Constitutional Debt in full, on July 1, 2016, Puerto Rico defaulted on approximately $817 million due on its Constitutional Debt—almost the entirety of what it owed.

77.     Puerto Rico's decision to choose near-total default on these bonds was not only clearly illegal under both the Constitution and PROMESA, it was also unnecessary.  As Puerto Rico's GDB has acknowledged, the Commonwealth had $200 million in its operating account when the July 1 payment came due—funds that even the Commonwealth must concede

constitute "available resources" that could, and should, have been used to pay Constitutional Debt. Indeed, in the press release announcing the default, the GDB openly admitted that there were hundreds of millions of dollars in cash on hand "available to pay GO and Commonwealth-guaranteed indebtedness expected to be payable on July 1." Ex. D ¶ 3. The Commonwealth simply chose not to follow its legal duty to pay Constitutional Debt, apparently preferring to divert that cash to other purposes.

78.     What is more, the Commonwealth decided not to devote even a single cent (outside of two issue-specific reserve accounts) to GO Bonds even though the Commonwealth had clawed back hundreds of millions of dollars in revenue conditionally earmarked for the payment of other debt, *for the express purpose of paying Constitutional Debt*. The Commonwealth's recent (and long overdue) financial disclosures state that the Commonwealth clawed back $289 million during the second half of Fiscal Year 2016. Roughly half of these funds have purportedly been deposited with the insolvent GDB, where the Commonwealth has chosen to restrict withdrawals. Approximately $150 million more was, by the GDB's admission, being held at a commercial bank and was indisputably available for the July 1 payment. *See* Ex. D ¶ 3. As the Commonwealth previously recognized in executive orders initiating the claw back of the earmarked revenue, these funds *must* be devoted to the payment of the public debt. *See, e.g.*, Ex. F, point "Third" (providing that clawed back funds "shall be kept in a separate account and shall be used only to make public debt payments as they become due").

79.     At the same time as the Commonwealth chose near-total default on its Constitutional Debt, hundreds of millions of dollars were paid to other, lower-priority obligations. Those include (to name but a few examples) payments on bonds issued by the Puerto Rico Highways and Transportation Authority, the Puerto Rico Convention Center District

Authority, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and $200 million on June 30, 2016, in payment of certain tax and revenue anticipation notes.   Those payments were in addition to billions of dollars that the Commonwealth spent on other purposes that are junior to Constitutional Debt over the months leading up to its July 1 default on its Constitutional Debt.   Choosing to default on the Constitutional Debt, after having made these other, lower-priority payments, plainly violated the express terms of the Puerto Rico Constitution, and P.R. Laws Ann. tit. 23, § 104(c)—and thereby violates Section 204(c)(3)(A) as well.

80.     To be clear, there was no basis for even a partial default on the Constitutional Debt.  The Commonwealth's Fiscal Year 2016 budget included a full appropriation for the July 1 payments; if the Commonwealth lacked the funds necessary to make this payment, that is due to Puerto Rico's failure to manage expenditures as necessary to respect Constitutional Debt's absolute priority.  *See also* P.R. Laws Ann. tit. 23, § 104(d)(1) (requiring mid-year adjustment of appropriations if necessary so that priorities set forth in P.R. Laws Ann. tit. 23, § 104(c) can be respected).

**B.     Puerto Rico Enacted A Fiscal Year 2017 Budget That Fails To Pay Constitutional Debt In Full, Despite Clawing Back Revenue Expressly Designated For That Purpose, And Diverts Massive Resources To Politically Preferred Uses**

81.     Puerto Rico's first violation of Section 204(c)(3) was compounded by a second series of violations resulting from the Commonwealth's recently passed general fund budget for Fiscal Year 2017.  That budget devotes zero dollars to Constitutional Debt.  That decision flouts the Puerto Rico Constitution, which expressly requires appropriations for full payment of Constitutional Debt.

82.     However, Puerto Rico's violations of its Constitution (and hence PROMESA) go far beyond not appropriating for and paying the Constitutional Debt in full in the ordinary course.  For starters, the budget fails to appropriate a single dollar to pay the Constitutional Debt even though, in Fiscal Year 2017, the Commonwealth expects to collect at least $863 million in funds that, by the express terms of the relevant documents, are subject to claw back for the purpose of funding payments on the Constitutional Debt.  The effect of Puerto Rico's budget is thus to divert these funds to other, lower-priority purposes.  (This spending spree may be expanded to include $289 million of the funds clawed back during Fiscal Year 2016 for purposes of paying the Constitutional Debt—money that appears to be unaccounted for.)

83.     This double-speak—clawing back money for the purpose of paying Constitutional debt, but then refusing to pay the Constitutional Debt—is emblematic of the Commonwealth's refusal to use the tools at its disposal to respect the Constitution.  Interest expense on the Constitutional Debt in Fiscal Year 2017 is very near to the $863 million in funds expressly subject to claw back that the Commonwealth expects to collect over the course of the year.  To respect the Constitution (at least in large part), Puerto Rico would simply need to exercise the claw back rights and then follow its legal duty to use those funds to pay the Constitutional Debt. Instead, the Commonwealth has invoked claw back rights that can be used only to *protect* Constitutional Debt, yet simultaneously *refuses* to make any payment on that debt.  The Commonwealth's hypocrisy defies explanation and flouts the rule of law.  There is no lawful justification for diverting clawed back revenue to any purpose except payment of Constitutional Debt.

84.     Adding insult to constitutional injury, the budget contemplates an *increase* of more than $500 million in non-debt service spending.   In other words, even as the

Commonwealth claims that it lacks sufficient funds to pay its Constitutional Debt, it plans additional spending for other purposes.

85.     Governor García Padilla has attempted to justify the decision to default by contending that essential services must be prioritized above payments to bondholders.  As a legal matter, that contention is demonstrably wrong.  As explained above, the Commonwealth's Constitution and laws prioritize payment of GO Bonds over even what the Commonwealth may characterize as essential services, and the Governor cannot lawfully alter the constitutionally mandated hierarchy of payments.

86.     Even if it were not patently unconstitutional and unlawful, Defendant Governor García Padilla's position cannot justify the Fiscal Year 2017 budget, which includes more than $1 billion in spending for purposes that cannot, by any stretch of the imagination, be described as "essential."  These include, to list but a few examples: approximately $250 million devoted to financing the insolvent GDB and assuming certain of its functions; approximately $800 million in pension funding (which is $150 million *more* than the Commonwealth contributed last year); subsidies of more than $800 million to the University of Puerto Rico (to maintain artificially low tuition rates well below what comparable state universities in fiscally balanced States charge); and a number of other smaller appropriations—such as $2.5 million to fund the Office of the First Lady, and $1.2 million for "development of high performance Puerto Rican athletes."  The spending decisions reflected in the budget are simply political calculations in clear violation of Puerto Rico's unambiguous legal duties under PROMESA, the Puerto Rico Constitution, and related laws.

C. **Puerto Rico Enacted Legislation That Diverts Still Further Resources To The GDB, Despite Failing To Make Required Payments On Its Constitutional Debt**

87.     On July 20, 2016, Governor García Padilla signed into law the Act of July 20, 2016, No. 74-2016, which is new legislation that functions to divert still more of the Commonwealth's financial resources to the insolvent GDB.   Act No. 74-2016 purports to authorize the GDB to "restructure" loans owed to the GDB by the Commonwealth, independent public corporations, and municipalities, causing the Commonwealth to take on vast new obligations for which it was not previously responsible, and then prioritizing payment of those obligations (and the Commonwealth's preexisting junior obligations to the GDB) above the Constitutional Debt.   All of this is in clear violation of the Puerto Rico Constitution and PROMESA.

88.     In particular, Act No. 74-2016 provides that at least $2 billion in loan obligations and unpaid interest owed to the GDB by independent public corporations and municipalities— obligations for which the Commonwealth was *not* previously responsible—will be consolidated into a single loan along with amounts previously owed by the Commonwealth to the GDB (the vast majority of which is not "public debt" under the Puerto Rico Constitution, and hence indisputably ranks below the Constitutional Debt in payment priority).   That consolidated loan is to be payable (at a 40% discount) *exclusively* from the Commonwealth's general fund, over a thirty-five-year period.   The law purports to relieve independent public corporations and municipalities from their obligations to repay the funds they borrowed from the GDB.

89.     Were that not enough, Act No. 74-2016 appropriates an additional $375 million in Fiscal Year 2017 for debt service on the new consolidated loan (to be followed by annual appropriations of $110 million in Fiscal Year 2018 through Fiscal Year 2022, and annual appropriations of $160 million in subsequent years).

90.     Act No. 74-2016 violates the Commonwealth's legal duties under PROMESA, the Puerto Rico Constitution, and related laws.  First, Act No. 74-2016 constitutes a transfer outside the ordinary course of business, in violation of PROMESA Section 204(c)(3), because it would cause the Commonwealth to incur a vast new obligation to repay loans for which it was not previously liable.  Second, Act No. 74-2016 violates PROMESA Section 207 by purporting to authorize and implement a restructuring regime for the GDB's public sector loan portfolio, and by causing the Commonwealth to take on a new debt to the GDB.  Under Section 207 of PROMESA, these actions are expressly barred without "the prior approval of the Oversight Board."  Third, and finally, Act No. 74-2016 violates the Constitutional Debt Priority Guarantee by making appropriations for the payment of the new loan to the GDB, even though that loan is junior in priority to the Commonwealth's obligation to repay the Constitutional Debt and the Commonwealth has failed to make required payments on its Constitutional Debt.  As a consequence of these violations of the Puerto Rico Constitution, Act No. 74-2016 likewise violates PROMESA Section 204(c)(3)'s prohibition on new laws "that are inconsistent with the constitution or laws" of Puerto Rico as of PROMESA's enactment.

