IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| LEX CLAIMS, LLC, *et al.*,<br><br>     **Plaintiffs,**<br><br>               **v.**<br><br>ALEJANDRO   GARCIA-PADILLA,   *et al.*,<br><br>     **Defendants.** | **Civil No.** 16-2374 (FAB) |

**OPINION AND ORDER**

BESOSA, District Judge.

This action arises from the Commonwealth of Puerto Rico (the "Commonwealth")'s default on general obligation bonds ("GO bonds"). Plaintiffs ("GO Bondholders") are beneficial owners of GO bonds. The GO Bondholders filed suit against the Commonwealth, the Governor of the Commonwealth, the Secretary of the Treasury of the Commonwealth, the Director of the Office of Management and Budget of the Commonwealth, the Puerto Rico Sales Tax Financing Corporation ("COFINA"), the Executive Director of COFINA, and the

Bank of New York Mellon Corporation (collectively "defendants").[1]

Among other things, the GO Bondholders seek declaratory and

injunctive relief pursuant to the Puerto Rico Oversight

Management, and Economic Stability Act ("PROMESA").  48 U.S.C. §

2121 *et seq*.

Before the Court are six motions:  (1) the Commonwealth and

COFINA defendants' motion to stay the action in its entirety

pursuant to section 405 of PROMESA (Docket No. 106);[2] (2) the

Financial Oversight and Management Board for Puerto Rico

("Oversight Board")'s motion to intervene pursuant to PROMESA and

Fed.R.Civ.P. 24 (Docket No. 62); (3) Ambac Assurance Corporation

("Ambac")'s motion to intervene as a defendant pursuant to

Fed.R.Civ.P. 24, and to stay this action pursuant to PROMESA

(Docket No. 55); (4) the COFINA Senior Bondholders motion to

_____

[1] The Court will refer to the Commonwealth, the Governor of the
Commonwealth, the Secretary of the Treasury, and the Director of
the Office of Management and Budget as the "Commonwealth
defendants."  COFINA, the Executive Director of COFINA, and the
Bank of New York Mellon will together be referred to as the "COFINA
defendants."  Furthermore, the second amended complaint named
"Bank of New York Mellon Corporation" as defendant.  (Docket.
No. 78.)  The Court granted Bank of New York Mellon's uncontested
motion to change the captioned name to "The Bank of New York
Mellon, as indenture trustee" ("BNYM Trustee").  (Docket Nos. 118
and 135.)

[2] BNYM Trustee moved to join the Commonwealth defendant's motion
to stay.  (Docket No. 134.)  The Court granted the motion to join.
(Docket No. 135.)

intervene pursuant to Fed.R.Civ.P. 24 (Docket No. 50); (5) Puerto Rico-based funds (the "Puerto Rico Funds")'s motion to intervene pursuant to Fed.R.Civ.P. 24 (Docket No. 95); and (6) the Major COFINA Bondholders' motion to intervene pursuant to Fed.R.Civ.P. 24 (Docket No. 113). The GO Bondholders have opposed all motions (Docket Nos. 87, 93, 110, 127, 145, 146, 155 and 166) and each movant, except the Oversight Board, has filed a reply (Docket Nos. 94, 133, 157, 159 & 170.)

The Court has considered the submissions filed in support of, and in opposition to, each of the pending motions. For the reasons set forth below, the Court **DENIES** the defendants' motion to stay (Docket No. 106), and the Senior COFINA Bondholder's motion to intervene (Docket No. 50), and **GRANTS** the motions to intervene of: the Oversight Board (Docket No. 62), Ambac (Docket No. 55), the Puerto Rico Funds (Docket No. 95), and the Major COFINA Bondholders (Docket No. 113).

## I.   BACKGROUND

The GO Bondholders are "beneficial owners" of GO bonds. (Docket No. 78 at p. 4.) GO bonds are issued by the Commonwealth and backed by a pledge of the Commonwealth's good faith, credit, and taxing power. Id. The GO Bondholders define GO bonds as "constitutional debt" because Article VI, Section 8 of the Puerto Rico Constitution declares that if "available resources" are

insufficient to finance the Commonwealth's obligations, "interest
on the public debt and amortization thereof shall first be paid,
and other disbursements shall thereafter be made in accordance
with the order of priorities established by law."  Id. (citing
P.R. Const. Art. VI, Sec. 8.)

According to the GO Bondholders, the Commonwealth's
obligation to pay GO bonds takes precedence over competing
financial obligations, including obligations on bonds issued by
COFINA, an instrumentality of the Commonwealth government.  Id. at
p. 8.  These COFINA bonds are secured by, and payable from, a
percentage of the revenues the Commonwealth collects from its Sales
and Use Tax, known in Spanish as the Impuesto sobre Ventas y Uso
("IVU").  Id.  The GO Bondholders allege that because IVU revenues
constitute "available resources" within the meaning of Article VI,
Section 8, these revenues must first satisfy GO Bond obligations,
not COFINA bond obligations.  Id.

### A.   PROMESA

On June 30, 2016, President Obama signed PROMESA into
law.  PROMESA seeks to address the dire fiscal emergency in Puerto
Rico, and sets forth "[a] comprehensive approach to [Puerto Rico's]
fiscal, management and structural problems and [. . .] a Federal
statutory authority for the Government of Puerto Rico to
restructure debts in a fair and orderly process."    PROMESA

§ 405(m)(4).  PROMESA establishes a seven-member Oversight Board
for Puerto Rico.  Id. §§ 101(b)(1), (e)(1)(A).  "The purpose of
the Oversight Board is to provide a method for [Puerto Rico] to
achieve fiscal responsibility and access to the capital markets."
Id. § 101(a).  The Oversight Board operates as an entity within
the Government of Puerto Rico, id. § 101(c), and is given broad
authority over the Commonwealth and any of its instrumentalities
that the Board designates as "covered" instrumentalities, id.
§ 101(d)(1).  For instance, the Oversight Board has the authority
to develop, review, and approve territorial and instrumentality
fiscal plans and budgets, id. §§ 201-202; to enforce budget and
fiscal plan compliance, id. §§ 203-204; to seek judicial
enforcement of its authority to carry out its responsibilities
under PROMESA, id. § 104(k); and to intervene in any litigation
filed against the Commonwealth or its instrumentalities, id.
§ 212.  All members of the Oversight Board were appointed on
August 31, 2016.