IV.     **The Executive Order Diverts Available Resources To COFINA And Its Bondholders**

91.     As described above (*see* ¶ 76, *supra*), the Governor promulgated the Executive Order pursuant to the Moratorium Act.  *See* Ex. E ¶ 1.  The Executive Order declared that the Commonwealth was in a state of emergency and caused the Commonwealth to default on its Constitutional Debt.  Specifically, the Executive Order declared a "moratorium on the Commonwealth's obligation to make payments on any bonds or notes issued or guaranteed by the Commonwealth," other than certain payments owed to the GDB.  Ex. E ¶¶ 1, 8.

92.     The day before he signed the Executive Order, the Governor sought to justify a moratorium on payments to holders of Constitutional Debt by stating that "Puerto Rico does not

have the ability to repay the $70 billion debt that was generated by past administrations and their creditors." Alejandro García Padilla, *There's No Choice: Puerto Rico Will Default on More than $1 Billion in Debt on Friday*, CNBC (June 29, 2016), http://www.cnbc.com/2016/06/29/puerto-ricos-governor-warns-of-imminent-default-on-more-than-1-billion-in-debt-commentary.html, Ex. C ¶ 1.  But at the same time, the Executive Order permits the application of revenues arising from collection of the SUT, which are "available resources" under the plain meaning of the Puerto Rico Constitution, to flow to COFINA.  Indeed, COFINA made an interest payment to COFINA bondholders the day after the Governor issued the Executive Order.  *See* Gov't Dev. Bank for P.R., Commonwealth of Puerto Rico – Bonded Indebtedness Debt Service Due July 1, 2016,                     http://www.gdb-pur.com/documents/CommonwealthofPuertoRico-July-1-2016DebtService.pdf.  Additionally, because of the Executive Order's failure to suspend such diversions, approximately $119.7 million was diverted to COFINA in July 2016, approximately $121.6 million was diverted to COFINA in August 2016, and millions more have likely been diverted since then.  *See* Press Release, Office of the Sec'y of the Treasury, P.R. Treasury Revenues Total $665.1 Million in July, $38.6 Million, or 6.2% Above July Revenues and $7.4 Million    Above    Estimates    (Aug.    15,    2016),    http://www.gdb-pur.com/documents/TreasuryPressRelease-July2016Final.pdf; Press Release, Office of the Sec'y of the Treasury, Treasury Revenues Totaled $550.0 Million in August, $10.3 Million, or 1.9% Above         Estimates         (Sept.         15,         2016), http://www.hacienda.gobierno.pr/sites/default/files/treasury_press_release_on_august_2016_rev enues.pdf.  The Commonwealth, acting pursuant to the Executive Order, has thus unlawfully diverted—and in the absence of relief from this Court will continue to divert—"available

resources" to COFINA, and COFINA's bondholders will continue to be paid, during a period when holders of Constitutional Debt will not be paid.

## V.   **COFINA**

93.   COFINA is a public corporation and an instrumentality of the Commonwealth. P.R. Laws Ann. tit. 13, § 11a(a).  It is "attached" to the GDB, *id*. § 11a(e), which is itself a public corporation of the Commonwealth.  The GDB serves as the Commonwealth's principal financing arm.  *See* Charter of the Government Development Bank for Puerto Rico, Act of Sept. 23, 1948, No. 17-1948 (8th Spec. Sess.), 1948 P.R. Laws 6th–8th Spec. Sess. 290.  COFINA is required to have the same board of directors as the GDB.  P.R. Laws Ann. tit. 13, § 11a(e).  Proceeds from the sales of bonds COFINA has issued have been used to fund general operating expenses of the Puerto Rico government and to retire debt, including extraconstitutional debt of the Puerto Rico central government.  *Id.* § 11a(b)(1).

94.   COFINA's primary purpose is to serve as a vehicle for the Commonwealth to borrow large sums of money in a way that circumvents the carefully prescribed debt limitations and priorities contained in the Puerto Rico Constitution.

### A.   **The Diversion Of Revenues Arising From Collection Of The SUT To COFINA**

95.   To facilitate borrowing by COFINA, Act No. 56-2007 purported to assign a portion of the SUT revenues to COFINA.  COFINA then issued bonds backed by those tax revenues.  Act No. 56-2007 purported to exclude these tax revenues from the Constitutional Debt Priority Guarantee by declaring that they shall not "constitute resources available to the Commonwealth of Puerto Rico."  *Id*. § 12.  Act No. 56-2007, however, sought to effectuate this diversion through legislation, which cannot trump the Puerto Rico Constitution (nor did Puerto Rico pursue the process mandated for amending the Puerto Rico Constitution).  *See* P.R. Const.

art. VII, §§ 1, 2.  Carried to its logical conclusion, the theory of Act No. 56-2007—that tax revenue can simply be declared to be not "available resources"—would appear to permit the Commonwealth to assign an unlimited amount of resources to support new borrowing through the mere expedient of legislative declarations.  Such a theory is utterly irreconcilable with the Puerto Rico Constitution.

96.    Acting pursuant to this scheme, COFINA has issued massive amounts of debt—more than $17.2 billion of which is currently outstanding—without any regard to the requirements of the Puerto Rico Constitution.

97.    The COFINA structure relies on the artifice, among others, that the revenues diverted to COFINA are not collected by the Commonwealth.  On information and belief, instead, merchants are required to transfer a portion of the SUT to Banco Popular de Puerto Rico ("Banco Popular") and First Data Corp. ("First Data") (along with any other "Authorized Collectors" designated by the Secretary of the Treasury).  *See, e.g.*, Official Statement for Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bonds, First Subordinate Series 2011A, at 16 (2011).  These revenues are then transferred to a joint account held by the GDB and COFINA at Banco Popular.  *Id*.  Next, the revenues arising from the collection of the SUT are transferred to an account in Banco Popular's Trust Department held in the name of COFINA.  *Id*. Finally, SUT revenues diverted to COFINA are transferred to a trust account held by BNYM as trustee for the COFINA bonds.  *Id*. at 16–17.

98.    These arrangements constitute an unconstitutional attempt by the Legislative Assembly, the Commonwealth Officer Defendants, and the COFINA Defendants to surrender and suspend the Commonwealth's power to collect the diverted portion of revenues arising from the Commonwealth's SUT.  As noted above, Article VI, Section 2 of the Puerto Rico

Constitution provides in pertinent part that the legislative power to impose and collect taxes "*shall never be surrendered or suspended*."  P.R. Const. art. VI, § 2 (emphasis added).  Act No. 56-2007, however, purports to circumvent this constitutional protection by providing that the funds earmarked for COFINA are purportedly to be "directly deposited" into a fund held by COFINA, rather than into the Treasury of Puerto Rico.  Act No. 56-2007 sec. 2, § 3.

99.     Commonwealth legislation structuring COFINA draws completely arbitrary distinctions between portions of revenues arising from the SUT that indisputably are "available resources," and portions of those revenues that supposedly are not.  Those arbitrary legislative distinctions underscore the reality that, for purposes of the Puerto Rico Constitution, *all* revenues arising from the collection of the SUT are "available resources."

100.     Specifically, the SUT is divided among the Commonwealth and COFINA as follows:[2]

a.     A 4.5% SUT is paid to the Commonwealth.  *See* Act of July 1, 2015, No. 101-2015, sec. 6, § 4210.01(b).  No portion of that revenue is transferred to COFINA, and there is no dispute that these funds are "available resources."

b.     The remaining 6% SUT is divided between the Commonwealth, municipalities, and COFINA (the "Divided Funds").[3]  At the start of each fiscal year (which begins on July 1), all of the Divided Funds are diverted to COFINA.  This

---

[2]   Puerto Rico's municipalities impose an additional 1% SUT.  Act of Jan. 24, 2014, No. 18-2014, art. 4, § 6080.14, 2014 P.R. Laws 12.  This additional 1% SUT brings the total SUT collected to 11.5%.

[3]   Prior to January 2014, this tax rate was 5.5%.  Act No. 18-2014 amended §§ 4020.01 and 4020.02 of the Internal Revenue Code for a New Puerto Rico, No. 1-2011, 2011 P.R. Laws 1, 760–61 (codified at P.R. Laws Ann. tit. 13, §§ 32021–22), to increase the rate of this portion of the SUT from 5.5% to 6%.  *See* Act of Jan. 24, 2014, No. 18-2014, art. 2–3, 2014 P.R. Laws 12.

diversion continues until a minimum amount, which varies each fiscal year (the "Pledged Sales Tax Base Amount"), is reached. *See, e.g.*, Official Statement for Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bonds, First Subordinate Series 2011A, at 14, 17 (2011). This threshold is typically reached within the first six or seven months of each fiscal year. For example, in Fiscal Year 2014–15, the Pledged Sales Tax Base Amount was reached in December, and in Fiscal Year 2015–16, the Pledged Sales Tax Base Amount was reached in early January. *See* P.R. Treasury Dep't, Office of Econ. & Fin. Affairs, States Sales and Use Tax, Distribution of Monthly Collection: Fiscal Years 2014-15–2016-17 (Aug. 15, 2016). Even though these funds are purportedly not "available resources," on information and belief, once the Pledged Sales Tax Base Amount is reached, the *same* revenue stream is paid to the Commonwealth.[4] *See* Official Statement for Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bonds, First Subordinate Series 2011A, at 17 (2011). During this period, precisely the same revenue stream that was previously diverted to COFINA now undisputedly becomes an "available resource[ ]." Payment of this revenue stream to the Commonwealth continues until the Commonwealth has received its share. *Id*. At that point, both COFINA and the Commonwealth receive a portion of the Divided Funds. *Id*. The Commonwealth's portion constitutes an "available resource[ ]," while the portion diverted to COFINA purportedly does not.