        Among PROMESA'S provisions is an automatic stay of all
debt-related litigation against the Commonwealth, which was or
could have been commenced before the statute's enactment.  PROMESA
§ 405(b).  Congress deemed that component of the legislation
"essential to stabilize the region for the purposes of resolving"
the Commonwealth's financial crisis.  Id. § 405(m)(5).  The stay

is designed to "allow the Government of Puerto Rico a limited period of time during which it can focus its resources on negotiating a voluntary resolution with its creditors instead of defending numerous, costly creditor lawsuits." Id. § 405(n)(2). The stay also helps "to ensure all creditors have a fair opportunity to consensually renegotiate terms of repayment" and allows the Oversight Board time "to determine whether to appear or intervene on behalf of the Government of Puerto Rico in any litigation." Id. § 405(m)(5)(B), (A). Congress indicated that by serving these important purposes, PROMESA's automatic stay was ultimately intended to "benefit the lives of 3.5 million American citizens living in Puerto Rico." Id. § 405(n)(5).

        The automatic stay, however, is "limited in nature," PROMESA § 405(m)(5)(B), and remains in effect until the earlier of (1) February 15, 2017, with a possible extension of sixty or seventy-five days, or (2) the date on which the Oversight Board files a petition on behalf of the Government of Puerto Rico or any of its instrumentalities to commence debt-adjustment proceedings

pursuant to Title III of PROMESA.[3]  Id. § 405(d).  The Court may,
however, grant relief from the stay to "a party in interest" either
"for cause shown," or "to prevent irreparable damage" to the
party's interest in property.  Id. § 405(e)(2), (g).

**B.   The Moratorium Act and Executive Order 30**

On April 6, 2016, the Commonwealth enacted the Puerto
Rico Emergency Moratorium and Financial Rehabilitation Act
("Moratorium Act").[4]   The Commonwealth acknowledged that the
ongoing financial crisis had been brought to a "perilous tipping
point."  Moratorium Act, Stmt. of Motives. § A.  The Moratorium
Act aims to provide the Commonwealth with the "tools" it needs "to
continue providing essential services to the people" of the
Commonwealth despite insufficient "resources to comply with debt
service obligations as originally scheduled."  Id.  To that end,
the Moratorium Act empowers the Governor to issue executive orders

---

[3] PROMESA's automatic stay expires by its own terms on the earlier
of those dates.  On February 14, 2017 the Oversight Board extended
the stay for an additional 75 days.  Letter From the Board to
Governor Ricardo Rossello Regarding the Extension of PROMESA Stay,
February 14, 2017, https://juntasupervision.pr.gov/index.php/en/
documents/ (last visited Feb. 17, 2017).  The stay will remain in
effect until May 1, 2017.

[4] On January 27, 2017 Governor Ricardo Rosello signed the Puerto
Rico Financial Emergency and Fiscal Responsibility Act of 2017.
This legislation repeals the "emergency periods" that initiated
the debt moratorium and litigation stay set forth in the previous
administration's Moratorium Act.  Stmt. of Intent p. 41.

(1) declaring a "state of emergency" with respect to the Commonwealth or its instrumentalities, and (2) suspending payment of principal and interest on "covered obligations," during a "covered period" through January 31, 2017.  Moratorium Act §§ 103(m), 201(a).  It also authorizes the Governor to "expropriat[e] property or rights in property interests" and to suspend or modify any statutory or other obligation to transfer money for the payment of, or to secure, any covered obligation, so that instrumentalities subject to the Moratorium Act are able to pay for "essential services." Id. §§ 201(b), (d)(ii).

          Immediately following the enactment of PROMESA, former Governor of Puerto Rico Alejandro Garcia-Padilla issued Executive Order 2016-30 ("Executive Order 30") pursuant to the authority invested in him by the Moratorium Act.  (Docket No. 78 at p. 5.) In fact, on the same day of PROMESA's enactment, Executive Order 30 suspended the Commonwealth's obligation to make payments on bonds or notes issued or guaranteed by the Commonwealth, other than payments to the Government Development Bank ("GDB").  Id. Essentially, Executive Order 30 halted payments on GO bonds.  Id.

          On July 1, 2016, the Commonwealth defaulted on $817 million in GO bond payments (Docket No. 78 at p. 26.)  The GO Bondholders commenced this case on July 20, 2016 by filing a

complaint (Docket No. 1), which they subsequently amended twice (Docket Nos. 25 and 78.)

### C.  The Second Amended Complaint

The first two renditions of the GO Bondholders' complaint set forth two causes of action arising under PROMESA to challenge Executive Order 30, the Commonwealth's failure to allocate funds for future GO bond obligations, and legislation diverting funds to the GDB.[5]  (Docket Nos. 1 and 25.)  The GO Bondholders alleged that the Commonwealth defendants violated sections 204(c)(3) and 207 of PROMESA.[6]  Id.  The Commonwealth defendants filed a motion to stay pursuant to section 405 of PROMESA.  (Docket No. 26.)  The Court denied this motion.  (Docket No. 32.)  The Commonwealth defendants then filed a motion for

---

[5] The complaint and the amended complaint asserted only one substantive cause of action.  The second count of the complaint and the amended complaint simply sought relief from the debt-litigation stay.

[6] Section 204(c)(3) of PROMESA provides that after PROMESA's enactment and before the complete appointment of the Oversight Board, the Commonwealth "shall not enact new laws that either permit the transfer of any funds or assets outside the ordinary course of business or that are inconsistent with the constitution or laws of the territory."  Section 207 of PROMESA states that "[f]or so long as the Oversight Board remains in operation, no territorial government may, without the prior approval of the Oversight Board, issue debt or guarantee, exchange, modify, repurchase, redeem, or enter into similar transactions with respect to its debt."

reconsideration, which the Court also denied. (Docket Nos. 34 and 75.)

With the Court's leave, the GO Bondholders later filed a second amended complaint. (Docket No. 78.) The second amended complaint set forth an additional twelve counts, and named additional defendants, including the COFINA defendants. (Docket No. 78.) The GO Bondholders concede that with the exception of the first, second, third, and twelfth counts (the "PROMESA counts"), the second amended complaint is subject to the section 405 debt-litigation stay of PROMESA. (Docket No. 39 at p. 2.)

The first count of the second amended complaint is substantively the same as that of the amended complaint, and names only the Commonwealth defendants. The second, third and twelfth counts assert causes of action against both the Commonwealth and the COFINA defendants pursuant to various provisions of PROMESA.

The second count alleges that Executive Order 30 is preempted by § 303(3) of PROMESA, which states:

> [U]nlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that diverts funds from one territorial instrumentality to another or to the territory, shall be preempted by this Act.

After PROMESA's enactment and pursuant to Executive Order 30, the Commonwealth defaulted on payments to GO Bondholders. (Docket No. 78 at 51.) The Commonwealth, however, continued to

fund COFINA with IVU revenues. Id. In so doing, the GO Bondholders allege the Commonwealth "impair[ed] their right to receive payment before the Commonwealth may use funds for any other purpose." Id. The GO Bondholders request that the Court declare that Executive Order 30 is unlawful, and grant injunctive relief.[7] Id. at p. 67.