101. Additionally, the portion of the Divided Funds diverted to COFINA has increased over time while the portion of the Divided Funds paid to the Commonwealth has

---

[4]  Once the Pledged Sales Tax Base Amount is paid to COFINA, a portion of the revenues arising from collection of the SUT is paid to the Municipal Administration Fund. *See* Act of Jan. 24, 2014, No. 18-2014, art. 1, § 2(a), 2014 P.R. Laws 12.

correspondingly decreased.  In 2007, when COFINA first issued bonds, approximately 18% of the Divided Funds were diverted to COFINA.  *See* Act of July 5, 2007, No. 56-2007, sec. 2, § 3, 2007 P.R. Laws 173, 176–77 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a–16).  Approximately 82% of the Divided Funds were therefore paid to the Commonwealth.  In 2009, Act No. 1-2009 doubled the portion of the Divided Funds diverted to COFINA to approximately 36% and caused a corresponding decrease in the portion paid to the Commonwealth.  *See* Act of Jan. 14, 2009, No. 1-2009, sec. 2, § 3, 2009 P.R. Laws 1, 7–8 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a–16).  Almost immediately the Commonwealth again increased the portion of the Divided Funds diverted to COFINA so that half of the Divided Funds would flow to COFINA.  *See* Act of Mar. 9, 2009, No. 7-2009, sec. 50, § 3, 2009 P.R. Laws 30, 121–22 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a, 12, 14).  In 2013, the Commonwealth again increased the portion of the Divided Funds diverted to COFINA and decreased the portion paid to the Commonwealth.  *See* Act of Oct. 10, 2013, No. 116-2013, sec. 2, § 3 (codified as amended at P.R. Laws Ann. tit. 13, § 12).  The last of these increases was intended to facilitate additional debt issuances by COFINA.  *Id*. Statement of Motives.

B.    **The Revenues Used To Support The COFINA Bonds Arise From A General Sales And Use Tax That Would Traditionally Be Paid To The Government**

102.    The history, purpose, and function of the Commonwealth's SUT reveals that the revenues derived from collection of the Commonwealth's SUT are those that would traditionally be paid to the Commonwealth government and constitute "available resources" for purposes of the Constitutional Debt Priority Guarantee.  The SUT is a general sales and use tax covering a broad range of goods and services.  The SUT was implemented as a replacement for the Commonwealth's general excise tax, which was repealed by the same legislation that created the SUT.  *See* Act of July 4, 2006, No. 117-2006, 2006 P.R. Laws 1231 (codified as amended at P.R.

Laws Ann. tit. 13, §§ 11a–16).  The excise tax was similar in purpose and function to the SUT and was paid in its entirety to the Commonwealth for its general use.  Both the excise tax and the SUT functioned by taxing a percentage of the value of goods and services sold.

103.  Bonds issued by COFINA purport to be backed by a legislative assignment of a portion of the revenues received from collection of the Commonwealth's  SUT.  In response to a fiscal crisis, the Puerto Rico Legislative Assembly passed Act No. 91-2006, which created the Urgent Interest Fund ("UIF"), a "special fund" used to cover the fiscal deficits of the Commonwealth government, along with other purposes.  Act of May 13, 2006, No. 91-2006, § 2, 2006 P.R. Laws 246, 247 (codified as amended at P.R. Laws Ann. tit. 13, § 12).  The UIF was administered by the Secretary and the GDB, and was financed by a portion of the revenues received from collection of the Commonwealth's SUT.  *Id.*  Seven months later, the Legislative Assembly passed Act No. 291-2006.  *See* Act of Dec. 26, 2006, No. 291-2006, 2006 P.R. Laws 1110 (codified as amended at P.R. Laws Ann. tit. 13, §§ 12–15).  Act No. 291-2006 created the Puerto Rico Urgent Interest Fund Corporation ("UIFC").  *Id.* at 1112.  Act No. 291-2006 transferred and made the UIF the property of the UIFC, which was created to issue bonds backed by revenues in the UIF in order to "pay or refinance the extraconstitutional debt of the Commonwealth."  *Id.*  Act No. 291-2006 also, for the first time, purported to make the revenues deposited in the UIF unavailable for repayment of Constitutional Debt, despite the fact that the same revenues deposited in the same fund had not previously been declared unavailable by Act No. 91-2006, and that the UIF continued to be administered by the Secretary and the GDB.  *Id.* at 1112–13.  Six months after passage of Act No. 291-2006, the Legislative Assembly passed Act No. 56-2007, which created COFINA as a replacement for the UIFC.  *See* Act of July 5, 2007, No. 56-2007, 2007 P.R. Laws 173 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a–16).

Unlike the UIFC, COFINA was purportedly created as an "independent corporation attached to [the] GDB, rather than one of its subsidiaries." *Id.* at 174. Despite this purported change in control, under Act No. 56-2007, COFINA is funded by the same revenues received from the collection of the Commonwealth's SUT that were previously deposited in the UIF under Act No. 91-2006. *See id.* at 176–177.

104.   Revenues arising from collection of the Commonwealth's SUT are a quintessential example of "available resources" for purposes of the Constitutional Debt Priority Guarantee. The constitutional status of these revenues as "available resources" cannot be eliminated by legislative proclamation. Despite legislative attempts to render a portion of the SUT unavailable, the entire SUT remains an "available resource[ ]" within the meaning of Article VI, Section 8. Holders of Constitutional Debt therefore have a higher priority claim to these resources than COFINA and COFINA bondholders, whose rights, if any, cannot be greater than COFINA's rights. COFINA's rights to revenues arising from collection of the Commonwealth's SUT, if any, are subordinate to the rights of holders of Constitutional Debt.

### C.   COFINA Finances The Commonwealth's Government

105.   The revenues purportedly assigned to COFINA arise, as explained above, from collection of a *general* sales and use tax. That tax would typically be collected by the general government. And COFINA uses its funds in a way that would also be typical for a general government: COFINA uses its funds to support the general activities of the Commonwealth's government. The sources and uses of COFINA's funds thus demonstrate that COFINA is merely a contrivance for financing the Commonwealth's government in a manner that attempts to evade provisions in the Puerto Rico Constitution applicable to the Commonwealth's public debt. This purpose confirms that the SUT revenues purportedly assigned to COFINA are "available resources" for purposes of the Puerto Rico Constitution.

106.    More specifically, COFINA's enabling legislation states that it was created to finance in whole or in part certain government expenses and functions, including:

> (1)    the extraconstitutional debt of the Commonwealth outstanding as of June 30, 2006;
>
> (2)    the debt of the Secretary of the Treasury with the GDB in the amount of $1 billion, used to finance the budgetary deficit of FY 2008–2009;
>
> (3)    accounts payable to suppliers of the Commonwealth;
>
> (4)    operating expenses of the Commonwealth Government for certain fiscal years;
>
> (5)    the Puerto Rico Economic Stimulus Fund, a fund established by the GDB to grant relief to taxpayers, boost businesses and trades, support training programs, assist displaced employees, and support any other purposes provided by legislation; and
>
> (6)    the Emergency Fund of the Commonwealth to meet expenses arising as a result of catastrophic events, such as hurricanes or floods.

*See* P.R. Laws Ann. tit. 13, §§ 11a(b), 14a.

## VI.    PROMESA Preempts The Unlawful Executive Order

107.    Article VI, Section 8 of the Puerto Rico Constitution provides that if the Commonwealth's "available resources" are insufficient to meet all of its appropriated obligations, "***interest on the public debt and amortization thereof shall first be paid***, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. Const. art. VI, § 8 (emphasis added). The Puerto Rico Constitution thus requires that principal and interest payments on the public debt receive the highest priority, and that these payments must be made before the Commonwealth may use funds for any other purposes, including transferring funds to COFINA to pay COFINA bondholders. Paying holders of Constitutional Debt in full and on time is mandatory, not discretionary.

41

108.    The Executive Order, however, does not recognize the priority structure dictated by Article VI, Section 8 of the Puerto Rico Constitution.

109.    The Executive Order turns the lawful order of priorities under the Puerto Rico Constitution on its head.  Instead of applying all "available resources" to payments on the Constitutional Debt in times of apparent scarcity, it halts these payments while allowing revenues arising from the collection of the Commonwealth's SUT to continue flowing to COFINA.  The Executive Order thus prevents the Commonwealth from using "available resources" held by COFINA to repay holders of Constitutional Debt, and purports to allow the Commonwealth to pay COFINA and COFINA bondholders with "available resources" that the Commonwealth is constitutionally required to apply to payment of the Constitutional Debt.

110.    The Executive Order is "unlawful" under Section 303(3) of PROMESA because the Executive Order allows the Commonwealth to divert "available resources" to COFINA and its bondholders in violation of the constitutional first lien and first priority rights conferred by the Constitutional Debt Priority Guarantee on holders of the Commonwealth's Constitutional Debt.