The third count challenges the legality of the Commonwealth's Moratorium Act pursuant to section 303(1) of PROMESA. Id. at p. 52. Section 303(1) states that:

> A territory law prescribing a method of composition of indebtedness or a moratorium law, but solely to the extent that it prohibits the payment of principal or interest [. . .] may not bind any creditor of a covered territory that does not consent to the composition or moratorium.

Because the Moratorium Act "purports to prohibit the payment" on GO bonds without first obtaining creditor consent, the GO Bondholders allege that the Moratorium Act runs afoul of section 303(1). Id. The GO Bondholders request a declaration

---

[7] The forms of injunctive relief the GO Bondholders seek in connection with the PROMESA counts include: (1) a prohibition of the enforcement of Executive Order 30 and the Moratorium Act; (2) a prohibition of the diversion of IVU revenues to COFINA; (3) a requirement that COFINA transfer IVU revenues to the Commonwealth; (4) a requirement that the Commonwealth preserve and segregate funds transferred from COFINA; (5) a prohibition of the implementation of "outsized transfers" to public employee pension funds, and the diversion of funds to the GDB; and (6) a requirement that the Commonwealth segregate and preserve "all funds clawed back, to be clawed back, or available to be clawed back" for the purpose of paying Constitutional debt. (Docket No. 78 at pp. 49-50, 66-69.)

that the Moratorium Act cannot bind them without their consent, and injunctive relief.  <u>Id</u>. at p. 67.

Lastly, the twelfth count alleges that the Commonwealth and COFINA defendants have violated 42 U.S.C. § 1983[8] insofar as they have deprived the GO Bondholders "of rights, privileges, and immunities secured by the laws of the United States," namely, PROMESA.

The Court will first address whether the debt-litigation stay pursuant to section 405 of PROMESA is applicable, and will then address the pending motions to intervene.

## II.  The Motion to Stay Pursuant to Section 405 of PROMESA

Section 405(b) of PROMESA stays lawsuits that are "with respect to a Liability" if those lawsuits fall within one of the categories listed in subsections (b)(1) through (b)(7).  PROMESA § 405(b).  Here, defendants argue that the PROMESA Counts are stayed by sections 405(b)(1), (b)(6), (b)(3), (b)(4) and (b)(5) of PROMESA.

---

[8] 42 U.S.C. 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any [. . .] Territory [. . .] subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Section 405 of PROMESA was patterned on the automatic stay provision of the United States Bankruptcy Code, 11 U.S.C. § 362. Indeed, the two provisions are nearly identical. Thus, the Court looks to how courts have interpreted section 362 in the bankruptcy context for guidance in deciding whether the PROMESA counts are stayed by section 405.

In the bankruptcy context, the automatic stay becomes operative upon the filing of a bankruptcy petition, and "is extremely broad in scope," applying "to almost any type of formal or informal action taken against the debtor." Montalvo v. Autoridad de Acueductos y Alcantarillados, 537 B.R. 128, 140 (Bankr. D.P.R. 2015) (citing Alan N. Resnick & Henry J. Sommer, 3 Collier on Bankruptcy ¶ 362.03 (16th ed. 2015)). The automatic stay, however, "is not all encompassing." E.g., Rodriguez v. Biltoria Realty LLC, 203 F. Supp. 2d 290, 291 (E.D.N.Y. 2002) (holding that automatic stay did not preclude victims from suing manufacturer for claims stemming from a post-petition accident). For instance, "proceedings or claims arising post-petition are not subject to the automatic stay." In re Gull Air, Inc., 890 F.2d 1255, 1263 (1st. Cir. 1989) (action to reallocate airport arrival slots not subject to section 362 stay because the claims arose post-petition).

With this framework in mind, the Court now turns to the merits
of defendants' arguments in support of a stay.

**A.   Section 405(b)(1) of PROMESA**

Section 405(b)(1) of PROMESA stays "actions or
proceedings against the Government of Puerto Rico that w[ere] or
could have been commenced before the enactment of [PROMESA]."  It
also stays judicial actions "to recover a Liability Claim against
the Government of Puerto Rico that arose before the enactment of
[PROMESA]."  Id.

In an earlier opinion, the Court held that count one of
the amended complaint, which is substantively identical to count
one of the second amended complaint, does not fall into either of
the two types of judicial actions stayed by section 405(b)(1) of
PROMESA.  (See Docket No. 32.)  In relevant part, the Court
reasoned that "[p]laintiffs could not have commenced this lawsuit
before PROMESA's enactment because their claims are to enforce
provisions of PROMESA by challenging conduct that occurred after
PROMESA's enactment."  Id.  The Court further reasoned that count
one did not assert a right to recover a "Liability Claim" inasmuch
as it did "not seek to recover a right to payment that arose before
PROMESA's enactment."  Id.

The Commonwealth and COFINA defendants now argue that
because the GO Bondholders have asserted numerous causes of action

in the second amended complaint which they concede are stayed, this entire action should be stayed because section 405(b)(1) of PROMESA does not stay particular causes of action, but "actions or proceeding[s]." (See Docket No. 84.)  The Court is not persuaded.

Courts interpreting section 362 of the Bankruptcy Code have observed that each claim in an action must be analyzed separately for purposes of determining whether that particular claim is subject to an automatic stay.  See, e.g., Mar. Elec. Co. v. United Jersey Bank, 959 F.2d 1194, 1204 (3d Cir. 1991) ("Multiple claim and multiple party litigation must be disaggregated so that particular claims [. . .] are treated independently when determining which of their respective proceedings are subject to the bankruptcy stay."); In re Mid-Atl. Handling Sys., LLC, 304 B.R. 111, 128 (Bankr. D.N.J. 2003) ("Especially in multiple claim and multiple party litigation, it is the function of the court to analyze each claim independently in determining whether the automatic stay should apply to that particular claim.").  Interpreting section 405(b)(1) of PROMESA in a manner consistent with how other courts have interpreted the analogous stay provision of the Bankruptcy Code compels the Court to conclude that merely because some counts in the second amended complaint are stayed, it does not necessarily follow that all counts in the second amended complaint are stayed.

Invoking section 405(b)(1) of PROMESA, defendants further argue that counts two and three are stayed "for the independent reason that they could have been brought long before the enactment of PROMESA." (Docket No. 84 at 7.) In so doing, they argue that these counts do not actually arise under PROMESA, but present a constitutional challenge to COFINA because resolution of these claims would ultimately require a determination as to whether IVU revenues assigned to COFINA constitute "available resources" within the meaning of Article VI, Section 8 of the Puerto Rico Constitution. (Docket No. 84 at pp. 7-8.) Defendants' argument is unpersuasive because it is based on a misinterpretation (or mischaracterization) of what the GO Bondholders have actually pled.

While counts two and three certainly implicate the lawfulness of the Commonwealth's assignment of IVU revenues to COFINA, the asserted legal premise underlying these counts is that Executive Order 30 and the Moratorium Act are preempted by sections 303(1) and 303(3) of PROMESA. The GO Bondholders could not have possibly raised these claims prior to the enactment of PROMESA because they seek to enforce a specific provision of PROMESA. Accordingly, there is no basis to hold that counts two and three are stayed pursuant to section 405(b)(1) of PROMESA.