## VII.    The Commonwealth Repudiates Its Obligations

### A.    The Commonwealth's Contractual Obligations

111.    In addition to the constitutional and statutory obligations outlined above, the Commonwealth contractually agreed that it would make timely payments of principal and interest on the Constitutional Debt before using funds for any other purpose.

112.    For instance, the Commonwealth issued $3.5 billion in Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A (the "2014 GO Bonds").  The Commonwealth issued the 2014 GO Bonds pursuant to a bond resolution (the "2014 GO Bond Resolution") that forms the Commonwealth's contract with holders of those bonds.  The 2014 GO Bond Resolution stated that the 2014 GO Bonds were issued "under the authority of the Puerto Rican

Federal Relations Act and the Constitution and laws of the Commonwealth."  Commonwealth of

P.R., Bond Resolution Authorizing and Securing $3,500,000,000 Commonwealth of Puerto Rico

General Obligation Bonds of 2014, Series A § 3(a) (2014).   In that same resolution, the

Commonwealth agreed to make timely payments of principal and interest on the 2014 GO

Bonds.

113.    The 2014 GO Bond Resolution provides, pursuant to express authorization in the

enabling legislation governing the 2014 GO Bonds, that the "good faith, credit and taxing power

of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and the

interest on the Bonds authorized by this Resolution."  *Id*. § 19; *see also* Act of Mar. 4, 2014, No.

34-2014, 2014 P.R. Laws 76 (authorizing issuance of 2014 GO Bonds).   The 2014 GO Bond

Resolution also states that the 2014 GO Bonds are protected by the Constitutional Debt Priority

Guarantee:

> The Bonds constitute public debt, as described in and for the purposes of Section
> 2 and Section 8 of Article VI of the Constitution of the Commonwealth of Puerto
> Rico (the "Constitution").   The Secretary is authorized and directed to pay the
> principal of and the interest on the Bonds as the same shall fall due from any
> funds in the Treasury of the Commonwealth available for such purpose in the
> fiscal year for which said payment is required.

2014 GO Bond Resolution § 19.

114.    Section 20 of the 2014 GO Bond Resolution states that bondholders may, among

other remedies, sue the Secretary of the Treasury directly to enforce the payment and

constitutional priority promises:

> In the event that the Commonwealth does not make any payment of principal of
> or interest on the Bonds when due in accordance with the provisions of this
> Resolution, a Bondholder may:
>
> > (a) bring an action against the Secretary, in accordance with the
> > provisions of Section 2 of Article VI of the Constitution, to compel the
> > Secretary of the Treasury to apply available Commonwealth resources

to the payment of the Bonds, as constituting public debt of the Commonwealth, in accordance with the provisions of Section 8 of Article VI of the Constitution; and

(b) seek any other remedies that are available under applicable law or in equity to any other holder of a Commonwealth bond to which its good faith, credit and taxing power are pledged.

*Id.* § 20.

115.    The 2014 GO Bond Resolution provides in Section 38 that Puerto Rico waives any available sovereign immunity defense in any "suit brought to compel the Secretary to comply with the provisions of Sections 2 and 8 of Article VI of the Constitution with respect to its obligations on the Bonds, or to enforce other remedies with respect to the Bonds provided in Section 20 of this Resolution."  *Id.* § 38.

116.    The 2014 GO Bond Resolution stipulates that the "Resolution shall be governed and construed in accordance with the laws of the State of New York, and the laws of the State of New York shall apply to any action or proceeding arising out of the Bonds or this Resolution." *Id.* § 37(a).  The Resolution further states that:

> [t]he Commonwealth hereby irrevocably submits to the exclusive jurisdiction of any New York state or U.S. federal court sitting in the Borough of Manhattan, The City of New York, New York, and any Commonwealth court or U.S. federal Court sitting in San Juan, Puerto Rico, and any appellate court from any thereof (each an "applicable court"), in any action or proceeding arising out of or relating to the Bonds or this Resolution, and the Commonwealth hereby irrevocably agrees that all claims in respect of such action or proceeding . . . may be heard and determined in any such applicable court.

*Id.* § 37(b); *see also* Act No. 34-2014, §4 (authorizing issuance of 2014 GO Bonds and waiver of sovereign immunity).

117.    Although the bond resolutions pursuant to which prior GO Bonds were issued do not contain the same choice-of-law and choice-of-forum provisions that apply to the 2014 GO Bonds, they share a number of relevant features with the 2014 GO Bonds.

118.    For example, the Commonwealth issued GO Bonds on March 7, 2012, titled Public Improvement Refunding Bonds, Series 2012 A and B (the "2012 GO Bonds").   (The Commonwealth offered Series B debt only to investors in Puerto Rico.)  The principal amount of the Series A Bonds totaled $2,318,190,000.  Section 3(a) of the resolution pursuant to which the 2012 GO Bonds were issued (the "2012 GO Bond Resolution") states that the issuance arises under the authority of the Puerto Rican Federal Relations Act and the Constitution and laws of the Commonwealth.  *See* Commonwealth of P.R., Bond Resolution Authorizing and Securing $2,318,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2012 A and $415,270,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2012 B § 3(a) (2012).

119.    The 2012 GO Bond Resolution includes a Section 19 similar to the Section 19 in the 2014 GO Bond Resolution:

> The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and the interest on the Refunding Bonds authorized by this Resolution.  The Secretary is authorized and directed to pay the principal of and the premium, if any, and the interest on the Refunding Bonds as the same shall fall due from any funds in the Treasury of the Commonwealth available for such purpose in the fiscal year for which said payment is required.

2012 GO Bond Resolution § 19; *see also* P.R. Laws Ann. tit. 13, § 41 (authorizing the issuance of GO Bonds).

120.    The Commonwealth has recognized the absolute and binding nature of the Constitutional Debt Priority Guarantee in other contexts as well.  For example, the Official Statement associated with a 2006 issuance of bonds by the Puerto Rico Infrastructure Finance Authority ("PRIFA") informed purchasers of those bonds that "[t]he Constitution of Puerto Rico provides that public debt of the Commonwealth constitutes a first lien on available

Commonwealth taxes and revenues," and made clear that funds otherwise pledged to the repayment of those bonds were subject to being applied first to the payment of debt service on the Constitutional Debt.  Official Statement for PRIFA Special Tax Revenue Bonds, Series 2006, at 10 (2006).

121.   The Constitutional Debt Priority Guarantee constitutes a material term of the Commonwealth's contracts with holders of its Constitutional Debt, and was a material inducement for purchasers of the bonds protected by the Constitutional Debt Priority Guarantee, including Plaintiffs.

### B.   The Commonwealth Defaults

122.   The Moratorium Act and the Executive Order purport to impose a moratorium on payments by the Commonwealth on its Constitutional Debt.  The Moratorium Act provides that the moratorium period extends until January 31, 2017, and further provides that the period may be extended by executive order for not more than two additional months.   Moratorium Act § 103(m).

123.   The Executive Order and Moratorium Act purport to set aside the Commonwealth's constitutional, statutory, and contractual obligations to make principal and interest payments when due (or, in the case of the GO-Guaranteed Debt, to guarantee the timely payment of principal and interest), and the corresponding right of holders of Constitutional Debt to receive payment when due.  Moratorium Act § 103(hh), (ii); id. § 202(a)(i)(A), (C); Ex. E ¶ 1.

124.   The Executive Order and Moratorium Act purport to strip bondholders of their rights to invoke judicial remedies to enforce Puerto Rico's obligations to them.   Pursuant to Section 201(b) of the Moratorium Act, the Executive Order bars bondholders from commencing or continuing lawsuits arising out of bonds that are subject to the moratorium except to the extent that they seek an order enforcing payment of a discretionary "minimum public debt payment,"

on pain of potential liability for contempt of court and punitive damages. *Id.* § 201(b), (c); Ex. E ¶ 7.

125.    Pursuant to the Moratorium Act and the Executive Order, the Commonwealth defaulted on the Constitutional Debt.  This default violates the Commonwealth's constitutional, statutory, and contractual obligations outlined above.  The Commonwealth continues to use funds to make numerous other disbursements, even while the Constitutional Debt remains in default, in violation of the constitutional first lien and first priority rights conferred by the Constitutional Debt Priority Guarantee on holders of the Commonwealth's Constitutional Debt.

**FIRST CAUSE OF ACTION**
**Declaratory and Injunctive Relief**
**(Against the Commonwealth Officer Defendants)**
**PROMESA §§ 204(c)(3) (codified at 48 U.S.C. § 2144(c)(3)), 207 (codified at 48 U.S.C. § 2147); 28 U.S.C. § 2201(a)**

126.    Plaintiffs re-allege and incorporate paragraphs 1–125 above.

127.    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), states that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  Plaintiffs seek a declaration that the Commonwealth's conduct described above violates Sections 204(c)(3) and 207 of PROMESA.

128.    The Commonwealth Officer Defendants have violated Section 204(c)(3) by implementing new laws and measures having the force of law that "permit the transfer of . . . funds or assets outside the ordinary course of business" and "that are inconsistent with the constitution or laws" of Puerto Rico as of PROMESA's enactment.  These actions have caused direct and substantial injury to Plaintiffs, and, if left unremedied, will continue to cause further direct and substantial injury to Plaintiffs.