**B.    Section 405(b)(6) of PROMESA**

Section 405(b)(6) of PROMESA stays "any act to collect, assess, or recover a Liability Claim against the Government of Puerto Rico that arose before" PROMESA's enactment.  A Liability Claim is defined as a "right to payment" or "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment."  PROMESA § 405(a)(2).  According to defendants, the PROMESA counts are stayed by section 405(b)(6) because the forms of injunctive relief which the GO Bondholders seek through the PROMESA counts "are designed to freeze government assets, garnish the same from third parties, and attach or segregate them for the eventual payments of plaintiffs' bonds."  (Docket No. 84 at pp. 9-10.)  Thus, defendants assert that the forms of injunctive relief sought in these claims "are 'acts to collect.'"  Id.  The Court disagrees.

Section 362(a)(6) of the Bankruptcy Code, the provision after which section 405(b)(6) of PROMESA was modeled, "is very broad."  E.g., In re Claudio, No. 11-02792, Adv. No. 11-00237, 2012 Bankr. LEXIS 5041, at *8 (D.P.R. Oct. 25, 2012) (Godoy, J.).  Its breadth, however, extends only to a creditor's acts to "collect, assess, or recover" a prepetition debt, not to any non-harassing, non-coercive act to ensure eventual payment from the debtor or the debtor's estate.  11 U.S.C. § 326(a)(6); see also

Citizens Bank v. Strumpf, 516 U.S. 16, 21 (1995) (holding that
bank's placing an administrative hold on a bankruptcy debtor's
account did not violate sections 362(a)(3) or 362(a)(6) because
the administrative hold did not take something from the bankruptcy
debtor, or exercise dominion over property that belonged to the
bankruptcy debtor); In re Knowles, 442 B.R. 150, 160-61 (B.A.P.
1st Cir. 2011) (observing that "a 'mere request for payment' does
not violate the stay unless it is coercive or harassing," and
holding that "the filing of the proof of claim is not an act
against property of the debtor."); Morgan Guar. Trust Co. v.
American Sav. & Loan Ass'n., 804 F.2d 1487, 1491 (9th Cir. 1986)
(observing that "[t]he activities that are specifically prohibited
[by 11 U.S.C. § 362(a)(6)] all involve attempts to confiscate the
debtor's property or require the debtor to act affirmatively to
protect its interests.")

        To support their overly broad interpretation of section
362(a)(6), defendants cite numerous cases which involve either
coercive or harassing conduct on the part of a creditor, or a
creditor's direct efforts to collect on a claim from a debtor.
See Divane v. A & C Elec. Co., 193 B.R. 856, 861 (N.D. Ill. 1996)
(holding that health benefit plan's act of sending notice to
employees that debtor employer was delinquent in making payments
to the plan constituted "harassment or coercion," and was therefore

a violation of section 362(a)(6); In re Hellums, 772 F.2d 379
(7th Cir. 1985) (holding that credit union violated section
362(a)(6) in applying automatic deductions from bankruptcy
debtor's wages to loan repayment); In re Guinn, 102 B.R. 838
(Bankr. N.D. Ala. 1989) (holding that credit union's refusal to
accept mortgage payments from debtor violated section 362(a)(6)
because this refusal constituted an effort to collect payment of
unsecured debts discharged in bankruptcy); In re Trevino, 535 B.R.
110, 149 (Bankr. S.D. Tex. 2015) (holding that debtors had stated
a viable claim pursuant to 362(a)(6) in light of their allegation
that creditor sent a letter that "threatened to bill them on
account of a pre-petition claim after they had obtained a
bankruptcy discharge if they did not provide proof of payment.").

Indeed, the cases defendants cite are inapposite because
the GO Bondholders, unlike the creditors involved in those cases,
have explicitly "disclaimed any attempt to collect." (Docket
No. 27 at 9.) What is more, the Court has no basis to find that
the GO Bondholders have brought this action to coerce or harass
any defendant, and defendants have raised no argument to the
contrary.

As the Court previously concluded in holding that count
one of the amended complaint was not stayed, "this is not an action
to recover a liability claim against the government of Puerto Rico"

that arose before the enactment of PROMESA because the GO
Bondholders seek only declaratory and injunctive relief.   See
Docket No. 28 at 2.   The additional PROMESA counts asserted in the
second amended complaint do not alter this conclusion
notwithstanding the fact that the GO Bondholders now also seek
injunctions that, *inter alia*, prohibit the diversion of IVU
revenues to COFINA, and direct the COFINA defendants to transfer
revenues held on behalf of COFINA to the Commonwealth.

        In suggesting that section 405(b)(6) would extend even
to the GO Bondholders' claims against the COFINA defendants and
BNYM Trustee, defendants point out that courts have stayed actions
seeking recovery of a debtor's post-petition transfers or payments
to third parties.   See Docket 84 at 11-12.   The cases defendants
cite for this proposition, however, all involve actions to recover
money from third parties to satisfy the pre-petition debts of a
bankruptcy debtor.   See In re Teleservices Grp., Inc., 463 B.R.
28, 35 (Bankr. W.D. Mich. 2012) (holding that section 362(a)(6)
stayed a creditor's unjust enrichment claim seeking money from
third-party bank that had received fraudulent transfers from the
debtor, which were traceable to the creditor); In re Colonial
Realty Co., 980 F.2d 125, 132 (2d Cir. 1992) (holding that the
bankruptcy stay applied to creditor's action against third-party
to recover funds that had allegedly been fraudulently conveyed by

debtor); In re Saunders, 101 B.R. 303 (Bankr. N.D. Fla. 1989) (holding that bankruptcy stay applied to creditor's action against a third-party "to recover assets allegedly transferred [by debtor] in fraud of creditors."). None of these cases involve actions seeking only declaratory and injunctive relief.

Indeed, the GO Bondholders' PROMESA counts are not aimed at confiscating any property of, or obtaining any form of payment from, the Commonwealth. Thus, the PROMESA claims are not stayed by section 405(b)(6).

**C.   Section 405(b)(3) of PROMESA**

Section 405(b)(3) of PROMESA stays "any act to obtain possession of property of the Government of Puerto Rico or of property from the Government of Puerto Rico or to exercise control over property of the Government of Puerto Rico." Courts have defined the exercise of control as "restraining or directing influence over' or 'to have power over.'" In re Weidenbenner, 521 B.R. 74, 79 (Bankr. S.D.N.Y. 2014) (quoting Thompson v. GMAC, LLC, 566 F.3d 699, 702 (7th Cir. 2009)). Put differently, "to exercise control" over something without actually possessing it is to have "constructive possession." In re Weidenbenner, 521 B.R. at 79 (observing that, "at some point, 'control' over another's property becomes constructive possession."); See Black's Law Dictionary (10th ed. 2014) (defining "constructive possession" as "[c]ontrol

or dominion over a property without actual possession or custody of it").