129.   The Commonwealth Officer Defendants have likewise violated Section 207 of PROMESA, which declares that the Commonwealth may not "without the prior approval of the Oversight Board, issue debt or guarantee, exchange, modify, repurchase, redeem, or enter into similar transactions with respect to its debt."  The Commonwealth has taken such action with respect to its own obligations to the GDB and with respect to certain obligations owed by independent public corporations and municipalities for which it was not previously responsible, all without prior approval of the Oversight Board.  These actions have caused direct and substantial injury to Plaintiffs, and, if left unremedied, will continue to cause further direct and substantial injury to Plaintiffs.

130.   Sections 204(c)(3)(A) and 207 of PROMESA grant Plaintiffs a right to enforce the requirements of those provisions against the Commonwealth Officer Defendants.  Creditors protected by the laws and Constitution of Puerto Rico are directly injured by the dissipation of assets in violation of Section 204(c)(3) and by the modification and assumption of additional debt obligations in violation of Section 207 (and by the Commonwealth's subsequent payments on those additional obligations).  That is particularly true for holders of Constitutional Debt, including Plaintiffs, who alone among creditors are protected by the clear rights established in Article VI of the Puerto Rico Constitution.

131.   Moreover, because the Oversight Board has not yet become fully operational, enforcement of these provisions necessarily falls to Puerto Rico's creditors such as Plaintiffs. While the Oversight Board maintains certain rights of rescission with respect to violations of Section 204(c)(3), until the Board is fully operational, only private enforcement can prevent the Commonwealth or others from later arguing that the unlawful results of these measures cannot, as a legal or practical matter, be fully unwound.  Private enforcement is thus consistent with—

indeed, it is absolutely necessary to—full and proper functioning of PROMESA's scheme of rights and remedies.

132.    This Cause of Action is not stayed by PROMESA.  *See* Mem. Order, Sept. 2, 2016, Dkt. No. 32.  This Cause of Action does not seek to compel payment of  Constitutional Debt at this time; rather, it seeks a declaration that Puerto Rico has violated PROMESA's prohibition on new measures authorizing transfers "outside the ordinary course of business" and violating Puerto Rico's Constitution and laws, and PROMESA's statement that the Commonwealth may not, "without the prior approval of the Oversight Board, issue debt or guarantee, exchange, modify, repurchase, redeem, or enter into similar transactions with respect to its debt."

133.    Plaintiffs also seek, at this time, a narrowly tailored injunction segregating and preserving assets affected by several of the most egregious violations of PROMESA Sections 204(c)(3) and 207.  The injunctive relief requested in connection with this Cause of Action, however, would afford at least partial protection from the Commonwealth's most flagrant dissipation of assets.  Accordingly, the requested injunction seeks to preserve the funds transferred (or to be transferred) by these extraordinary, unconstitutional, and unlawful measures until the Oversight Board is fully operational and has made a determination as to the propriety of these measures.  More particularly, Plaintiffs seek an injunction:

    a.    requiring the Commonwealth Officer Defendants, in their official capacities as Commonwealth officers, to segregate and preserve all funds clawed back, to be clawed back, or available to be clawed back under contractual and legal provisions expressly acknowledging that those funds are subject to turnover for purposes of paying the Constitutional Debt;

b.      prohibiting the Commonwealth Officer Defendants, in their official capacities as Commonwealth officers, from implementing the outsized transfers to the public employee pension funds contemplated in the Fiscal Year 2017 budget and limiting the Commonwealth to the contribution it made in Fiscal Year 2016;

c.      prohibiting the Commonwealth Officer Defendants, in their official capacities as Commonwealth officers, from implementing the diversion to the insolvent GDB of the approximately $250 million contemplated by the Fiscal Year 2017 budget; and

d.      prohibiting the Commonwealth Officer Defendants, in their official capacities as Commonwealth officers, from implementing the additional payments to the GDB contemplated by Act No. 74-2016.

134.   The injunctive relief requested in connection with this Cause of Action at this time would not require payment to be made to Plaintiffs, but would forbid the Commonwealth Officer Defendants from transferring funds or assets pursuant to those laws found to violate PROMESA Sections 204(c)(3) and 207 and to preserve those assets until such time as the Oversight Board is fully operational.  Plaintiffs currently lack an adequate remedy at law; the Commonwealth will otherwise dissipate these and other assets and then claim that it lacks funds sufficient to pay Constitutional Debt as required.  The requested injunctive relief is therefore necessary and appropriate.

### SECOND CAUSE OF ACTION
### Declaratory and Injunctive Relief
#### (Against the Commonwealth Officer Defendants and the COFINA Defendants)
#### PROMESA § 303(3) (codified at 48 U.S.C. § 2163(3)); 28 U.S.C. § 2201(a)

135.    Plaintiffs re-allege and incorporate paragraphs 1–134 above.

136.    Plaintiffs seek a declaration that the Executive Order described above is preempted by Section 303(3) of PROMESA.

137.    Plaintiffs are holders of substantial amounts of debt issued by Puerto Rico or its instrumentalities.

138.    The Executive Order alters and modifies the rights of Plaintiffs by subordinating the rights of holders of Constitutional Debt to COFINA bondholders while the Constitutional Debt is in default.

139.    The Executive Order is unlawful because the revenues diverted to COFINA are "available resources" within the meaning of Article VI, Section 8 of the Puerto Rico Constitution.

140.    The Executive Order thus unlawfully alters, amends, or modifies the rights of holders of Constitutional Debt by impairing their right to receive payment before the Commonwealth may use funds for any other purpose.

141.    As a consequence, the Executive Order is preempted by Section 303(3) of PROMESA.

142.    The Executive Order has caused direct and substantial injury to Plaintiffs, and, if left unremedied, will continue to cause further direct and substantial injury to Plaintiffs.

143.    Section 303(3) grants Plaintiffs a right to enforce the requirements of that provision against the Commonwealth Officer Defendants and the COFINA Defendants.  Holders of Constitutional Debt, including Plaintiffs, are directly injured by the issuance of unlawful

executive orders that prioritize junior creditors, including COFINA bondholders, over holders of Constitutional Debt.

144.     Plaintiffs currently lack an adequate remedy at law.  Unless this Court grants the requested relief, the Commonwealth Officer Defendants and the COFINA Defendants will continue the unlawful transfer of funds to COFINA for the payment of COFINA bondholders, notwithstanding the Commonwealth's failure to make payments on its Constitutional Debt and its obligation to apply the revenues diverted to COFINA to payments on the Constitutional Debt. The injunctive relief requested below is therefore necessary and appropriate.

**THIRD CAUSE OF ACTION**
**Declaratory and Injunctive Relief**
**(Against the Commonwealth Officer Defendants)**
**PROMESA § 303(1) (codified at 48 U.S.C. § 2163(1)); 28 U.S.C. § 2201(a)**

145.     Plaintiffs re-allege and incorporate paragraphs 1–144 above.

146.     The Moratorium Act is a moratorium law that, as applied to the Constitutional Debt, purports to prohibit the payment of principal or interest on the Constitutional Debt.  The Constitutional Debt was not issued by entities described in 11 U.S.C. § 109(b)(2).  Plaintiffs do not consent to the moratorium.

147.     The Moratorium Act is preempted by Section 303(1) of PROMESA insofar as it purports to bind holders of Constitutional Debt, including Plaintiffs.

148.     Section 303(1) grants Plaintiffs a right to enforce the requirements of that provision against the Commonwealth Officer Defendants.

149.     Holders of Constitutional Debt, including Plaintiffs, are directly injured by the Moratorium Act, which has been used to prohibit payment of principal or interest on the Constitutional Debt.

150.    Plaintiffs currently lack an adequate remedy at law.  Unless this Court grants the requested relief, the Commonwealth will continue to spend funds on other uses in violation of the Constitutional Debt Priority Guarantee.  The injunctive relief requested below is therefore necessary and appropriate.

**FOURTH CAUSE OF ACTION**
**Declaratory and Injunctive Relief**
**(Against the Commonwealth Officer Defendants and the COFINA Defendants)**
**Article VI of the Puerto Rico Constitution; 28 U.S.C. § 2201(a)**

151.    Plaintiffs re-allege and incorporate paragraphs 1–150 above.

152.    Article VI, Section 8 of the Puerto Rico Constitution requires that principal and interest payments on the public debt receive the highest possible priority, and that these payments must be made before the Commonwealth may divert funds to COFINA or to any other expenditures.  In addition, Article VI, Section 7 requires the Commonwealth to have a balanced budget and, if the budget is not balanced, to raise taxes sufficient to cover any excess appropriations.   Article VI, Section 6 provides that appropriations for payments on the Constitutional Debt are carried over from year-to-year, if not otherwise appropriated.

153.    Revenues arising from collection of the Commonwealth's SUT are "available resources" for purposes of the Constitutional Debt Priority Guarantee.  All revenues arising from collection of the Commonwealth's SUT therefore remain "available resources" within the meaning of Article VI, Section 8.  Holders of Constitutional Debt therefore have a higher priority claim to these funds than COFINA bondholders do.  Act No. 56-2007 is unconstitutional to the extent that it purports to exclude these funds from the first-priority claim and constitutional lien of holders of Constitutional Debt.

154.    The Executive Order and Moratorium Act also transgress the rights of holders of Constitutional Debt because they impose a moratorium on payments of principal and interest on

53

the "public debt."   The Executive Order and Moratorium Act thus purport to allow the Commonwealth to spend funds for whatever purposes the Governor chooses before meeting the Commonwealth's explicit and nondiscretionary constitutional obligation to pay principal and interest to holders of its public debt.   In that way, the Executive Order and the Moratorium Act directly contravene the Constitutional Debt Priority Guarantee, which requires that the Constitutional Debt be paid before all other disbursements.