        Defendants do not argue that the PROMESA counts seek to obtain possession from, or the property of, the Commonwealth.  On the contrary, defendants argue only that the GO Bondholders seek to exercise control over the Commonwealth's property through the PROMESA counts.  To support this argument, defendants emphasize that the injunctive relief sought in the PROMESA counts would: (1) require the segregation and preservation of certain funds, (2) prohibit certain transfers pursuant to the Commonwealth's budget; (3) prohibit the transfer of IVU revenues to COFINA; and (4) require COFINA to transfer IVU revenues to the Commonwealth. (Docket No. 84 at p. 13.)  In essence, defendants' argument is reduced to this:  the GO Bondholders' request for injunctive relief amounts to an act to exercise control over the Commonwealth's property because, if the GO Bondholders prevail on the PROMESA counts, the Commonwealth will be not be at complete liberty to dispose of its assets as it deems fit.

        To support their contention that the GO Bondholders seek to exercise control over the Commonwealth's property, defendants rely on two cases, both of which involve taking affirmative steps to control a debtor's assets.  See In re Weidenbenner, 521 B.R. at 79-80 (holding that bank's freezing the funds in debtor's account

while unilaterally determining who would have access to those funds

amounted to "control over property of the estate"); In re

Patterson, 967 F.2d 505, 511-12 (11th Cir. 1992) (holding that

credit union's act of freezing debtor's funds "constituted an act

to exercise control over the property of the bankruptcy estate in

violation of Section 362(a)(3)" because the freeze deprived the

debtors "of any control of those funds and invested exclusive

control in the [c]redit [u]nion.").

        Unlike the acts determined to constitute "exercises of

control" in Weidenbenner and Patterson, the injunctive relief the

GO Bondholders seek would not permit them to have any possession,

influence, or power over any asset, much less any asset of the

Commonwealth.  Rather, the injunctive relief the GO Bondholders

seek would, if the GO Bondholders ultimately prevail, preclude the

Commonwealth from dissipating its assets in a manner that violates

PROMESA.  Consequently, the Court holds that the PROMESA counts

are not stayed by section 405(b)(3). See, e.g., Amplifier Research

Corp. v. Hart, 144 B.R. 693, 695 (E.D. Pa. 1992) (concluding that

section 362(a)(3) "protects interests in a debtor's property, not

tortious uses of that property by the debtor."); Larami Ltd. v.

Yes! Entm't Corp., 244 B.R. 56, 60 (D.N.J. 2010) ("Section

362(a)(3) was intended to prevent interference with a bankruptcy

court's orderly disposition of the property of the estate, it was

not intended to preclude post-petition suits to enjoin unlawful
conduct."); <u>United States</u> v. <u>Inslaw, Inc.</u>, 932 F.2d 1467, 1473
(D.C. Cir. 1991) ("The object of the automatic stay provision is
essentially to solve a collective action problem -- to make sure
that creditors do not destroy the bankrupt estate in their scramble
for relief.  Fulfillment of that purpose cannot require that every
party who acts in resistance to the debtor's view of its rights
violates § 362(a) . . .") (citation omitted).

   **D.   Sections 405(b)(4) and 405(b)(5) of PROMESA**

        Sections 405(b)(4) and 405(b)(5) of PROMESA stay "any
act to create, perfect, or enforce any lien against property of
the Government of Puerto Rico."  Defendants suggest that the
PROMESA counts are stayed by sections 405(b)(4) and 405(b)(5)
because the injunctive relief sought in connection with these
counts "is clearly an act to create, perfect, or enforce a lien."
(<u>See</u> Docket No. 84 at 16.)  This argument lacks merit.

        As defendants acknowledge in their motion to stay, the
second amended complaint alleges that the GO Bondholders have a
first lien on available resources of the Commonwealth — resources
which the GO Bondholders allege include IVU revenues and certain
Commonwealth expenditures — pursuant to Article VI of the Puerto
Rico Constitution.  <u>See</u> Docket Nos. 84 at p. 16; 78 at p. 5.  If
the GO Bondholders are correct, their liens already exist and have

been perfected by operation of the Puerto Rico Constitution.  If the GO Bondholders are incorrect, the PROMESA counts will do nothing to create or perfect any lien, and the GO Bondholders will simply not be entitled to the relief they seek.  Regardless, the mere assertion of the PROMESA counts, which at this juncture does nothing to affect the Commonwealth's interests in its property, does not constitute an act to create or perfect any lien on property of the Commonwealth.

Additionally, it would be improper to characterize the GO Bondholders' assertion of the PROMESA counts as an act "to enforce" a lien.  Arguing otherwise, defendants contend that the GO Bondholders' request that IVU revenues be transferred to the Commonwealth's treasury is "an act to enforce a lien."  (Docket No. 84 at 16.)  To support this proposition, defendants cite In re Reserves Dev. Corp., a case that is inapposite because it does not even address what constitutes an act to enforce a lien.  78 B.R. 951, 958 (W.D. Mo. 1986) (holding that act of attaching "the debtors' coalwashing unit for the purpose of securing the payment of past-due wage claims" amounted to "an act to 'create' or 'perfect' a lien on this property" and thus was an act falling within the scope of Section 362(a)(4)).

If the GO Bondholders ultimately prevail on their claims, their requested relief would have the effect of precluding

the Commonwealth from continuing to spend and transfer its assets in a manner that violates PROMESA. In light of this, the Court is not convinced that the injunctive relief sought in connection with the PROMESA counts constitutes an act to "enforce" a lien, particularly because these claims do not seek any form of payment from the Commonwealth.

### D. The Court's Inherent Authority to Stay this Action

Defendants argue that even if the Court disagrees that the entire case is stayed pursuant to Section 405(b) of PROMESA, the Court should nonetheless exercise its inherent authority to stay this case in its entirety to avoid piecemeal litigation in contravention of the purpose of the PROMESA stay. Defendants argue that a stay is appropriate to give effect to PROMESA's purpose of allowing the Commonwealth time to restructure its debts in an orderly way. To do otherwise, defendants suggest, "would spurn Congress's express objectives in passing PROMESA." (Docket No. 84 at p. 14.) The Court disagrees.

If Congress had intended to stay all claims against the Commonwealth for a particular period of time, it could have included language to this effect in PROMESA. That Congress did not do so indicates that Congress intended PROMESA to stay only certain types of claims, and not others. See Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("[C]ourts must

presume that a legislature says in a statute what it means and means in a statute what it says there.").

Because the Court has held that the PROMESA counts are not stayed by the express provisions of PROMESA enacted by Congress, the Court disagrees that staying these counts would "spurn Congress's express objectives." Accordingly, the Court will not stay the PROMESA claims in the exercise of its inherent authority.