155.    Article VI, Section 2 of the Puerto Rico Constitution guarantees holders of Constitutional Debt express judicial remedies to protect their rights and to bar the Commonwealth from claiming sovereign immunity or any other defense against enforcement of the Constitutional Debt Priority Guarantee.

156.    Because all revenues arising from the collection of the Commonwealth's SUT are "available resources" and Plaintiffs are holders of Constitutional Debt, the Secretary of the Treasury may be compelled to apply all revenues arising from the collection of the SUT to the repayment of their bonds.

157.    The restrictions on government action contained in the Puerto Rico Constitution limit the Commonwealth's exercise of its police power.   As a result, the Commonwealth lacks authority under its police power to take actions that violate the protections for holders of Constitutional Debt set forth in Article VI of the Puerto Rico Constitution.   This is particularly so while the Commonwealth continues to divert revenues from the collection of the SUT to COFINA and pay COFINA bondholders.   The Moratorium Act is thus unlawful under the Puerto Rico Constitution, and is unenforceable against holders of Constitutional Debt.

**FIFTH CAUSE OF ACTION**
**Declaratory and Injunctive Relief**
**(Against the Commonwealth Officer Defendants and the COFINA Defendants)**
**Article VI, Section 2 of the Puerto Rico Constitution; 28 U.S.C. § 2201(a)**

158.    Plaintiffs re-allege and incorporate paragraphs 1–157 above.

159.    Article VI, Section 2 of the Puerto Rico Constitution provides that "[t]he power of the Commonwealth of Puerto Rico to impose and ***collect*** taxes and to authorize their imposition and ***collection*** by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended." P.R. Const. art. VI, § 2 (emphasis added).

160.    In an effort to render a portion of the funds arising from the collection of the Commonwealth SUT unavailable, those funds are "directly deposited" into a fund held by COFINA, rather than into the Treasury of Puerto Rico. Act No. 56-2007 provides that the SUT "shall be directly deposited in [a fund held by COFINA] at the time of receipt and shall not be deposited in the Treasury of Puerto Rico." P.R. Laws Ann. tit. 13, § 12.

161.    These revenues are "collected" from merchants by Banco Popular and First Data. They are transferred to various accounts and finally held in a trust account held by BNYM. This method of collecting revenues arising from the SUT violates Article VI, Section 2 because it surrenders or suspends the Commonwealth's power to "collect" taxes.

162.    The language and purposes of Article VI, Section 2 of the Puerto Rico Constitution demonstrate that Plaintiffs are entitled to enforce the requirements of that provision against Defendants. The Commonwealth had pledged its taxing power to guarantee the timely payment of principal and interest to holders of Constitutional Debt (including Plaintiffs). Plaintiffs are therefore directly injured by the Commonwealth's unlawful surrender and suspension of its power to "collect" taxes.

**SIXTH CAUSE OF ACTION**
**Declaratory and Injunctive Relief**
**(Against the Commonwealth Officer Defendants)**
**Contract Clause of the United States Constitution; 28 U.S.C. § 2201(a)**

163.    Plaintiffs re-allege and incorporate paragraphs 1–162 above.

164.    The Contract Clause of the United States Constitution, which applies to Puerto Rico, prohibits the Commonwealth from passing "any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1.  Under that Clause, a State or territory may not enact a law that substantially impairs a contractual relationship unless the impairment is both "reasonable and necessary to serve an important public purpose." *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 25 (1977).  Even if the Puerto Rico Constitution did not categorically preclude the Commonwealth from invoking its police power to impair the rights of holders of its Constitutional Debt, the Contract Clause would prevent the application of the Moratorium Act and the Executive Order to Puerto Rico's Constitutional Debt.

165.    The Moratorium Act and Executive Order substantially impair the Commonwealth's contractual obligations to holders of its Constitutional Debt.  In its contracts with holders of Constitutional Debt, the Commonwealth promised to make timely payments of principal and interest according to the contractually agreed terms, and those promises are backed by explicit and nondiscretionary provisions of the Puerto Rico Constitution that require the Commonwealth to adhere to these contractual duties.  The Moratorium Act and Executive Order substantially impair these contractual rights by purporting to authorize the Commonwealth to violate these agreements and not to make payments of principal and interest owed to holders of Constitutional Debt.  As a direct consequence of the Moratorium Act and the Executive Order, Puerto Rico failed to make principal and interest payments owed to holders of Constitutional Debt on July 1, 2016, August 1, 2016, September 1, 2016, and October 1, 2016.

56

166.   This substantial impairment of the Constitutional Debt was not necessary in light of the availability of more moderate courses of action and not reasonable in light of the surrounding circumstances.  It is clear that there are numerous ways in which Puerto Rico can allocate resources sufficient to make timely payment on its Constitutional Debt.

167.   The Commonwealth claims to have collected gross general fund revenue of over $9.6 billion in Fiscal Year 2016.[5]   Press Release, Office of the Sec'y of the Treasury, The Treasury Dep't Reports That Net Income to the Gen. Fund for Fiscal Year 2015-16 Totaled $9.175 Billion, a $214.4 Million or 2.4% Year-to-Year Increase Over the Previous Fiscal Year, and 98.7% of the Revised Total Estimate (July 28, 2016), http://www.gdb-pur.com/documents/IngresosAFENGLISH.pdf.  The amounts necessary to pay the Constitutional Debt are just a small fraction of that.  Thus, even crediting the Commonwealth's incorrect view that it can prioritize essential services over payments on the Constitutional Debt and considering only a fraction of the Commonwealth's revenues, there is no plausible argument that, if the Commonwealth were to respect existing creditor priorities, it could not make payments on the Constitutional Debt.

168.   Instead of respecting creditor priorities, the Commonwealth continues to allow the diversion of a portion of the revenues received from collection of the Commonwealth's SUT to COFINA and to make payments to COFINA bondholders.   In Fiscal Year 2016, the Commonwealth diverted approximately $696 million of the revenues received from collection of the Commonwealth's SUT to COFINA.  *See* P.R. Treasury Dep't, Office of Econ. and Fin.

---

[5]   Plaintiffs do not concede that their claims are limited to gross general fund revenues.  The Puerto Rico Constitution grants holders of Constitutional Debt a first-priority claim and constitutional lien on all "available resources."  All "available resources" therefore must be applied to payment on the Constitutional Debt regardless of whether those resources are paid into the general fund.

Affairs, States Sales and Use Tax, Distribution of Monthly Collection: Fiscal Years 2014-15–
2016-17                                (Aug.                             15,                              2016),
http://www.hacienda.gobierno.pr/sites/default/files/distribucion_mensual_ivu_agosto_2016-
17.pdf.  COFINA has paid over $300 million in principal and interest payments to COFINA
bondholders during Fiscal Year 2017.  Additionally, as noted above in paragraph 92, $119.7
million was diverted to COFINA in July 2016, approximately $121.6 million was diverted to
COFINA in August 2016, and millions more have likely been diverted since then.  *See id.*; Press
Release, Office of the Sec'y of the Treasury, Treasury Revenues Totaled $665.1 Million in July,
$38.6 Million, or 6.2% Above July 2015 Revenues and $7.4 Million Above Estimates (Aug. 15,
2016),     http://www.gdb-pur.com/documents/TreasuryPressRelease-July2016Final.pdf;    Press
Release, Office of the Sec'y of the Treasury, Treasury Revenues Totaled $550.0 Million in
August,    $10.3    Million,    or    1.9%    Above    Estimates    (Sept.    15,    2016),
http://www.bgfpr.com/documents/TreasuryPressReleaseonAugust2016Revenues.pdf.       The
Commonwealth has also permitted payments on numerous bonds that are not protected by the
Constitutional Debt Priority Guarantee.  Because the Commonwealth could pursue precisely the
same interests by stopping the unlawful diversion of revenues received from collection of the
Commonwealth's SUT and ceasing payments on bonds not protected by the Constitutional Debt
Priority Guarantee, the Commonwealth's substantial impairment of its contractual obligations to
holders of Constitutional Debt is unnecessary, and thus cannot be justified under the Contract
Clause.

169.    This substantial impairment is also not necessary because the Commonwealth
could generate billions more in "available resources" through structural and budgetary reforms.
Even while the Commonwealth claims to have insufficient resources to honor the Constitutional

Debt Priority Guarantee, its Fiscal Year 2017 budget contemplates an *increase* of more than $500 million in non-debt service spending.  On the other side of the ledger, the Commonwealth has refused to take appropriate measures to ensure that taxes sufficient to fund its spending are collected.  For instance, a study performed by international accounting firm KPMG on behalf of the Puerto Rico Treasury Department concluded that Puerto Rico collects only 10.66% of its gross domestic product in income and consumption taxes—a figure that was exceedingly low in comparison to the countries KPMG selected as peer jurisdictions.  *See* Commonwealth of P.R. Tax Reform Assessment Project, Unified Tax Code of Puerto Rico: Tax Policy Implementation Options Executive Summary 6–7 (Oct. 31, 2014).