## III. Motions to Intervene[9]

Having determined that the PROMESA counts are not stayed, the Court turns to the merits of the five pending motions to intervene filed by: (1) the Oversight Board; (2) Ambac, which provides the Commonwealth with financial guaranty insurance on billions of dollars in debt, including insurance on $800 million for outstanding bonds issued by COFINA, (Docket No. 55 at p. 1); and (3) the COFINA Senior Bondholders, the Puerto Rico Funds, and the

---

[9] In their respective motions to intervene, Ambac, the COFINA Senior Bondholders, and the Oversight Board raise arguments in support of an automatic stay. To the extent these motions to intervene also request a stay, the motions are denied for the reasons the Court already set forth in determining that the PROMESA counts are not stayed.

Major COFINA Bondholders, all of whom own COFINA bonds in differing amounts.[10]

### A.    Rule 24 Standard

Federal Rule of Civil Procedure 24 ("Rule 24") provides two avenues by which a party may successfully intervene: intervention by right and permissive intervention. Fed.R.Civ.P. 24.

A party is entitled to intervene by right if "it is given an unconditional right to intervene by a federal statute." Fed.R.Civ.P. 24(a)(1).    If no federal statute grants an unconditional right to intervene, the Court is nonetheless required to grant a party's motion to intervene if that party has "demonstrate[d] that:  (1) its motion is timely; (2) it has an interest relating to the property or transaction that forms the foundation of the ongoing action; (3) the disposition of the action threatens to impair or impede its ability to protect this interest; and (4) no existing party adequately represents its interest."

---

[10]  Senior COFINA Bondholders include Jose Rodriguez and institutional holders who together own approximately $2 billion dollars of senior secured bonds issued by COFINA.  (Docket No. 50 at p. 4.)   Puerto Rico Funds are institutional holders of approximately $435 million in senior secured COFINA bonds and $210 million in subordinate COFINA bonds.  (Docket No. 95 at p. 2.) Major COFINA Bondholders are mutual funds that hold $748,214 in senior bonds and $2,893,748 in subordinate bonds issued by COFINA. (Docket No. 113 at p. 5.)

Ungar v. Arafat, 634 F.3d 46, 50 (1st Cir. 2011) "Failure to satisfy any one of the four requirements defeats intervention by right."  Students for Fair Admissions v. Fellows of Harvard College, 807 F.3d 472, 474 (1st Cir. 2015).  Determining whether a proposed intervener has fulfilled these requirements "calls for discretion in making a series of judgment calls, a 'balancing of factors that arise in highly idiosyncratic factual settings.'" Id. (quoting Arafat, 634 F.3d at 50; see also R&G Mortg. Corp. v. Fed. Home Loan Mortg. Corp., 584 F.3d 1, 8 (1st Cir. 2009) ("[E]ven in the case of a motion to intervene as of right, the district court's discretion is appreciable.").

Even if a proposed intervener is not entitled to intervene as of right, it may request permissive intervention. Pursuant to Rule 24(b), the Court may allow a party to intervene when that party's "claim or defense and the main action have a question of law or fact in common."  Daggett v. Comm'n on Governmental Ethics & Election Practices, 172 F.3d 104, 108 (1st Cir. 1999).  The Court "can consider almost any factor rationally relevant" and "enjoys very broad discretion" in granting or denying a motion for permissive intervention.  Id. at 113.

Whether moving for intervention by right or for permissive intervention, a motion to intervene must "state the grounds for intervention and be accompanied by a pleading that

sets out the claim or defense for which intervention is sought." Fed.R.Civ.P. 24(c).[11]

### 1.   The Oversight Board

The Oversight Board's motion to intervene satisfies the requirements set forth in Rule 24(a), permitting intervention when a party "is given an unconditional right to intervene by a federal statute."  See Peaje Invs. LLC v. García-Padilla, 845 F.3d 505, 516 (1st Cir. 2017) (noting that "PROMESA appears to grant the Board" the right to intervene in bondholder litigation pursuant to Section 212(a) of PROMESA).  In drafting PROMESA, Congress specifically stated that the Oversight Board "may intervene in any

---

[11] The Court finds that all pending motions to intervene are timely and place no undue prejudice on the existing parties.  This case is in the initial stages, when "the balance of prejudices … weigh heavily in favor of the [proposed intervener]." P.R. Tel. Co. v. Sistema de Retiro de los Empleados del Gobierno y la Judicatura, 637 F.3d 10, 16 (1st Cir. 2011), citing Zurich Capital Markets, Inc. v. Coglianese, 236 F.R.D. 379, 384-85 (N.D. Ill. 2006) (motion to intervene filed over two years after proposed intervener was placed on notice found timely where plaintiff could show no prejudice from the delay). The COFINA Senior Bondholders, Ambac, and the Oversight Board filed motions to intervene before the GO Bondholders filed the second amended complaint. (Docket Nos. 50, 55 & 62.)  The Puerto Rico Funds and the Major COFINA Bondholders filed motions to intervene the same month that the GO Bondholders filed the second amended complaint.  (Docket Nos. 95 & 113.) Notably, the GO Bondholders neither dispute that the motions to intervene are timely, nor do they argue that intervention will result in undue prejudice.

litigation filed against the territory."[12]  PROMESA § 212(a).  The second amended complaint names as a defendant the Commonwealth of Puerto Rico.  (Docket No. 78.)  Accordingly, the text of PROMESA compels the Court to allow the Oversight Board to intervene as of right pursuant to Rule 24(a).

The Oversight Board failed to attach a pleading to its motion to intervene.  In fact, the GO Bondholders' sole argument opposing intervention is based on this procedural defect. (Docket No. 110 at p. 5.)  While Rule 24(c) does, indeed, demand "a pleading that sets out the claim or defense for which intervention is sought," failure to comply with this requirement does not necessarily preclude intervention.  See, e.g., City of Bangor v. Citizens Commc'ns Co., 532 F.3d 70, 95 n.11 (1st Cir. 2008) (no abuse of discretion where Court excused failure to file a pleading with motion to intervene).  As the First Circuit Court of Appeals recently held, "denial of a motion to intervene based solely on the movant's failure to attach a pleading, absent prejudice to any party, constitutes an abuse of discretion." Peaje, 845 F.3d at 515.

In this case, there is no basis to find that the Oversight Board's failure to attach a pleading to its motion to

---

[12] According to section 5(20) of PROMESA, the term "territory" includes Puerto Rico.

Civil No. 16-2374 (FAB)                                                    32

intervene has caused prejudice to the GO Bondholders.  Nor have the GO Bondholders identified any such prejudice.  Following binding precedent, the Court will avoid an "overly technical reading[] of Rule 24(c)," and will excuse the Oversight Board's failure to attach a pleading.  Id.  Because the Oversight Board is statutorily entitled to intervene in this action, its motion to intervene is granted.