170.    This impairment is unreasonable because it advances the interests of certain creditors and stakeholders at the expense of Plaintiffs and other holders of Constitutional Debt. The Moratorium Act and Executive Order target only holders of the Commonwealth's financial debt—placing the consequences of Puerto Rico's financial mismanagement on Plaintiffs and other holders of Constitutional Debt, without sharing the burden with other stakeholders—such as trade creditors and those who receive subsidies or other payments from the Puerto Rico government.

171.    This impairment cannot be defended as an emergency measure, primarily because (as discussed above) there is not a legally cognizable emergency justifying the Commonwealth's failure to meet its obligations to the holders of Constitutional Debt, including Plaintiffs.  If the Commonwealth would simply respect the existing hierarchy of priorities among its creditors, it would have—by its own admission—more than sufficient resources to honor its commitments to holders of Constitutional Debt.  Moreover, although the impairment is technically for a limited duration, there is no reasonable prospect that the impairment will truly be only temporary—

especially given that the Commonwealth refuses to take any steps to improve its financial condition.  The Commonwealth's evident plan is to attempt to force holders of Constitutional Debt to accept *permanent* impairment of their absolute right to receive payment, through the imposition of a purportedly temporary moratorium.

172.    Given all of these circumstances—and particularly in light of the strong reliance interests at issue here given the constitutionally enshrined priority of the Commonwealth's Constitutional Debt—the Moratorium Act and Executive Order substantially, unreasonably, and unnecessarily impair the obligation of contracts, and accordingly violate the Contract Clause of the United States Constitution.

### SEVENTH CAUSE OF ACTION
**Declaratory and Injunctive Relief**
**(Against the Commonwealth Officer Defendants)**
**Contract Clause of the Puerto Rico Constitution; 28 U.S.C. § 2201(a)**

173.    Plaintiffs re-allege and incorporate paragraphs 1–172 above.

174.    For the reasons set forth above, the conduct of the Commonwealth Officer Defendants also violates the parallel Contract Clause in Article II, Section 7 of the Puerto Rico Constitution, which provides that "[n]o laws impairing the obligation of contracts shall be enacted."  P.R. Const. art. II, § 7.  That provision is analogous to the Contract Clause of the United States Constitution and provides at least the same level of protections against impairments of the obligations of contracts.  *See, e.g.*, *Bayrón Toro v. Serra*, 19 P.R. Offic. Trans. 646, 661–62 (1987); *Warner Lambert Co. v. Superior Court of Puerto Rico*, 1 P.R. Offic. Trans. 527, 550–53 (1973).

**EIGHTH CAUSE OF ACTION**
**Monetary, Declaratory, and Injunctive Relief**
**(Against the Commonwealth and the Commonwealth Officer Defendants)**
**Takings and Due Process Clauses of the United States Constitution; 28 U.S.C. § 2201(a)**

175.    Plaintiffs re-allege and incorporate paragraphs 1–174 above.

176.    The Fifth Amendment to the U.S. Constitution, which applies to Puerto Rico, provides that private property shall not be "taken for public use, without just compensation." U.S. Const. amend. V.  The Fifth and Fourteenth Amendments to the U.S. Constitution further prohibit the deprivation of "life, liberty, or property, without due process of law."  U.S. Const. amend. V; *id.* amend. XIV, § 1.

177.    Plaintiffs' beneficial ownership of a substantial amount of Constitutional Debt, including both GO Bonds and GO-Guaranteed Bonds, carries certain vested contractual and property rights, including but not limited to the Constitutional Debt Priority Guarantee.

178.    As holders of Constitutional Debt, Plaintiffs had reasonable investment-backed expectations that their contractual and property rights as bondholders, including the Constitutional Debt Priority Guarantee, would be preserved.  These rights were substantial and material features of the Constitutional Debt.

179.    Plaintiffs' contractual and property interests in the Constitutional Debt, "available resources," and the Constitutional Debt Priority Guarantee are constitutionally cognizable property rights protected by the Fifth and Fourteenth Amendments to the U.S. Constitution.  The Executive Order and Moratorium Act take Plaintiffs' contract and property rights embodied in the Constitutional Debt Priority Guarantee by (a) nullifying the Commonwealth's obligation to pay interest and principal on the Constitutional Debt promptly when due; (b) prioritizing other expenditures, such as payments to COFINA bondholders, above payment of the Constitutional Debt; and (c) depriving Plaintiffs of their contractually and constitutionally guaranteed remedies

61

to enforce payment of the Constitutional Debt without due process of law.  Specifically, the Executive Order provides that "no action or proceeding shall be commenced or continued in any court of any jurisdiction that is related to or arises under any Covered Obligation," including Constitutional Debt.  Ex. E ¶ 1, 7.  Sections 201(b)–(c) of the Moratorium Act similarly purport to bar access to courts.

180.    The Commonwealth's taking of this property without just compensation is unlawful and Plaintiffs are therefore entitled to all appropriate remedies for that violation, including, without limitation, declaratory and injunctive relief along with damages.

### NINTH CAUSE OF ACTION
**Monetary, Declaratory, and Injunctive Relief**
**(Against the Commonwealth and the Commonwealth Officer Defendants)**
**Takings and Due Process Clauses of the Puerto Rico Constitution; 28 U.S.C. § 2201(a)**

181.    Plaintiffs re-allege and incorporate paragraphs 1–180 above.

182.    For the reasons set forth above, the conduct of the Commonwealth and the Commonwealth Officer Defendants also violates the parallel Takings Clause in Article II, Section 9 of the Puerto Rico Constitution, which provides that "[p]rivate property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law."  P.R. Const. art. II, § 9.  That provision is analogous to the Takings Clause of the U.S. Constitution and provides at least the same level of protections against takings of private property without just compensation.  The conduct of the Commonwealth and the Commonwealth Officer Defendants likewise violates the parallel Due Process Clause in Article II, Section 7 of the Puerto Rico Constitution, which provides that "[t]he right to life, liberty and the enjoyment of property is recognized as a fundamental right of man. . . .  No person shall be deprived of his liberty or property without due process of law."  *Id.* § 7.  That provision is analogous to the Due

Process Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution and provides at least the same level of protections.

**TENTH CAUSE OF ACTION**
**Declaratory and Injunctive Relief**
**(Against the Commonwealth Officer Defendants)**
**Unconstitutional Denial of Access to Courts; 28 U.S.C. § 2201(a)**

183.    Plaintiffs re-allege and incorporate paragraphs 1–182 above.

184.    Paragraph Seven of the Executive Order and Sections 201(b)–(c) of the Moratorium Act purport to preclude holders of Constitutional Debt from pursuing judicial remedies in connection with the Commonwealth's default on July 1, 2016.   Indeed, the Commonwealth may even seek to preclude challenges to the constitutionality of the Executive Order and the Moratorium Act itself.

185.    The Commonwealth may not, however, enjoin proceedings in federal court.  *See*, *e.g.*, *Donovan v. City of Dallas*, 377 U.S. 408, 411–13 (1964).  To the extent any provision of the Executive Order or Moratorium Act purports to enjoin, stay, suspend, or preclude Plaintiffs from exercising their rights in federal court, including the right to challenge the constitutionality of the Executive Order or the Moratorium Act in federal court, those provisions also violate the United States Constitution.

**ELEVENTH CAUSE OF ACTION**
**Declaratory and Injunctive Relief**
**(Against the Commonwealth Officer Defendants)**
**The Moratorium Act Is Invalid as Applied to the 2014 GO Bonds Because the Puerto Rico Legislative Assembly Lacks Authority to Modify the Terms of New York Law; 28 U.S.C. § 2201(a)**

186.    Plaintiffs re-allege and incorporate paragraphs 1–185 above.

187.    The 2014 GO Bond Resolution's choice-of-law clause states that the 2014 GO Bond Resolution is governed by New York law.

188.    The Legislative Assembly of Puerto Rico lacks legislative authority to alter the content of New York law, including New York's substantive law of contracts and the remedies established by New York law for breach of contract.  Moreover, it would violate the federal Constitution's Due Process Clause for a territory to attempt to change the substantive law of a State, particularly having explicitly submitted to the same.

189.    The Executive Order and Moratorium Act nonetheless purport to modify the contractual rights of holders of the 2014 GO Bonds by purporting to suspend the Commonwealth's obligation to make payments on the 2014 GO Bonds according to their terms, and purport to preclude bondholders from pursuing their contractual remedies in response to the Commonwealth's default.

190.    Accordingly, the Moratorium Act's provisions cannot validly be applied with respect to the 2014 GO Bonds.

**TWELFTH CAUSE OF ACTION**
**Declaratory and Injunctive Relief**
**(Against the Commonwealth Officer Defendants and the COFINA Defendants)**
**42  U.S.C. § 1983; 28 U.S.C. § 2201(a)**

191.    Plaintiffs re-allege and incorporate paragraphs 1–190 above.

192.    42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any . . . Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

193.    The Commonwealth Officer Defendants and the COFINA Defendants have deprived Plaintiffs of rights, privileges, and immunities secured by laws of the United States,

64

including Sections 204(c)(3), 207, 303(1), and 303(3) of PROMESA, the United States Constitution, and the Puerto Rico Constitution, under color of the Executive Order and the Moratorium Act, along with other statutes, ordinances, regulations, customs, or usages of the Commonwealth of Puerto Rico.  Accordingly, the Commonwealth Officer Defendants and the COFINA Defendants' conduct adopting, applying, or enforcing these measures violates 42 U.S.C. § 1983.