        2.    **Ambac**

        In support of its motion to intervene, Ambac claims a direct interest in this litigation because it insures over $800 million of COFINA bonds, and will have to make payments to COFINA bondholders should COFINA default on its obligations.  (See Docket No. 55 at pp. 8-10.)  Ambac further argues that the disposition of this case could impair its interests insofar as there is a "realistic and practical threat that Ambac would have to pay claims" if the GO Bondholders prevail.  Id. at p. 10.  For instance, if the GO Bondholders prevail, a possible hold on the transfer of IVU revenues to COFINA may result in COFINA's inability "to make its debt payments in a timely manner."  Id.

        The GO Bondholders do not specifically contest that Ambac has an interest in this litigation, or that its disposition could potentially impair Ambac's legitimate interest in avoiding having to pay insurance claims on COFINA bonds.  Rather, the GO

Bondholders raise two arguments to support the contention that the contract by which Ambac has agreed to insure bonds issued by COFINA (the "Ambac Insurance Policy") divests Ambac of any "legally cognizable" interest in this case, and specifically bars Ambac from intervening.

As to their first argument, the GO Bondholders argue that Ambac lacks any interest in this litigation because the Ambac Insurance Policy allows Ambac to become subrogated to the rights of the COFINA bondholders only to the extent that it makes payment of principal of or interest on insured COFINA bonds. (Docket No. 93 at p. 7.)  The GO Bondholders' argument does not persuade the Court.

The subrogation provision of the Ambac Insurance Policy to which the GO Bondholders make reference merely states that if Ambac pays a claim on an insured bond, it will be subrogated to the rights of the bondholders. (See Docket No. 93-1, at Ex. B, at 12.)  Nothing in this provision, however, either limits Ambac's right to intervene in an action pursuant to Rule 24, or otherwise limits the scope of the interests Ambac may seek to protect.

The GO Bondholders' second argument posits that even if Ambac were subrogated to the rights of the COFINA bondholders, Ambac's intervention would nevertheless be foreclosed because the COFINA Bondholders contractually delegated any right

they may have had to participate in this action to BNYM Trustee,
the trustee for their bonds.    (Docket No. 93 at 8-11.)
Specifically, Ambac points to language on the COFINA bonds stating
that COFINA bondholders

> "have no right to enforce the provisions of this
> Resolution, to institute action to enforce the
> provisions of the Resolution or to institute, appear in
> or defend any suit or other proceeding with respect
> thereto, except as provided in the Resolution."

(Docket No. 93 at 8.)   The GO Bondholders proceed
to cite the no-action provision of the Resolution referenced on
the Ambac-insured COFINA bonds, which allows bondholders to "step
into the shoes of the Trustee and 'institute [a] suit . . . or
other proceeding'" only if certain prerequisites are satisfied.
Id. at 10.

The GO Bondholders' second argument does not
convince the Court that Ambac is contractually barred from
intervening in this action for two reasons.   First, insofar as the
language on the COFINA bonds limits COFINA Bondholders' rights to
"appear in or defend" suits, it does so only with respect to the
"provisions of the Resolution." (Docket No. 93-1, at Ex. A, at 2.)
Because this case does not stem from any alleged violation of the

"provisions of the Resolution," the language from the COFINA bonds

which the GO Bondholders reference is not dispositive.[13]

Second, the selected provisions of the Resolution

that the GO Bondholders reference, read in context, make clear

that they set forth procedures bondholders must follow to pursue

claims pursuant to the Resolution.  To illustrate, the complete,

relevant language of section 1106 of the Resolution that the GO

Bondholders cite states:

> No owner of any Bond shall have any right to institute
> any suit, action, mandamus or other proceeding in equity
> or at law hereunder, or for the protection or enforcement
> of any right under this  Resolution, unless [. . . .]

---

[13] It bears emphasis that the GO Bondholders acknowledge that they
are not parties to the Resolution, (Docket No. 93 at p. 9), but
nonetheless seek enforcement of the no-action clause, relying on
cases of the Delaware Court of Chancery allowing non-parties to
enforce no-action clauses.  Feldbaum v. McCrory Corp., Civ. No.
11186, 1992 WL 119095 (Del. Ch. June 2, 1992); In re Enron Corp.
Sec., Deriv. & ERISA Litig., Civ. No. H-01-3624, 2008 WL 744823
(S.D. Tex. Mar. 19, 2008).  Even if the Court were to agree with
the GO Bondholders' interpretation of the Resolution, the Court
would not allow the GO Bondholders to enforce the provisions of
the Resolution because the overwhelming weight of authority
supports the conclusion that a non-party to a contract cannot
generally enforce the provisions of that contract.  See, e.g.,
Rajamin v. Deutsche Bank Nat'l Trust Co., 757 F.3d 79, 86 (2d Cir.
2014) (observing "that the terms of a contract may be enforced
only by contracting parties or intended third-party beneficiaries
of the contract."); Aho v. Bank of Am., N.A., Civ. No. 15-cv-128-
JL, 2015 U.S. Dist. LEXIS 169357, at *8 (D.N.H. Dec. 18, 2015)
(observing that under New York law, "a non-party lacks standing to
enforce a contract unless the contract contains a clear indication
of an intent to allow it."); Davidson v. Yihai Cao, 211 F. Supp.
2d 264, 283 (D. Mass. 2011) (observing that under Illinois law
"[t]here is a strong presumption that a non-party to a contract
cannot enforce the contract.").

Because Ambac's motion to intervene is unrelated to the Resolution, the Court fails to see how the Ambac insurance policy precludes Ambac from intervening.[14]

As Ambac has filed a timely motion to intervene, and established that it has an interest in this litigation, the disposition of which could impair its interests, the Court is satisfied that Ambac is entitled to intervene pursuant to Fed.R.Civ.P. 24(a)(2).

### 3.   COFINA Senior Bondholders

The COFINA Senior Bondholders filed a motion to intervene for the limited purpose of seeking enforcement of the

---

[14] Although the GO Bondholders have not specifically argued otherwise, the Court notes that Ambac has made the required "minimal showing that the representation afforded by a named party would prove inadequate." B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc., 440 F.3d 541, 545 (1st Cir. 2006). This is so because, unlike the other named defendants, there is a reasonable likelihood that Ambac would suffer direct economic harm if the GO Bondholders are ultimately successful in this case. To illustrate, the transfer of IVU revenues from COFINA to the Commonwealth's treasury could potentially deplete COFINA's assets, resulting in COFINA defaulting on its bond obligations. Consequently, Ambac would have to pay insurance claims to COFINA Bondholders. By contrast, the Commonwealth's treasury will only grow larger if the GO Bondholders prevail, as IVU revenues would be transferred from COFINA to the Commonwealth. In light of the potential for this litigation to have a disparately adverse impact on Ambac than on other defendants, the Court is satisfied that Ambac has made a showing of inadequate representation. See, e.g., Kellogg USA, 440 F.3d at 547 (holding that a showing that "the potential for … litigation to have a greater adverse impact on [the potential intervenor] is sufficient to establish that a named party is an inadequate representative.").