### THIRTEENTH CAUSE OF ACTION
### Relief from Stay
### (Against All Defendants)
### PROMESA § 405(e) (codified at 48 U.S.C. § 2194(e))

194.    Plaintiffs re-allege and incorporate paragraphs 1–193 above.

195.    Plaintiffs respectfully request relief from the stay under Section 405(e) of PROMESA to file this complaint.  If some or all of the Causes of Action Plaintiffs seek to pursue immediately are deemed to fall within PROMESA's stay provisions, Plaintiffs respectfully request relief from the stay under Section 405(e) of PROMESA in order to pursue those Causes of Action.

196.    Section 405(e)(1) of PROMESA, titled "JURISDICTION, RELIEF FROM STAY" states that "[t]he United States District Court for the District of Puerto Rico shall have original and exclusive jurisdiction of any civil actions arising under or related to this section."

197.    Section 405(e)(2) of PROMESA states that "[o]n motion of or action filed by a party in interest and after notice and a hearing, the United States District Court for the District of Puerto Rico, for cause shown, shall grant relief from the stay provided under subsection (b) of this section."

198.    Plaintiffs are parties in interest within the meaning of Section 405(e)(2).  They have a direct and substantial interest in the protections afforded to Constitutional Debt by the Puerto Rico Constitution and the United States Constitution.

199.    As established in the accompanying motion for relief from the stay, Plaintiffs have shown cause for relief from the stay.  The First, Second, Third, and Twelfth Causes of Action are not subject to the stay under the Court's September 2 Memorandum and Order because they could not have been commenced before PROMESA's enactment and they are not actions "to recover on a Liability Claim."  Dkt. No. 32 at 2.  Accordingly, relief from the stay is not necessary to the extent Plaintiffs seek to file and pursue the First, Second, Third, and Twelfth Causes of Action.[6]  With respect to the remaining Causes of Action, as set forth in the accompanying motion for relief from the stay, Plaintiffs seek relief from the stay only to file a complaint containing these Causes of Action but not to pursue them further at this time. Plaintiffs currently seek only relief that will prevent Puerto Rico from siphoning assets away from Constitutional Debt.

### **PRAYER FOR RELIEF**[7]

WHEREFORE, Plaintiffs request the entry of judgment as follows:

### I.    **Relief That Plaintiffs Seek At This Time**

Plaintiffs' First, Second, Third, and Twelfth Causes of Action are not subject to the stay set forth in PROMESA § 405 (codified at 48 U.S.C. § 2194).  Plaintiffs seek certain relief

---

[6]    Plaintiffs seek to pursue their Twelfth Cause of Action only to the extent that the Twelfth Cause of Action rests on underlying violations of Sections 204(c)(3), 207, 303(1), and 303(3) of PROMESA.

[7]    Plaintiffs do not concede that this relief reflects the full scope of their legal rights (or even reflects all of the unlawful measures identified above), because Constitutional Debt is senior to *all* expenditures of the Commonwealth's available resources.

pursuant to those claims that is similarly not barred by that stay, and that Plaintiffs are consequently entitled to seek, and do seek, immediately following the filing of this Second Amended Complaint.  Accordingly, on their First, Second, Third, and Twelfth Causes of Action, Plaintiffs demand the entry of judgment awarding such relief as follows:

A.      Declaring that the Commonwealth's post-PROMESA measures permitting transfers outside the ordinary course of business or in violation of Puerto Rico's Constitution and laws to the detriment of holders of Puerto Rico's Constitutional Debt are invalid under Section 204(c)(3) of PROMESA, and that Act No. 74-2016 violates Section 207 of PROMESA.

B.      Declaring that the Executive Order is unlawful and preempted by Section 303(3) of PROMESA.

C.      Declaring that, under Section 303(1), the Moratorium Act cannot bind Plaintiffs without their consent.

D.      Declaring that the revenues diverted to COFINA (or any substitute revenues) are "available resources" within the meaning of Article VI, Section 8 of the Puerto Rico Constitution and that such funds cannot be transferred to COFINA or COFINA bondholders.

E.      Declaring that the Commonwealth is obligated to afford the Constitutional Debt absolute payment priority over all other expenditures, including payments to COFINA and COFINA bondholders.

F.      Enjoining enforcement or implementation of the unlawful Executive Order and the Moratorium Act, with such injunction:

1.      prohibiting the diversion of revenues arising from collection of the SUT (or any substitute revenues) to COFINA and requiring the Commonwealth Officer Defendants, in their official capacities as Commonwealth Officers, and the COFINA Defendants to direct such funds to Puerto Rico's Treasury;

2.      directing the COFINA Defendants to transfer any revenues received from the collection of the Commonwealth's SUT in their possession or held on behalf of COFINA to the Commonwealth;

3.      directing the Commonwealth Officer Defendants to segregate and preserve such funds arising from collection of the SUT or transferred from the COFINA Defendants; and

4.      prohibiting the enforcement of the Moratorium Act and the Executive Order as applied to the Constitutional Debt.

G.      Enjoining enforcement or implementation of certain measures until the Oversight Board has made a determination as to their propriety, with such injunction:

1.      requiring the Commonwealth Officer Defendants, in their official capacities as Commonwealth officers, to segregate and preserve all funds clawed back, to be clawed back, or available to be clawed back under contractual and legal provisions expressly acknowledging that those funds are subject to turnover for purposes of paying the Constitutional Debt;

2.      prohibiting the Commonwealth Officer Defendants, in their official capacities as Commonwealth officers, from implementing the outsized transfers to the public employee pension funds contemplated in the Fiscal Year 2017 budget and limiting the Commonwealth to the contribution it made in Fiscal Year 2016;

3.     prohibiting the Commonwealth Officer Defendants, in their official capacities as Commonwealth officers, from implementing the diversion to the insolvent GDB of the approximately $250 million contemplated by the Fiscal Year 2017 budget; and

4.     prohibiting the Commonwealth Officer Defendants, in their official capacities as Commonwealth officers, from implementing the additional payments to the GDB contemplated by Act No. 74-2016.

H.     Only for the purposes of filing this Second Amended Complaint, an order granting relief under Section 405(e) from PROMESA's stay on certain creditor litigation, insofar as is necessary to prevent harm to the interests of holders of Constitutional Debt.

I.     Awarding Plaintiffs costs and attorneys' fees, as authorized under 42 U.S.C. § 1983.

J.     Granting such other and further relief as the Court deems just and proper.

## II.     <u>Relief That Plaintiffs Do Not Seek At This Time</u>

Plaintiffs' Causes of Action entitle them to certain relief that Plaintiffs have elected not to pursue immediately upon filing of this Second Amended Complaint in light of, *inter alia*, the stay set forth in PROMESA § 405.  This Section II of Plaintiffs' Prayer for Relief describes that relief.  Accordingly, subject to the foregoing, on all of Plaintiffs' Causes of Action, Plaintiffs demand entry of judgment awarding additional relief as follows:

A.     Declaring that the Executive Order and Moratorium Act cannot be validly applied and are unenforceable with respect to the Constitutional Debt because they violate the United States Constitution and Puerto Rico Constitution, and exceed the scope of the Puerto Rico Legislative Assembly's legislative authority.

B.     Declaring that, if given effect, the Commonwealth's purported diversion of a

portion of the SUT to COFINA would constitute an unlawful surrender or suspension of its power to collect taxes in violation of Article VI, Section 2 of the Puerto Rico Constitution.

C.      Declaring that the Executive Order and the Moratorium Act cannot validly bar Plaintiffs from exercising their rights in federal court.

D.      Declaring that the Legislative Assembly of Puerto Rico lacks legislative authority to alter the content of New York law and therefore the Moratorium Act and Executive Order do not alter the legal rights of holders of the 2014 GO Bonds.

E.      Declaring that the Moratorium Act and Executive Order constitute an unconstitutional taking without just compensation under the United States and Puerto Rico Constitutions.

F.      Declaring that the Moratorium Act and Executive Order violate the due process clauses of the United States and Puerto Rico Constitutions.

G.      Enjoining enforcement or implementation of the unlawful Executive Order and the Moratorium Act, with such injunction requiring the Secretary of the Treasury to apply all "available resources," including revenues previously derived from the collection of the Commonwealth's SUT, to the repayment of the Constitutional Debt.

H.      Only in connection with the Ninth and Tenth Causes of Action, determining and awarding to Plaintiffs the damages they have sustained as a result of the violations set forth above from the Commonwealth.

I.      Awarding Plaintiffs costs and attorneys' fees, as authorized under 42 U.S.C. § 1983.

J.      Granting such other and further relief as the Court deems just and proper.

**WE HEREBY CERTIFY** that on this same date, we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

October 7, 2016

Respectfully submitted,

/s/J. Ramón Rivera Morales
J. Ramón Rivera Morales
USDC-PR BAR NO. 200701
JIMÉNEZ, GRAFFAM & LAUSELL
PO Box 366104
San Juan, PR 00936
Telephone: (787) 767-1030
Facsimile: (787) 751-4068
rrivera@jgl.com

Mark T. Stancil (admitted *pro hac vice*)
Gary A. Orseck (admitted *pro hac vice*)
Ariel N. Lavinbuk (admitted *pro hac vice*)
Donald Burke (admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT, ORSECK
     UNTEREINER & SAUBER LLP
1801 K Street, NW
Washington, D.C. 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
mstancil@robbinsrussell.com
gorseck@robbinsrussell.com
alavinbuk@robbinsrussell.com
dburke@robbinsrussell.com

*Counsel for Plaintiffs*