PROMESA stay (Docket No. 50.)   Subsequently, the GO Bondholders filed the second amended complaint, in addition to a response in opposition to the COFINA Senior Bondholder's motion.   (Docket Nos. 78 & 87.)   With the Court's permission, the COFINA Senior Bondholders then filed a reply in which they reiterated their request for intervention for the limited purpose of enforcing the PROMESA stay.   (Docket No. 94.)

Courts may deny motions to intervene when the underlying purpose for which intervention is sought is non-existent.   See 4MVR, LLC v. Hill, 2015 U.S. Dist. LEXIS 81904, at *25 (D. Mass 2015) (motion to intervene for the purpose of opposing leave to amend denied as moot after the Court denied underlying motion to amend).   The COFINA Senior Bondholder's motion to intervene is moot in light of the Court's conclusion that the PROMESA counts are not stayed.   Consequently, the COFINA Senior Bondholders' motion to intervene is denied.

### 4. Puerto Rico Funds and Major COFINA Bondholders

The Puerto Rico Funds and the Major COFINA Bondholders' respective motions to intervene raise similar arguments as to why each should be permitted to intervene as of right.   Specifically, both the Puerto Rico Funds and the Major COFINA Bondholders argue that they have an interest in the IVU revenues that back the COFINA bonds which they hold.   See Docket

Nos. 95 at p. 10 & 113 at p. 5.   They also argue that the
disposition of this litigation threatens to impair their interests
insofar as the GO Bondholders seek to divert IVU revenues to the
Commonwealth's treasury for the purpose of prioritizing payments
to the GO Bondholders at the expense of COFINA Bondholders.   See
Docket Nos. 95 at pp. 5-6 & 113 at 11.   Finally, the Puerto Rico
Funds and the Major COFINA Bondholders assert that no existing
party to this action can adequately represent their respective
interests.   See Docket Nos. 113 at 6-8 & 95 at 11.   It is only
this last point which the GO Bondholders contest in opposing the
Puerto Rico Funds and the Major COFINA bondholders' respective
motions to intervene.[15]   (Docket Nos. 146 & 155.)

        According to the GO Bondholders, COFINA Bondholders
"contractually delegated any right they may have had to participate
in this lawsuit to BYN[M] [Trustee], the trustee for their bonds."
(Docket Nos. 146 at p. 6 & 115 at p. 7.)   Thus, the GO Bondholders

---

[15] It is apparent to the Court that the COFINA bonds owned by the
Puerto Rico Funds and the Major COFINA Bondholders represent a
legitimate interest related to the subject matter of this case,
the disposition of which could potentially impair the Puerto Rico
Funds and the Major COFINA Bondholders' interest in the value of
their bonds.   Indeed, the GO Bondholders tacitly concede this
point, acknowledging that "[t]o the extent that the Court holds
that the Commonwealth's actions [with respect to IVU revenues]
violate federal and Puerto Rico law, [the Puerto Rico Funds and
the Major COFINA Bondholders] will have to surrender their . . .
privileged position among the Commonwealth's creditors." (Docket
Nos. 146 at pp. 3-4 & 155 at p. 3.)

contend, BNYM Trustee adequately represents the interests of all COFINA Bondholders, including the Puerto Rico Funds and the Major COFINA Bondholders. See Docket Nos. 146 at pp. 6-11 & 155 pp. 6-13.

The GO Bondholders' argument mirrors the failed argument they raised in opposition to Ambac's motion to intervene, relying on language set forth on the COFINA bonds and the Resolution these bonds cross-reference. As previously discussed, the COFINA bonds and the Resolution generally restrict COFINA Bondholders' ability to litigate disputes stemming from the Resolution. They do not, however, pose an absolute bar to their ability to defend against actions that have nothing to do with a dispute arising from the Resolution.

In any event, the Court is satisfied that the Puerto Rico Funds and the Major COFINA Bondholders have met their modest burden of showing that there is a possibility that no named defendant may adequately represent their interests. Conservation Law Found., Inc. v. Mosbacher, 966 F.3d 39, 44 (1st Cir. 1992) ("An intervenor need only show that representation may be inadequate, not that it is inadequate."). They have met this burden, if for no other reason, than that BNYM Trustee — the named defendant the GO Bondholders allege adequately represents the interests of the Puerto Rico Funds and the Major COFINA

Civil No. 16-2374 (FAB)                                           40

Bondholders—has moved to dismiss the second amended complaint on grounds that could result in BNYM Trustee being dismissed as a defendant.  See Docket No. 162.  Should BNYM Trustee prevail on its motion to dismiss, no COFINA Bondholder representative would remain as a litigant in this case unless the Court permits intervention.[16]

Because the Puerto Rico Funds and the Major COFINA Bondholders have satisfied each of the four requirements to intervene as of right, the Court will must allow them to intervene pursuant to Fed.R.Civ.P. 24(a)(2).[17]

## V.  Conclusion

For the reasons set forth above, the Court **DENIES** the Commonwealth Defendants' motion to stay (Docket No. 106), and the

---

[16] In deciding whether the Puerto Rico Funds and the Major COFINA Bondholders have made a showing of inadequate representation, the Court has not considered the extent to which either party could adequately represent the other's interest.  This is so because neither the Puerto Rico Funds nor the Major COFINA Bondholders were named parties at the time they filed their respective motions to intervene.  See Kellogg, 440 F.3d at 546 (observing that relevant inquiry as to whether a proposed intervenor has shown inadequate representation is limited to whether its interests are adequately represented by a "named party.").

[17] Even if the Puerto Rico Funds and the Major COFINA Bondholders were not entitled to intervene as of right pursuant to Fed.R.Civ.P. 24(a)(2), the Court would nonetheless permit them to intervene pursuant to Fed.R.Civ.P. 24(b) because their interest in COFINA bonds implicates at least one legal question shared in common with this litigation, namely, whether the use of IVU revenues to secure COFINA bonds is unlawful.  See Fed.R.Civ.P. 24(b)(2)(B).

COFINA Senior Bondholders motion to intervene (Docket No. 50). The Court **GRANTS** the motions to intervene of the Oversight Board (Docket No. 62), Ambac (Docket No. 55), the Puerto Rico Funds (Docket No. 95), and the Major COFINA Bondholders (Docket No. 113). To the extent the Oversight Board and Ambac have requested a stay of this action in their respective motions, the motions are **DENIED.**

       **IT IS SO ORDERED.**

San Juan, Puerto Rico, February 17, 2017.

s/ Francisco A. Besosa<br>
FRANCISCO A. BESOSA<br>
United States District Judge